2025-1694

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ASIA WHEEL CO., LTD.,

Plaintiff-Appellant,

ZC RUBBER AMERICA INC.,

Plaintiff,

v.

UNITED STATES,

Defendant-Appellee,

and

ACCURIDE CORP.,

Defendant-Appellee.

Appeal from the United States Court of International Trade
in Consol. Case No. 1:23-CV-00143
Judge Gary S. Katzmann

## OPENING BRIEF OF PLAINTIFF-APPELLANT

Jay C. Campbell
Ron Kendler
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellant Asia Wheel
Co., Ltd.

June 23, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1694

**Short Case Caption** Asia Wheel Co., Ltd. v. US

**Filing Party/Entity** Asia Wheel Co., Ltd. v. US

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/23/2025

Signature: /s/ Jay C. Campbell

Name: Jay C. Campbell

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Asia Wheel Co., Ltd. | | Zhejiang Jingu Co., Ltd., a publicly traded company in China, indirectly owns 99.99% of Asia Wheel Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Walter J. Spak, White & Case LLP | Chunfu Yan, White & Case LLP | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................. vii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE................................................................3

SUMMARY OF THE ARGUMENT ...................................................14

ARGUMENT .......................................................................................16

   I.     STANDARD OF REVIEW..................................................16

   II.    ARGUMENT.........................................................................17

       A.    Commerce's Unreasonable Interpretation of the Scope of the *AD/CVD Orders*, Erroneously Upheld by the CIT, Is Unsupported by Substantial Evidence ...........................................17

          1.    Commerce's interpretation of the scope based on the § 351.225(k)(1) primary interpretive sources is unsupported by substantial evidence ...................................18

             a.    Commerce determined in the AD/CVD investigations that truck wheels made in third countries with rims <u>or</u> discs from China (but not both) are outside the scope ...........................................19

             b.    Commerce recharacterized its *Final Issues and Decision Memo* from the AD/CVD investigations.........22

             c.    Conclusion ...................................................26

          2.    The CIT incorrectly upheld Commerce's finding that Thai Truck Wheels were within the scope of the *AD/CVD Orders*...................................................26

B.    Because Importers Did Not Receive Fair Warning of Retroactive AD/CVD Duties, Commerce Impermissibly Directed CBP To Continue To Suspend Liquidation of Imports Entered Before the Date of Initiation of the Scope Inquiry ........................................................................29

    1.    Importers did not receive fair warning that truck wheels produced in third countries from Chinese "rims or discs" were subject to the *AD/CVD Orders* and could be assessed duties..............................................30

    2.    The CIT erroneously concluded that Commerce provided fair warning.........................................35

    3.    Commerce unlawfully "continued" CBP's prior suspension of liquidation ....................................38

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................44

# TABLE OF AUTHORITIES

## CASES

Allegheny Bradford. Corp. v. United States,
    342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004)........................................17

Am. Silicon Techs. v. United States,
    334 F.3d 1033 (Fed Cir. 2003) ..........................................................16

Aspects Furniture Int'l Inc. v. United States,
    607 F. Supp. 3d 1246 (Ct. Int'l Trade 2022)........................................42

Bell Supply Co., LLC v. United States,
    888 F.3d 1222 (Fed. Cir. 2018) .........................................................21

Canadian Solar, Inc. v. United States,
    918 F.3d 909 (Fed. Cir. 2019) ..............................................37, 38, 40

Chr. Bjelland Seafoods A/S v. United States,
    19 CIT 35 (1995) ...........................................................................17

Consol. Edison Co. v. NLRB,
    305 U.S. 197 (1938)........................................................................16

Diamond Tools Technology LLC v. United States,
    545 F. Supp. 3d 1324 (Ct. Int'l Trade 2021)................................43, 44

Duferco Steel, Inc. v. United States,
    296 F.3d 1087 (Fed. Cir. 2002) ................................................... 17-19

DuPont Teijin Films USA v. United States,
    407 F.3d 1211 (Fed. Cir. 2005) .........................................................16

JTEKT Corp. v. United States,
    642 F.3d 1378 (Fed. Cir. 2011) .........................................................16

Meridian Prods., LLC v. United States,
    851 F.3d 1375 (Fed. Cir. 2017) ................................................... 17-19

Micron Tech. Inc. v. United States,
    117 F.3d 1386 (Fed. Cir. 1997) .........................................................16

Mid Continent Nail Corp. v. United States,
    725 F.3d 1295 (Fed. Cir. 2013) .............................................18, 32, 36

Smith Corona Corp. v. United States,
    915 F.2d 683 (Fed. Cir. 1990) ...........................................................19

Sunpreme Inc. v. United States,
    946 F.3d 1300 (Fed. Cir. 2020) .............................................39, 40, 43

Tai-Ao  Aluminum, Tai-Ao II,
    983 F.3d 495 ......................................................................passim

Target Corp. v. United States,
    609 F.3d 1352 (Fed. Cir. 2010) ..................................................16, 27

Trans Texas Tire LLC v. United States,
    519 F. Supp. 3d 1275; 519 F. Supp. 3d 1378 (Ct. Int'l Trade 2021).................32

USX Corp. v. United States,
    655 F. Supp. 487 (Ct. Int'l Trade 1987)............................................17

## STATUTES AND REGULATIONS

19 U.S.C. § 1516a(b)(1)(B)(i)...............................................................16

19 U.S.C. § 1517(4)(A)(i)...................................................................41

19 U.S.C. § 1517(a)(3)......................................................................41

19 U.S.C. § 1517(b)(4).......................................................................7

19 U.S.C. § 1517(b)(4)(A)................................................................39, 41

19 U.S.C. § 1517(c)(1)(A)...................................................................41

19 U.S.C. § 1517(e) ........................................................................40

19 U.S.C. § 1671e(a)(2).....................................................................31

19 U.S.C. § 1673e(a)(2).....................................................................31

19 C.F.R. § 351.225 ........................................................................18

19 C.F.R. § 351.225(b) .....................................................................19

19 C.F.R. § 351.225(k) ...........................................................................39

19 C.F.R. § 351.225(k)(1).......................................................................40

19 C.F.R. § 351.225(l) .............................................................................40

19 C.F.R. § 351.225(l)(3).........................................................................40

## LEGISLATIVE MATERIALS

Enforce and Protect Act of 2015,
    Pub. L. 114-125, 130 Stat. 122, 155, Feb. 24, 2016 ...................................passim

## ADMINISTRATIVE DETERMINATIONS

Aluminum Extrusions from the People's Republic of China,
    81 Fed. Reg. 15039 (Dep't Commerce Mar. 21, 2016) ................................32, 33

Certain Steel Wheels from the People's Republic of China,
    83 Fed. Reg. 17794 (Dep't Commerce Apr. 24, 2018) ("CVD Initiation").........3

Certain Steel Wheels from the People's Republic of China,
    83 Fed. Reg. 17798 (Dep't Commerce Apr. 24, 2018) ("AD Initiation") ...........3

Certain Steel Wheels from the People's Republic of China,
    84 Fed. Reg. 11744 (Dep't Commerce Mar. 28, 2019) (final CVD determ.)......6

Certain Steel Wheels from the People's Republic of China: Notice of Covered
    Merchandise Referral,
    86 Fed. Reg. 38270 (Dep't Commerce July 20, 2021).........................................8

Regulations to Improve Administration and Enforcement of Antidumping and
    Countervailing Duty Laws,
    86 Fed. Reg. 52300 (Dep't Commerce Sept. 20, 2021) .....................................18

## <u>STATEMENT OF RELATED CASES</u>

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiff-Appellant Asia Wheel Co., Ltd. ("Asia Wheel") makes the following statement:

1. No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2. The following actions pending before the Court of International Trade ("CIT") and before this Court may be directly affected by the Court's disposition of this appeal:

- *Asia Wheel Co., Ltd. v. United States* (Fed. Cir. Consol. Case No. 25-1689) (companion case); and

- *Vanguard. Natl. Trailer Corp. v. United States* (CIT Case No. 24-00034) (stayed pending outcome of this appeal).

## JURISDICTIONAL STATEMENT

The action filed by Plaintiff-Appellant Asia Wheel Co., Ltd. ("Asia Wheel") before the CIT, *Asia Wheel Co., Ltd. v. United States*, Ct. No. 23-00143, which resulted in this appeal, contested the Department of Commerce's ("Commerce" or the "Department") final scope ruling that certain truck wheels produced by Asia Wheel in Thailand fall within the scope of the antidumping duty ("AD") and countervailing duty ("CVD") orders on certain steel wheels 22.5 to 24.5 inches in diameter ("truck wheels") from the People's Republic of China ("China" or "PRC") ("*Final Scope Ruling*"). *See* Appx18-Appx52. The CIT had exclusive jurisdiction over Plaintiff-Appellant's Complaint under 28 U.S.C. § 1581(c).

On February 21, 2025, the CIT affirmed Commerce's *Final Scope Ruling*, and Plaintiff-Appellant timely filed its notice of appeal on April 21, 2025.

This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUES

**Issue 1:** Was Commerce's *Final Scope Ruling* that truck wheels produced in Thailand from Thai-origin rims and Chinese-origin discs fall within the scope of the AD and CVD orders on steel wheels from China unsupported by substantial evidence?

**Issue 2:** Did Commerce fail to provide fair warning to the importers of truck wheels produced in Thailand (using Thai-origin rims and Chinese-origin discs) of AD/CVD applicability, such that Commerce impermissibly directed U.S. Customs and Border Protection ("CBP" or "Customs") to continue to suspend liquidation of imports of the merchandise at issue entered before the date of initiation of the scope inquiry?

## STATEMENT OF THE CASE

**1.** *Commerce AD/CVD Investigations and Scope Determination*

Commerce initiated AD and CVD investigations of truck wheels from China on April 28, 2018, based on petitions filed by Accuride Corporation ("Accuride") and Maxion Wheels Akron LLC ("Maxion") (collectively, "Petitioners"). *Certain Steel Wheels from the People's Republic of China*, 83 Fed. Reg. 17798 (Dep't Commerce Apr. 24, 2018) ("*AD Initiation*"); *Certain Steel Wheels from the People's Republic of China*, 83 Fed. Reg. 17794 (Dep't Commerce Apr. 24, 2018) ("*CVD Initiation*").

A truck wheel consists of two main components: a rim and a disc. "The rim comprises the perimeter of the wheel and supports the tire when it is attached to the wheel, while the disc serves as the center portion of the wheel without the rim." Appx945. The rim and disc are "two primary components" of a finished truck wheel. *See id*. The image below depicts the disc, rim, and complete truck wheel (before the painting/coating process):



Appx121. The scope of the AD/CVD investigations included steel wheels, rims, and discs imported from China. *See AD Initiation*, 83 Fed. Reg. at 17802 and *CVD Initiation*, 83 Fed. Reg. at 17797.

At the time that Commerce initiated the AD and CVD investigations, the proposed scope of the investigations did not include language covering truck wheels, rims, or discs from China that undergo further processing in a third country. *See AD Initiation*, 83 Fed. Reg. at 17802; *CVD Initiation*, 83 Fed. Reg. at 17797. Subsequently, in December 2018, Petitioners proposed amending the scope to include the following language addressing "third-country-processing":

> The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of **rims and discs** to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the People's Republic of China.

Appx940-941 (emphasis added).

In response, mandatory respondent Zhejiang Jingu Company Limited ("Zhejiang Jingu"), an affiliate of Asia Wheel, argued that Chinese-origin rims and discs that are welded and painted in third countries should be considered outside the scope. *See* Appx78-79. In the alternative, Zhejiang Jingu argued that Petitioners' proposed language was "overly broad and vague, potentially expanding the scope to include other merchandise that also originates in third countries (*e.g.*, the language does not explicitly require that **both the rim <u>and</u> disc be produced in China** for

China to be considered the country of origin)." *See* Appx78 (emphasis added). Additionally, Xiamen Sunrise Wheel Group Co., Ltd. ("Sunrise"), the other Chinese mandatory respondent in the AD/CVD investigations argued that Petitioners' proposed scope clarification "{sought} to include imports of non-subject merchandise from other countries under the scope of these investigations." *Id.*

In its final issues and decision memoranda issued in the respective final AD and CVD determinations ("*Final Issues and Decision Memo*"),[1] Commerce decided that it could "properly frame the scope of the investigation and properly address issues concerning circumvention by incorporating the petitioners' proposed clarification of the scope," subject to a "minor change" in response to Zhejiang Jingu's comment. Appx81. Specifically, Commerce "agree{d} with Zhejiang Jingu that the proposed scope amendment should include further clarifying language." Appx82. Based on its understanding that Petitioners' proposed language was "requesting that **_rims and discs from China_** that have been further processed in a third country into finished steel wheels be included within scope{,}" Commerce "clarified the petitioners' proposed scope language to reflect the petitioners'

---

[1] Commerce included the same scope analyses in its final determination in the both the AD and CVD investigations. *Compare* Appx76-83 *with* Appx85-95. For ease of reference, this brief refers only to Commerce's analyses and decisions in the AD investigation.

intention." *Id.* (emphasis added). Specifically, Commerce added the "from China" requirement, as follows:

> The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of ***rims and discs from China*** to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China.

Appx79 (emphasis added). This amended scope language was included in the final AD/CVD determinations issued by Commerce in March 2019. *Certain Steel Wheels from the People's Republic of China*, 84 Fed. Reg. 11746, 11748 (Dep't Commerce Mar. 28, 2019) (final AD determ.); *Certain Steel Wheels from the People's Republic of China*, 84 Fed. Reg. 11744, 11746 (Dep't Commerce Mar. 28, 2019) (final CVD determ.) (collectively, "*Final AD/CVD Determinations*").

**2. *Asia Wheel's Production of Truck Wheels in Thailand***

Asia Wheel is a manufacturer and exporter of steel wheels located in Rayong, Thailand. Asia Wheel acquired the capability to produce truck wheels using only one component from China (discs) and began such production long before the *Final AD/CVD Determinations*. *See* Appx63 (describing the year Asia Wheel started truck wheel production), Appx115-122 (Production flowchart showing the years Asia Wheel acquired equipment for each production step).

To produce truck wheels, Asia Wheel imported rectangular steel plates from China and a third country, and performed multiple processing steps (including

coiling, butt-welding, planing, edge expansion, rolling, and hole punching) to convert the rectangular steel plates into rims.  Asia Wheel then assembled and welded the Thai-origin rims with discs imported from China to form truck wheels.  Finally, Asia Wheel painted the wheels per the customer's specification and packaged them for shipping.  *See* Appx115-122.

### 3. *EAPA Investigation*

On July 17, 2020, Petitioners filed an allegation with CBP pursuant to the Enforce and Protect Act of 2015, Pub. L. 114-125, 130 Stat. 122, 155, Feb. 24, 2016 ("EAPA"), alleging that Vanguard National Trailer Corp. ("Vanguard") evaded the *AD/CVD Orders* by importing truck wheels "produced by Chinese manufacturer {Zhejiang Jingu} that ***were transshipped through Jingu's affiliate in Thailand, {Asia Wheel}***, and entered into the United States as a product of Thailand . . . ." Appx144 (emphasis added); *see generally* Appx143-150.  In response, CBP initiated EAPA Case No. 7509 on August 18, 2020.  *See* Appx144.  Petitioners did not allege that Vanguard evaded the *AD/CVD Orders* by importing wheels produced in Thailand with only one Chinese-origin wheel component; nor did CBP initiate its EAPA investigation on that basis.  *See* Appx143-150.

As "interim measures," CBP suspended liquidation of Vanguard's imports of truck wheels from Asia Wheel with entry dates from August 18, 2020, and extended the liquidation period for each unliquidated entry that entered before that date,

***retroactively subjecting Vanguard's imports to AD and CVD liability in excess of***

***680%*** of the value of the imported merchandise. Appx150; *AD/CVD Orders*, 84

Fed. Reg. at 24098-24099.

On June 9, 2021, Commerce received from CBP a "covered merchandise

referral" under 19 U.S.C. § 1517(b)(4), because CBP was unable to determine

whether the truck wheels at issue in EAPA Case No. 7509 – "steel wheels {that}

were produced in Thailand using rims that did not originate in China" – were

"covered merchandise" (*i.e.*, subject to the *AD/CVD Orders*). *Certain Steel Wheels*

*from the People's Republic of China: Notice of Covered Merchandise Referral*, 86

Fed. Reg. 38270 (Dep't Commerce July 20, 2021) ("*Referral Notice*").

**4. *Commerce Scope Inquiry***

Before CBP issued its covered merchandise referral, Asia Wheel had

requested on November 11, 2020, that Commerce issue a scope ruling to confirm

that certain truck wheels Asia Wheel produced in Thailand were not covered by the

scope of the *AD/CVD Orders*. *See* Appx62. In particular, Asia Wheel asked

Commerce to confirm that truck wheels Asia Wheel produced in Thailand using the

following production method ("Thai Truck Wheels") are not covered by the scope

of the *AD/CVD Orders*.

- Asia Wheel produces rims in Thailand from rectangular steel plates sourced
  from China or a third country; welds the Thailand-produced rims to discs

sourced from China to form truck wheels; and paints the wheels per the customer's specification. Each step (including multiple steps within the rim-production process) uses specific machinery. *See* Appx115-122.

- To convert the steel plate into a rim, Asia Wheel:

    o Coils the rectangular steel plate to form a circle;

    o Welds the open butts of the steel ring into a closed steel ring;

    o Polishes the welded steel ring to remove slag from the surface;

    o Expands the outer sides of the polished steel ring for precise positioning during the subsequent rolling phases;

    o Rolls the steel rings in three stages, gradually forming the surface of the steel ring into the precise shape of the rim;

    o Adjusts the unfinished rim to the precise shape required for insertion of the disc; and

    o Punches a valve hole in the surface of the rim. *See id.*

The images below show the input rectangular steel plate compared to the output rim described above (*see id.*):

**Rectangular Steel Plate (input)**



Appx553.

**Rim (output)**



Appx565.

Asia Wheel did not request a scope ruling from Commerce because it thought that Thai Truck Wheels were potentially covered by the scope of the *AD/CVD Orders*. Rather, Asia Wheel requested a scope ruling because it needed Commerce to confirm that the products were outside the scope for CBP, since CBP had initiated EAPA Case. No. 7509 concerning the same wheels imported from Thailand.

Commerce initiated a scope inquiry in response to Asia Wheel's request on May 12, 2021. *See* Appx195-196. During the inquiry, Commerce issued supplemental questionnaires, and Asia Wheel responded. Commerce also announced in the initiation notice that it would "address {CBP's} covered merchandise referral and Asia Wheel's scope ruling request in the ongoing scope inquiries of the *Orders*." *Referral Notice*, 86 Fed. Reg. at 38271.

Commerce issued the preliminary scope ruling on December 13, 2022. *See* Appx1779. Therein, Commerce preliminarily found that Thai Truck Wheels are within the scope of the *AD/CVD Orders*. *Id.* In its preliminary scope ruling, Commerce denied that it had determined in the original AD/CVD investigations that only truck wheels produced in a third country with ***both*** rims ***and*** discs from China are covered by the scope of the *AD/CVD Orders*. *See* Appx1789-1790.

On January 9, 2023, Asia Wheel filed a case brief in the scope proceeding. *See* Appx1837. In relevant part, Asia Wheel ***first*** argued that the scope of the *AD/CVD Orders*, as interpreted by Commerce during the original AD/CVD investigations in the *Final Issues and Decision Memo*, does not include truck wheels made in a third country using only discs from China. Appx1848-1852. ***Second***, Asia Wheel argued that, in the event of an affirmative final scope ruling, Commerce should direct CBP to commence suspension of liquidation no earlier than the date of the preliminary scope ruling (December 13, 2022), and discontinue any prior suspension imposed

by CBP, because importers lacked adequate notice that Thai Truck Wheels were covered by the scope of the *AD/CVD Orders* until that date. Appx1869-1874.

ZC Rubber America Inc. ("ZC Rubber"), an importer of Thai Truck Wheels and interested party to the scope inquiry, also submitted a case brief making the same or similar arguments. *See* Appx1879-1888.

On June 7, 2023, more than two years after it had initiated the scope inquiry and after having given itself **sixteen** extensions of the deadline, *see* Appx1941, Commerce issued the *Final Scope Ruling*. Commerce continued to find that Thai Truck Wheels are subject to the scope of the *AD/CVD Orders*. *See* Appx51.

Commerce found that the "plain language of the scope is ambiguous" as to whether such wheels – where only one of the two components (the discs) was from China – are subject to the scope of the *AD/CVD Orders*. Appx26. Commerce further stated that it "intend{ed} to instruct CBP to continue the suspension of liquidation for products found to be covered by the scope of the *Orders* if already suspended." Appx44. Commerce added that, "if liquidation of entries of such products is not already suspended, {it} intend{ed} to instruct CBP to suspend liquidation of entries of products found to be covered by the scope of the *Orders* effective to the date {it} initiated an inquiry upon Asia Wheel's Scope Ruling Request" (*i.e.*, May 12, 2021). *Id.*

**5. *CBP EAPA Determination***

In August 2023, after Commerce issued the *Final Scope Ruling*, CBP issued an affirmative duty evasion determination, for which Vanguard requested administrative review per 19 C.F.R. § 165.41. *See* CBP, Notice of Determination as to Evasion – EAPA Case Number 7509 (Aug. 21, 2023). Based upon its administrative review, CBP affirmed the agency's affirmative evasion determination on December 22, 2023. *See* CBP, H334791, Enforce and Protect Act ("EAPA") Case Number 7509 (Dec. 22, 2023). Vanguard appealed CBP's affirmative evasion determination to the CIT in February 2024, and the CIT granted a stay of that appeal (CIT Court No. 24-00034) pending final resolution of the present action addressing Commerce's *Final Scope Ruling*.

**6. *CIT Appeal and Decision***

Asia Wheel appealed the *Final Scope Ruling* to the CIT in July 2023. In February 2025, the CIT affirmed Commerce's *Final Scope Ruling*. *See generally* Appx1-17. This appeal followed.

## SUMMARY OF THE ARGUMENT

**Issue 1: Commerce's Determination that Thai Truck Wheels Are Covered by the *AD/CVD Orders* on Certain Steel Wheels from China Is Unsupported by Substantial Evidence.**

Commerce's determination that truck wheels produced in Thailand from Thai-origin rims and Chinese-origin discs fall within the scope of the *AD/CVD Orders* on certain steel wheels from China is unsupported by substantial evidence. In its *Final Issues and Decision Memo* in the original investigations, Commerce was clear: only wheels produced in third countries from Chinese-origin rims **and** discs are subject to the scope of the *AD/CVD Orders*. In later backtracking and concluding that Asia Wheel's Thai Truck Wheels – which are produced in Thailand using Thai-origin rims and Chinese-origin discs – fall within the scope of the *AD/CVD Orders*, Commerce disregarded and recharacterized its reasoning and conclusion from the *Final Issues and Decision Memo*. Consequently, Commerce's *Final Scope Ruling* is unsupported by substantial evidence. Similarly, in affirming the *Final Scope Ruling*, the CIT misread Commerce's *Final Issues and Decision Memo* from the original investigations, relying on isolated statements out of context. Consequently, the CIT's decision should not be affirmed.

**Issue 2: Commerce Impermissibly Directed CBP To Apply AD/CVD to Thai Truck Wheels Retroactively Without Fair Warning in Violation of Due Process.**

Commerce failed to provide fair warning to importers that Thai Truck Wheels produced in Thailand using only one Chinese-origin component (discs) were covered by the *AD/CVD Orders* on certain steel wheels from China. Commerce may not lawfully suspend liquidation retroactively and collect AD/CVD cash deposits for entries that entered prior to the initiation of a scope inquiry without having previously provided "adequate notice" of AD/CVD liability. In the original investigations, Commerce agreed with the Chinese respondents that truck wheels produced in third countries fall within scope *only if* both the rims *and* discs originate from China. Consequently, Commerce failed to provide fair warning to importers that truck wheels produced in third countries from rims *or* discs from China (but not both) are covered by the *AD/CVD Orders*. Commerce's authority to determine whether *and when* a product is within the scope of an order is necessarily subject to the due-process requirement of providing fair warning before AD/CVD applicability. Because Commerce failed to provide adequate notice to importers that Thai Truck Wheels are covered, Commerce impermissibly directed CBP to continue to suspend liquidation of imports entered before the date of initiation of the scope inquiry.

# ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews the CIT's rulings *de novo*, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted). It does so "without affording any deference to the Court of International Trade . . . ." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed Cir. 2003) (citation and internal quotation marks omitted). The Court "shall hold unlawful" a Commerce final scope determination if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Micron Tech. Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether Commerce's conclusions are based on substantial evidence, the Court must consider "the record as a whole, including {evidence} which fairly detracts from {the} weight" of Commerce's conclusions. *Target Corp. v. United States*, 609 F.3d 1352, 1358 (Fed. Cir. 2010) (internal quotation marks and citation omitted). A determination based on inadequate reasoning cannot survive the "substantial evidence" standard of review.

*See Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 37 (1995) (citing *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987)).

As concerns judicial review of Commerce's scope rulings, "the question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that {the court} review{s} de novo." *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (citing *Allegheny Bradford. Corp. v. United States*, 342 F. Supp. 2d 1172, 1183 (Ct. Int'l Trade 2004)). The separate "question of whether a product meets the . . . scope terms presents a question of fact reviewed for substantial evidence." *Meridian Prods.*, 851 F.3d at 1382.

## II.  ARGUMENT

### A.  Commerce's Unreasonable Interpretation of the Scope of the *AD/CVD Orders*, Erroneously Upheld by the CIT, Is Unsupported by Substantial Evidence

"Scope orders may be interpreted as including {specific} merchandise only if they contain language that specifically includes {that} merchandise or may be reasonably interpreted to include it." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002).  Commerce confirmed in the original investigations that the scope of the *AD/CVD Orders* requires that **both** the rims **and** the discs must originate from China for a truck wheel assembled in a third country to fall within the scope.  Despite this, Commerce unreasonably backtracked in the *Final Scope Ruling*,

claiming that wheels manufactured in third countries with either rims or discs that originated in China are within the scope of the *AD/CVD Orders*. Commerce's interpretation of the scope language in the *Final Scope Ruling* is unsupported by substantial evidence. Likewise, the CIT's affirmance of that interpretation is based on a misreading of Commerce's *Final Issues and Decision Memo* from the original investigations and should be vacated or reversed.

**1.** **Commerce's interpretation of the scope based on the § 351.225(k)(1) primary interpretive sources is unsupported by substantial evidence**

Commerce determines whether a product is covered by the scope of an order in accordance with 19 C.F.R. § 351.225(k).[2] The starting point for Commerce's analysis is the scope language itself. *See Meridian*, 851 F.3d at 1381; *see also Duferco*, 296 F.3d at 1097. If "the language is ambiguous, Commerce must . . . consider . . . the so-called '(k)(1) materials': '{t}he descriptions of the merchandise contained in the petition, Commerce's initial investigation, and the prior determinations of Commerce (including prior scope determinations) and the International Trade Commission.'" *Mid Continent Nail Corp. v. United States*, 725

---

[2] Commerce amended 19 C.F.R. § 351.225, effective November 4, 2021. Appx19 n.4 (citing *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52300 (Dep't Commerce Sept. 20, 2021)). As Commerce explained, however, "because Asia Wheel filed its scope ruling request on November 11, 2020," the pre-amendment version of 19 C.F.R. § 351.225 applies to Commerce's *Final Scope Ruling* and is discussed throughout this brief. *Id.*

F.3d 1295, 1302 (Fed. Cir. 2013) (citations, internal quotation marks and brackets omitted); 19 C.F.R. § 351.225(k)(1); *see also Meridian*, 851 F.3d at 1382; *Duferco*, 296 F.3d at 1097; *Smith Corona Corp. v. United States*, 915 F.2d 683, 685 (Fed. Cir. 1990). "Commerce's analysis of these sources against the product in question produces factual findings reviewed for substantial evidence." *Meridian*, 851 F.3d at 1382. Here, contrary to an unequivocal record, Commerce unreasonably denied having confirmed in its *Final Issues and Decision Memo* from the original investigations that wheels manufactured in third countries with only one wheel component (rims or discs) originating from China are outside the scope.

### a. Commerce determined in the AD/CVD investigations that truck wheels made in third countries with rims *or* discs from China (but not both) are outside the scope

Commerce's scope determination in the original investigations – consideration of which is required under 19 C.F.R. § 351.225(k)(1) – demonstrates that both the rims and discs must originate in China for steel wheels assembled in third countries to fall within the scope of the *AD/CVD Orders*.

During the AD/CVD investigations, Petitioners requested a clarification of the scope, proposing that Commerce include the following third-country-provision language:

> The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of **rims _and_ discs** to form a steel wheel, or any other processing that

would not otherwise remove the merchandise from the scope of the investigations if performed in the People's Republic of China.

Appx940-941 (emphasis added).  Zhejiang Jingu argued that Petitioners' proposed scope language was "overly broad and vague, potentially expanding the scope to include other merchandise that also originates in third countries (*e.g.*, the language does not explicitly require that ***both the rim <u>and</u> disc be produced in China*** for China to be considered the origin)."  *See* Appx78 (emphasis added).

In response, Commerce stated that it "***agree{d} with Zhejiang Jingu*** that the proposed scope amendment should include further clarifying language."  Appx82 (emphasis added).  Consequently, based on its understanding that Petitioners were "requesting that ***rims and discs from China*** that have been further processed in a third country into finished steel wheels be included within scope{,}" *id.*, Commerce added the "from China" requirement to Petitioners' proposed third-country-processing language, as follows:

> The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of ***rims and discs <u>from China</u>*** to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China.

Appx79 (emphasis added).  By doing so, Commerce conveyed its agreement with Zhejiang Jingu that, absent such language ("from China"), the *AD/CVD Orders* would be expanded beyond Petitioners' stated intent, impermissibly capturing steel wheels that originate in third countries (not China).

Although Commerce mentioned in passing its authority to examine the issue of third-country processing using a substantial transformation analysis (*i.e.*, "Commerce has relied on a substantial transformation analysis to address country-of-origin issues, {but} the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case"), this unremarkable comment did not detract from its conclusion that third-country wheels produced from rims *or* discs from China (but not both) components are outside the scope of the *AD/CVD Orders*. *See* Appx9. Commerce *always* has authority to conduct a scope ruling and perform a substantial transformation analysis to address a particular fact pattern. 19 C.F.R. § 351.225(b), (c) (providing that Commerce may self-initiate a scope inquiry or initiate a scope inquiry based on an application by an interested party); *cf. Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 1230 (Fed. Cir. 2018) ("Commerce is entitled to use the substantial transformation analysis to determine whether an imported article is covered by AD or CVD orders in the first instance."). Commerce added nothing to its interpretation of the scope by recognizing its inherent authority. Commerce's superfluous reference to its ability to conduct a substantial transformation analysis as part of a scope inquiry does not affect its unequivocal decision that "rims ***and*** discs from China that have been further processed into finished steel wheels" are "included within scope" – not third-country wheels made from rims *or* discs (but not both) from China. Appx82 (emphasis added).

For these reasons, Commerce's scope determination in the AD/CVD investigations leads to the unavoidable conclusion that the agency interpreted the third-country-processing provision to mean that truck wheels manufactured in a third country with rims *or* discs from China – but not both – are outside the scope of the *AD/CVD Orders*. Any conclusion otherwise is unsupported by substantial evidence.

### b. Commerce recharacterized its *Final Issues and Decision Memo* from the AD/CVD investigations

Despite its interpretation of the third-country-processing provision in the original AD/CVD investigations and continued use of the phrase "rims *and* discs from China" (which unambiguously does not mean "rims *or* discs from China") in the scope description, Commerce concluded in the *Final Scope Ruling* that the scope of the *AD/CVD Orders* is "ambiguous" as to coverage of finished wheels manufactured in a third country using rims or discs (but not both) from China. *See* Appx26. In doing so, Commerce offered three flawed justifications for its newfound position – none of which is supported by substantial evidence.

First, Commerce claimed to have rejected the interpretation advanced by the Chinese respondents that the third-country processing provision includes only wheels made in third country from rims *and* discs from China. *See id.* ("we declined to clarify the scope language as requested by the respondents . . . in the underlying investigations beyond the merchandise subject to those investigations"). Appx26. Commerce's claim, however, is impossible to reconcile with its handling of the

third-country-processing provision during the original AD/CVD investigations, as recounted above in **Section II.A.1.a**.

In particular, Commerce "***agree{d} with Zhejiang Jingu*** that the proposed scope amendment should include further clarifying language{,}" and therefore added "from China" to Petitioners' proposed third-country-processing provision to clarify that "***rims and discs from China*** that have been further processed in a third country into finished steel wheels be included within scope." Appx82 (emphases added). Moreover, Commerce made this change in response to Zhejiang Jingu's argument that, absent such language ("from China"), the *AD/CVD Orders* would be expanded beyond Petitioners' stated intent, impermissibly capturing steel wheels that originate in third countries (not China). *See* Appx78, Appx82. Commerce's claim in the *Final Scope Ruling* is unreasonable and, thus, unsupported by substantial evidence.

Second, Commerce asserted that the "including, but not limited to" language of the third-country-processing provision means that wheels made in third countries from rims or discs from China were not necessarily excluded from the scope. *See* Appx27; *see also* Appx1789 ("The 'including, but not limited' clause indicates that the 'welding and painting of rims and discs from China to form a steel wheel' are non-exhaustive examples of included processing."). While the "including, but not limited to" phrase indicates the scope ***may*** include scenarios of third-country

processing of Chinese-origin rims, discs, and wheels beyond those provided as examples in the scope language, Commerce specifically addressed the question of wheels made in third countries from rims *or* discs from China in the *Final Issues and Decision Memo*.

In fact, Commerce implemented Zhejiang Jingu's request to clarify the scope language to "explicitly require that both the rim and disc be produced in China for China to be considered the country of origin . . . ." Appx78, Appx82. In light of its *Final Issues and Decision Memo* from the original AD/CVD investigations, Commerce's contrary conclusion in the *Final Scope Ruling* that the "including, but not limited to" phrase could be interpreted to cover steel wheels assembled in third countries with rims *or* discs from China is unreasonable and unsupported by substantial evidence.

Third, Commerce contended that it deferred the question of whether the scope covers wheels made in third countries from rims *or* discs (but not both) from China in the underlying AD/CVD investigations for resolution in a future scope or circumvention inquiry. *See* Appx26-27. According to the *Final Scope Ruling*, in the original AD/CVD investigations:

> Commerce did not automatically exclude an array of products, such as steel wheels assembled in a third country of Chinese-origin and third country components. Instead, Commerce explained that it considered the most appropriate resolution to the question to be an evaluation of specific examples on a case-by-case basis in the context of future scope or circumvention inquiries, in consideration of information regarding

> substantial transformation, if appropriate. As stated in the Final Determinations, "{w}hile in some instances Commerce has relied on a substantial transformation analysis to address country-of-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case."

Appx26 (citing Appx81). Again, however, Commerce mischaracterizes the original investigation record. In the final determinations of the AD/CVD investigations, Commerce declined to conduct a substantial transformation analysis to determine the country of origin for steel wheels assembled and painted in third countries using *Chinese-origin rims and discs*. *See* Appx77-78, Appx80-81. Commerce decided that it could include such wheels in the scope – without conducting a substantial transformation analysis – "by incorporating the petitioners' proposed clarification of the scope" (*i.e.*, by incorporating the "welding and painting of *rims and discs from China* to form a steel wheel" language). *See* Appx 80-81.

Commerce did not state – or even suggest – that it was deferring the question of whether the *AD/CVD Orders* include "steel wheels assembled in a third country of Chinese-origin and third country components." To the contrary, as discussed above, Commerce agreed with Zhejiang Jingu that the scope should be clarified further to avoid including such third-country wheels contrary to Petitioners' stated intent. Consequently, this assertion is also unsupported by substantial evidence.

### c. Conclusion

To produce Thai Truck Wheels, Asia Wheel manufactures rims in Thailand from rectangular steel plates, welds the Thai-origin rims to Chinese-origin discs, and coats the assembled wheel. *See* Appx115-122. Asia Wheel manufactures Thai Truck Wheels in Thailand using Thai-origin rims and Chinese-origin discs – not "rims and discs from China." Consequently, consistent with Commerce's interpretation of the third-country-processing provision in the *Final Issues and Decision Memo* from the original AD/CVD investigations, Asia Wheel's Thai Truck Wheels are outside the scope of the *AD/CVD Orders*. Commerce's conclusion in the *Final Scope Ruling* that the scope is ambiguous on this point is unsupported by substantial evidence.

### 2. The CIT incorrectly upheld Commerce's finding that Thai Truck Wheels were within the scope of the *AD/CVD Orders*

In affirming Commerce's *Final Scope Ruling*, the CIT made various incorrect conclusions, based on isolated instances in which it misread Commerce's *Final Issues and Decision Memo* from the original investigations. The CIT's conclusions should not be affirmed. Commerce interpreted the third-country-processing provision to exclude "rims or discs from China" wheels in the original AD/CVD investigations, and continued to use the phrase "rims and discs from China" (which unambiguously does not mean "rims or discs from China") in the scope description. In addition, the substantial evidence standard of review requires the court to consider

"the record as a whole, including {evidence} which fairly detracts from {the} weight" of Commerce's conclusions. *Target*, 609 F.3d at 1358 (internal quotation marks and citation omitted). Here, the CIT selectively relied on isolated statements in the *Final Issues and Decision Memo* out of context, thereby rendering its judgment – like Commerce's below – unsustainable.

First, the CIT ignored relevant context to conclude that, in the original investigations, Commerce indicated that third-country wheels produced from rims or discs (but not both) from China could fall within the scope of the *AD/CVD Orders*. For example, the CIT concluded that, by refusing to accept Zhejiang Jingu's proposed revisions to the third-country processing provision during the original investigations, "Commerce communicated that . . . it would not address the inclusion of wheels produced from mixed-origin components." Appx8. This is not, however, what Commerce said in response to the proposed revision. To the contrary, Commerce "*agree{d} with Zhejiang Jingu* that the proposed scope amendment should include further clarifying language{,}" and therefore added "from China" to Petitioners' proposed third-country-processing provision to clarify that "*rims and discs from China* that have been further processed in a third country into finished steel wheels be included within scope." Appx82 (emphases added). Commerce made this change in response to Zhejiang Jingu's argument that, absent such language ("from China"), the *AD/CVD Orders* would be expanded beyond

Petitioners' stated intent, impermissibly capturing steel wheels that originate in third countries (not China). *See* Appx78, Appx82. Consequently, Commerce **agreed** at the time that steel wheels assembled in third countries with rims or discs (but not both) from China were outside the scope.

Second, the CIT ignored Commerce's explicit statements in the *Final Issues and Decision Memo* indicating that third-country wheels produced from rims or discs from China (but not both) are outside the scope of the *AD/CVD Orders*. The CIT erroneously concluded that Commerce "deferred the issue of wheels produced from {rims or discs from China (but not both)} and noted that further analysis would be necessary on a case-by-case basis." Appx8. Yet, contrary to the CIT's misreading of the record, Commerce found that the existing language – including the "minor change" of "from China" – made clear that only "rims and discs from China that have been further processed in a third country" fall within the scope of the *AD/CVD Orders*. Appx81-82.

Finally, the CIT otherwise misread Commerce's *Final Issues and Decision Memo* from the original investigations. For example, the CIT concluded that "Commerce declined to conduct a preemptive substantial transformation analysis" in light of its view that "the decision to conduct {a substantial transformation} analysis is contingent upon the facts and circumstances of a particular case." Appx4, Appx8 (quoting *Final Issues and Decision Memo*, Appx81). Although Commerce's

discussion does state as much, nowhere does Commerce connect that statement to the conclusion that a scope determination on third-country wheels produced from rims or discs from China (but not both) would be inappropriate. *See id.* To the contrary, Commerce stated that it could "properly address issues concerning circumvention by incorporating the petitioner's proposed clarification of the scope, subject to the minor change discussed further below" (*i.e.*, specifying that only rims **and** discs **from China** are subject to the scope of the *AD/CVD Orders*). *See id.*, Appx81-82.

Because the CIT misread Commerce's analysis in the original AD/CVD investigations, its affirmance of the *Final Scope Ruling* – which is unsupported by substantial evidence – should not be affirmed.

**B. Because Importers Did Not Receive Fair Warning of Retroactive AD/CVD Duties, Commerce Impermissibly Directed CBP To Continue To Suspend Liquidation of Imports Entered Before the Date of Initiation of the Scope Inquiry**

The issue here is whether importers did not receive fair warning that the scope of the *AD/CVD Orders* could reasonably be interpreted to include wheels produced in a third country using rims or discs from China (but not both) in light of Commerce's confirmation in the *Final Issues and Decision Memo* from the original investigations that the scope of the *AD/CVD Orders* did not include such products. The answer is "yes" – importers lacked fair warning. Consequently, Commerce impermissibly directed CBP to continue to suspend liquidation of imports entered

before the date of initiation of the scope inquiry – retroactively subjecting importers to crippling AD/CVD in excess of 680% of the entered value.  In the event that the Court sustains Commerce's ruling that third-country wheels made with rims or discs from China are within the scope of the *AD/CVD Orders*, we respectfully ask the Court to remand the *Final Scope Ruling* and order Commerce to instruct CBP that suspension of liquidation and AD/CVD duties can only be collected on entries of Thai Truck Wheels that entered on or after May 12, 2021, the date of initiation of the underlying scope inquiry.

      **1.**      **Importers did not receive fair warning that truck wheels produced in third countries from Chinese "rims or discs" were subject to the *AD/CVD Orders* and could be assessed duties**

Commerce wrongly concluded in the *Final Scope Ruling* that its *Final Issues and Decision Memo* from the original AD/CVD investigations could reasonably be interpreted as providing adequate notice that Thai Truck Wheels were covered by the scope of the *AD/CVD Orders*.  *See* Appx18-52.

As acknowledged by the CIT below, an "antidumping and countervailing duty order must contain 'a description of the subject merchandise, in such detail as the administering authority deems necessary,' to provide adequate notice to the relevant importers. 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2)." Appx12.  Commerce may not retroactively suspend liquidation and collect cash deposits for entries that entered prior to the initiation of a scope inquiry without having provided "adequate notice"

of AD/CVD liability.  *See Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487, 495 (Fed. Cir. 2020) ("*Tai-Ao II*"); *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300–01 (Fed. Cir. 2013).  To determine whether an interested party has "adequate notice" prior to initiation of a scope inquiry, the court inquires whether the scope of the orders "may be reasonably interpreted to include" the products at issue.  *Mid Continent*, 725 F.3d at 1301; Appx12.

In *Tai-Ao II*, this Court reaffirmed the "broader due-process principle" that Commerce must provide fair warning of potential AD or CVD liability before liquidation of entries can be suspended.  *Tai-Ao II*, 983 F.3d at 495.  In doing so, this Court made clear that the "notice requirement is designed to avoid unfairness to importers and foreign exporters."  Although *Tai-Ao* involved a circumvention proceeding, there is no indication in the decision that critical due process protection regarding scope is only required in a circumvention proceeding.  Indeed, the CIT expressly found that *Tai-Ao* is not limited to the circumvention context and applies when Commerce revisits the scope of AD/CVD orders.  *Trans Texas Tire LLC v. United States*, 519 F. Supp. 3d 1275, 1287-88 (Ct. Int'l Trade 2021); *Trans Texas Tire LLC v. United States*, 519 F. Supp. 3d 1378, 1304-05 (Ct. Int'l Trade 2021).

Rather, the *Tai-Ao* case stands for the "broader due-process principle" that Commerce must not impose AD/CVD liability retroactively without having provided "fair warning" to importers.  *Tai-Ao II*, 983 F.3d at 495; *Tai-Ao Aluminum*

*(Taishan) Co. v. United States*, 391 F. Supp. 3d 1301, 1314-15 (Ct. Int'l Trade 2019) ("*Tai-Ao I*"). Moreover, *Tai-Ao* confirms that Commerce's statements of intent to consider the potential application of AD/CVD in the future do not, by themselves, constitute fair notice. *See Tai-Ao*, 391 F. Supp. 3d at 1314–15; *Tai-Ao II*, 983 F.3d at 495.

The *Tai-Ao* facts confirm the lack of warning here, because Commerce – at most – suggested in the *Final Scope Decision Memo* that it might in the future revisit its finding that rims and discs must be from China for AD/CVD to apply based on a substantial transformation analysis.

In *Tai-Ao*, Commerce was found to have unlawfully assessed AD/CVD retroactively on entries of "5050-grade" aluminum extrusions from China imported by Tao-Ao Aluminium (Taishan) Co. ("Tai-Ao"). Tai-Ao was not identified as a company covered by the circumvention inquiry as initiated, which covered only Zhongwang Holdings Ltd. ("Zhongwang"). *Aluminum Extrusions from the People's Republic of China*, 81 Fed. Reg. 15039, 15039 (Dep't Commerce Mar. 21, 2016) ("*Tai-Ao Initiation Notice*").

As to companies other than Zhongwang, the *Tai-Ao Initiation Notice* said only that: "The Department **intends to consider** whether the inquiry should apply to all imports of extruded aluminum products that meet the chemical specifications for 5050-grade aluminum alloy and are heat-treated, regardless of producer, exporter,

or importer, from the PRC." *Id.* at 15042 (emphasis added). This Court found that such a statement of intent did not confer "fair warning" unless and until Commerce actually applied AD/CVD to companies other than Zhongwang. *Tai-Ao II*, 983 F.3d at 494-95 ("A statement of intention to 'consider whether the inquiry should apply to all imports' is not the same as a notice that such imports are within the scope of the inquiry.").

Here, the lone sentence in Commerce's *Final Scope Decision Memo* (*i.e.*, "Commerce has relied on a substantial transformation analysis to address country-of-origin issues, {but} the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case{,}" Appx81) – which, at most, suggested that Commerce might revisit the question of substantial transformation and third-country wheels made from a "mix of rim and disc parts from China and a third country" in the future – was nothing more than the "inten{t} to consider" found insufficient in *Tai-Ao. Tai-Ao Initiation Notice*, 81 Fed. Reg. at 15039. Commerce plainly found that only wheels comprised of rims and discs from China were in-scope; for wheels comprised of rims or discs from China, Commerce provided the antithesis of fair warning. The investigation record does not support the CIT's basis to distinguish *Tai-Ao*, because it cannot reasonably be concluded that Commerce's unremarkable reference to its authority to address substantial issues served as

adequate notice that truck wheels produced in a third country from rims or discs (but not both) are within the scope of the *AD/CVD Orders*.

To the contrary, Commerce indicated in the *Final Issues and Decision Memo* that that wheels produced in a third country from rims or discs from China (but not both) are outside the scope, explaining that:

> {W}e agree with Zhejiang Jingu that the proposed scope amendment should include further clarifying language. The scope of this investigation makes clear that steel wheels, discs, and rims from China are covered by the scope. However, we understand the petitioners' statements in their scope comments filed in December 2018 to be requesting that **rims *and* discs from China** that have been further processed in a third country into finished steel wheels be included within scope. We have, therefore, clarified the petitioners' proposed scope language to reflect the petitioners' intention.

Appx82 (emphasis added). Against this clear statement quoted above, the *Final Scope Ruling* points to **one sentence** that Commerce claims provided adequate notice that Thai Truck Wheels are covered by the *AD/CVD Orders*: "While in some instances Commerce has relied on a substantial transformation test to address country-of-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case." Appx44-45 (quoting Appx81). Yet, as noted above, *see* **Section II.A.1.a** *supra*, Commerce **always** has the authority to conduct a scope inquiry and perform a substantial transformation analysis. *See* 19 C.F.R. § 351.225(b), (c). Consequently, a reference to such inherent authority is not fair warning.

To summarize, Commerce's *Final Issues and Decision Memo* in the original AD/CVD investigations confirmed that truck wheels produced in a third country using rims or discs from China (but not both) are out-of-scope. Because the scope could not reasonably be interpreted as covering the wheels at issue prior to May 12, 2021 (the date of initiation of the underlying scope inquiry), interested parties lacked adequate notice up until that date. *See Mid Continent*, 725 F.3d at 1300. Moreover, even if the *Final Issues and Decision Memo*'s line that a substantial transformation analysis "is contingent upon the facts and circumstances of a particular case" could somehow be construed to mean that Commerce was deferring the question of wheels made in third countries from rims or discs from China (but not both), a stated intention to consider whether merchandise is subject to an AD/CVD order in the future fails to provide adequate notice. *See Tai-Ao II* at 495 ("A statement of intention to 'consider whether the inquiry should apply to all imports' is not the same as a notice that such imports are within the scope of the inquiry."). Simply put, importers did not receive adequate notice.

### 2. The CIT erroneously concluded that Commerce provided fair warning

The CIT wrongly held that Commerce provided fair warning to importers that truck wheels produced in third countries with rims or discs from China (but not both) are covered by the scope of the *AD/CVD Orders* on steel wheels from China. The CIT offered two main reasons for concluding that Commerce had provided adequate

notice, each of which is either inconsistent with the *Final Issues and Decision Memo* or binding case law.

First, the CIT stated that the "existence of some ambiguity in scope language does not mean that notice is inadequate as to products requiring substantial transformation to determine country of origin, as it is impractical to require Commerce to anticipate every type of third-country processing." Appx13. The CIT's statement overlooks that Commerce was asked to address the specific issue of third-country wheels comprised of rims or discs from China (but not both) in the original AD/CVD investigations and did so. *See supra* **Section II.A.1.a**. Consequently, contrary to the CIT's reasoning, this is not a situation of asking "Commerce to anticipate every type of third-country processing." *Id.*

Second, the CIT cited *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 921–22 (Fed. Cir. 2019) for the proposition that it "is unnecessary for Commerce to engage in a game of whack-a-mole when it may reasonably define the class or kind of merchandise in a single set of orders, and within the context of a single set of investigations, to include all imports causing injury." Appx13. *Canadian Solar*, however, is inapposite. *Canadian Solar* involved original investigations in which Commerce used a country of assembly test to determine country of origin instead of its usual substantial transformation test. *See Canadian Solar*, 918 F.3d at 919. This Court held that Commerce provided a reasoned explanation for using a different

country-of-origin test and that the test was permissible. *See id.* at 920-21. Here, in contrast, Commerce addressed in the *Final Issues and Decision Memo* whether the scope included third-country wheels made with rims or discs from China (but not both) and determined that such wheels are outside the scope. Consequently, this case does not give rise to a "whack-a-mole" situation at all. Nor does the instant action involve Commerce's determination of the scope in an original investigation, in which Commerce has the authority to define a scope so as to prevent circumvention. *See Canadian Solar*, 918 F.3d at 921-22. Rather, the current appeal challenges a *Final Scope Ruling* issued *after* imposition of the *AD/CVD Orders* and Commerce's unlawful decision to impose retroactive AD/CVD liability without having given importers fair warning that Thai Truck Wheels were within scope.

To be clear, Plaintiff-Appellant does not contest Commerce's authority to clarify the scope – provided it does not change the scope and the scope language may reasonably be interpreted to include the products in question. Rather, the issue in this case concerns *when* AD/CVD liability may begin to attach. Liability cannot attach retroactively without fair warning. Here, importers had the *opposite* of fair warning because of Commerce's indication in the *Final Issues and Decision Memo* that third-country wheels made with rims or discs from China (but not both) are outside the scope. Sustaining the CIT's decision on this issue would be inconsistent with this Court's binding precedent in *Tai-Ao II*.

### 3. Commerce unlawfully "continued" CBP's prior suspension of liquidation

Because of the lack of fair warning, it was unlawful for Commerce to direct CBP to continue to suspend liquidation of, and collect AD/CVD cash deposits for, entries that entered prior to May 12, 2021 (*i.e.*, the date Commerce initiated the scope inquiry resulting in the *Final Scope Ruling*). Commerce did so despite CBP's admission that it could not determine whether the wheels were within the scope of the *AD/CVD Orders*. In declining to instruct CBP to terminate its prior (and retroactive) suspension of liquidation under the EAPA, Commerce impermissibly – and in contravention of the broader due-process principle of adequate notice – relied on the suspension of liquidation provision of its regulations, 19 C.F.R. § 351.225(l).

Commerce received a covered merchandise (scope) referral request from CBP on June 9, 2021. *Referral Notice*, 86 Fed. Reg. at 38270. CBP made the request pursuant to 19 U.S.C. § 1517(b)(4)(A) because it was "unable to determine whether the merchandise at issue is covered merchandise {defined as merchandise covered by an AD or CVD order}." *Id.* at 38270. In response, Commerce stated that it "intend{ed} to determine whether the merchandise subject to the referral is covered by the scope of these orders" and that the covered merchandise referral would be addressed in the scope inquiry requested by Asia Wheel. *Id.*

In its *Final Scope Ruling*, Commerce found the scope language ambiguous with respect to the truck wheels manufactured by Asia Wheel in Thailand with one

wheel component (the disc) sourced from China, yet refused to acknowledge that it had failed to provide fair warning to importers that such wheels were within the scope of the *AD/CVD Orders*.  Appx26, Appx44-48.  Commerce stated it would "instruct CBP to continue the suspension of liquidation for products found to be covered by the scope of the *Orders* if already suspended," Appx44, citing 19 C.F.R. § 351.225(l)(3), and claimed it lacked "authority to direct suspension of liquidation implemented by CBP {under interim measures pursuant to 19 U.S.C. 1517(e)}." Appx47.

To the contrary, Commerce has the authority to determine whether ***and when*** a product is within the scope of an order, subject to the due-process requirement of providing fair warning before AD/CVD applicability.  *See Sunpreme Inc. v. United States*, 946 F.3d 1300, 1321 (Fed. Cir. 2020) (recognizing that, while CBP has initial authority to determine whether a given entry of imported merchandise is subject to the scope of an AD/CVD order, CBP cannot "'modify Commerce's determinations' or otherwise impinge on Commerce's authority to issue and set the scope of duty orders"); *Canadian Solar*, 918 F.3d at 917 ("{Because t}he Tariff Act does not require Commerce to define the 'class or kind of {foreign} merchandise' in any particular manner{,} . . . Commerce has the authority to fill that gap and define the scope of an order consistent with the countervailing duty and antidumping duty laws.") (citation omitted).

Under the EAPA specifically, Commerce has the authority to determine whether "the merchandise at issue is covered merchandise" in response to a CBP referral. 19 U.S.C. § 1517(b)(4)(A). "Covered merchandise" means "merchandise that is subject to" an AD/CVD order. 19 U.S.C. § 1517(a)(3). Inherently, a determination of whether imported merchandise is "subject to" an order may also entail *when* the merchandise *became* subject to the order.

Here, Commerce did not provide importers with either adequate notice or fair warning that the Thai Truck Wheels imported from Asia Wheel were "subject to" the *AD/CVD Orders* until May 12, 2021, the date Commerce initiated the scope inquiry. Accordingly, Commerce was bound by due-process principles and this Court's decision in *Tai-Ao II* to direct CBP to terminate its prior suspension of liquidation applying to entries made before that date.

The CIT has recognized that Commerce's determination of the scope overrides a contrary scope position taken by CBP:

> Customs' inclusion of merchandise in the EAPA investigation that had been determined by Commerce to be outside the scope of the Order is contrary to law because ***the EAPA statute does not permit Customs to include merchandise that is not covered by the scope of the Order***. 19 U.S.C. § 1517(c)(1)(A). The Court notes that the EAPA statute states clearly that Commerce, not Customs, is the appropriate administering authority to issue a referral determination of whether merchandise is covered or not. Id. § 1517(b)(4)(A)(i), (B). ***Allowing Customs to override and disregard a statutorily authorized Final Scope Ruling by the administering authority would be contrary to law*** because this would effectively substitute Customs as the administering authority rather than Commerce. *Id*. § 1517(b)(4)(A)(i).

*Aspects Furniture Int'l Inc. v. United States*, 607 F. Supp. 3d 1246, 1267-1268 (Ct. Int'l Trade 2022) (emphases added).

Given the lack of fair warning, Commerce should have instructed CBP that imports of Thai Truck Wheels were not covered merchandise prior to the date of initiation of the scope inquiry. In *Tai-Ao*, for example, this court instructed: "Because Commerce did not provide adequate notice . . . until November 14, 2016, Commerce's instructions to suspend liquidation effective March 21, 2016, were not in accordance with law." *Tai-Ao II*, 983 F.3d at 497. Tai-Ao did not receive fair warning or adequate notice until Commerce acted on its intent and added companies other than Zhongwang in its November 2016 preliminary circumvention determination, despite having communicated that intent earlier in the *Tai-Ao Initiation Notice*.

Likewise, here, importers first received fair warning and adequate notice when Commerce actually considered adding wheels with "rims or discs" from China when initiating the scope inquiry in May 2021, despite – at most – having suggested the possibility of reconsidering that question through a substantial transformation analysis in the *Final Issues and Decision Memo* from the AD/CVD investigations.

This Court's decision in *Sunpreme* does not change this outcome. In *Sunpreme*, CBP determined the merchandise at issue was subject to an AD order and, consequently, suspended liquidation of those entries. *See Sunpreme*, 946 F.3d

at 1305.  This Court upheld Commerce's instructions for CBP to continue suspension of liquidation even though the scope at issue was ambiguous, holding that "Customs has the authority to suspend liquidation of goods **when it determines** that the goods fall within the scope of an ambiguous {AD/CVD} order." *Sunpreme*, 946 F.3d at 1321 (emphasis added).

Here, in stark contrast, CBP was **unable to determine** that Thai Truck Wheels were within the scope of the *AD/CVD Orders* and referred that question to Commerce.  Consequently, *Sunpreme* does not require Commerce to continue the prior (and retroactive) suspension of liquidation imposed by CBP.  To the contrary, "the broader due-process principle" of fair warning required Commerce to instruct CBP to terminate its prior suspension of liquidation and to commence suspension as of March 22, 2021, at the earliest.  *Tai-Ao II*, 983 F.3d at 495.  Unlike here, this Court affirmed Commerce's decision to continue CBP's prior suspension of liquidation in *Sunpreme* because "retroactivity concerns" were not raised.  *See Sunpreme*, 946 F.3d at 1319.

In the *Final Scope Ruling*, Commerce also cited *Diamond Tools Technology LLC v. United States*, 545 F. Supp. 3d 1324 (Ct. Int'l Trade 2021) as supporting CBP's separate authority to suspend liquidation under the EAPA.  Appx47.  That case, however, is distinguishable.  In *Diamond Tools*, the CIT upheld CBP's decision to continue a prior suspension of liquidation imposed as interim measures under the

EAPA, where Commerce had not imposed any temporal limitation on CBP's authority to suspend liquidation in its response to a covered merchandise referral. *See* 545 F. Supp. 3d at 1348. Whereas *Diamond Tools* involved a challenge to CBP's EAPA authority directly, here Asia Wheel and the Importers contest **Commerce's** unlawful decision to continue a prior (and retroactive) suspension of liquidation in violation of "the broader due-process principle" that importers must have fair warning before their imported merchandise is subject to AD/CVD liability. *Tai-Ao II*, 983 F.3d at 495.

Because importers did not have fair warning that Thai Truck Wheels were in-scope, as discussed above, Commerce's instructions to continue to suspend liquidation of and collect AD/CVD cash deposits for entries that entered prior to May 12, 2021, are unlawful.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, Commerce's *Final Scope Ruling* is unsupported by substantial evidence on the record and otherwise not in accordance with law. Plaintiff-Appellant respectfully requests that this Court vacate or reverse the CIT's decision on these issues, and remand to Commerce with instructions to issue a revised determination, consistent with the opinion of this Court.

Respectfully submitted,

 /s/ Jay C. Campbell
Jay C. Campbell
Ron Kendler

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellant Asia Wheel Co., Ltd.

June 23, 2025

*Asia Wheel Co., Ltd. v. United States*,
762 F.Supp.3d 1316 (2025)
Appx001-017

762 F.Supp.3d 1316
United States Court of International Trade.

ASIA WHEEL CO., LTD., Plaintiff,
and
ZC Rubber America Inc., Plaintiff-Intervenor,
v.
UNITED STATES, Defendant,
and
Accuride Corp., Defendant-Intervenor.

Slip Op. 25-18
|
Court No. 23-00143
|
February 21, 2025

**Synopsis**
**Background:** Importer filed suit challenging Department of Commerce's scope ruling that importer's steel truck wheels, manufactured in Thailand using discs from China and rims produced in Thailand from steel plates sourced from China or third country, were within scope of antidumping (AD) and countervailing duty (CVD) orders on certain steel trailer wheels from China. Following intervention by another importer as plaintiff-intervenor, and by domestic producer, as defendant-intervenor, importers moved for judgment on agency record.

**Holdings:** The Court of International Trade, Gary S. Katzmann, J., held that:

Commerce correctly determined that plain scope language of orders did not categorically exclude wheels produced from mixed-origin components;

Commerce's scope determination did not change orders' scope;

Commerce's substantial transformation methodology was in accordance with law;

Commerce's determination that importer's truck wheels were not substantially transformed was supported by substantial evidence;

Commerce's imposition of duties on entire wheel was supported by substantial evidence; and

importers had sufficient notice that mixed-origin wheels were covered by orders.

Motion denied; sustained.

**Procedural Posture(s):** Review of Administrative Decision; Motion for Judgment on Administrative Record.

**Attorneys and Law Firms**

*1321 Jay C. Campbell, White & Case LLP, of Washington, D.C., argued for Plaintiff Asia Wheel Co., Ltd. With him on the briefs were Walter J. Spak and Chunfu Yan.

Jing Zhang, Mayer Brown LLP, of Washington, D.C., argued for Plaintiff-Intervenor ZC Rubber America, Inc.

Stephen C. Tosini, Senior Trial Counsel, and Danielle V. Cossey, Of Counsel, U.S. Department of Justice, Washington, D.C., argued for Defendant the United States. With them on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, L. Misha Preheim, Assistant Director, and Ian A. McInerney, Senior Attorney, U.S. Department of Commerce.

Nicholas J. Birch, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenor Accuride Corp. With him on the briefs was Roger B. Schagrin.

**OPINION**

Katzmann, Judge:

This case arises from the U.S. Department of Commerce's ("Commerce") ruling that certain truck wheels produced by Asia Wheel Co., Ltd. ("Asia Wheel") fall within the scope of the antidumping and countervailing duty orders on certain steel trailer wheels from the People's Republic of China ("China"). In May 2019, Commerce issued antidumping and countervailing duty orders on certain steel wheels from China that included as subject products: "certain on-the-road steel wheels, discs, and rims," including "rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the

Appx001

scope of the proceeding if performed in China." Certain Steel Wheels from the People's Republic of China: Antidumping and Countervailing Duty Orders, 84 Fed. Reg. 24098, 24100 (Dep't Com. May 24, 2019) ("Orders").

In response to Asia Wheel's request for scope proceedings, see Letter from White and Case LLP to Com., re: Request for Scope Ruling for Asia Wheel's Steel Truck Wheel (Feb. 11, 2021), P.R. 1 ("Scope **1322** Ruling Request"), Commerce determined in a scope ruling that Asia Wheel's steel truck wheels, manufactured in Thailand using discs from China and rims produced in Thailand from rectangular steel plates sourced from China or a third country, are subject to the Orders. See Mem. from J. Pollack to J. Maeder, re: Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Dep't Com. June 7, 2023), P.R. 79 ("Final Scope Ruling"). Plaintiff Asia Wheel, a Thai subsidiary of a Chinese steel wheel Manufacturer, and Plaintiff-Intervenor ZC Rubber America Inc., a U.S. importer of the subject merchandise ("ZC Rubber") challenge Commerce's Final Scope Ruling. See Pl.'s Am. Mot. for J. on Agency R., Feb. 22, 2024, ECF No. 35 ("Pl.'s Br."); Pl.-Inter.'s Mot. for J. on Agency R., Feb. 13, 2024, ECF No. 31 ("Pl.-Inter.'s Br."); Pl.'s Reply Br., June 18, 2024, ECF No. 46; Pl.-Inter.'s Reply Br., July 2, 2024, ECF No. 47; Orders, 84 Fed. Reg.; Final Scope Ruling. Defendant the United States ("the Government") and Defendant-Intervenor Accuride Corporation ("Accuride") ask the court to sustain Commerce's determination. See Def.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R., Apr. 30, 2024, ECF No. 42 ("Gov't Br."); Def.-Inter.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R., May 14, 2024, ECF No, 43 ("Def.-Inter.'s Br.").

This case presents four issues: (1) whether Commerce impermissibly expanded the scope of the Orders; (2) whether Commerce's determination that Asia Wheel's truck wheels produced from mixed-origin components were not substantially transformed in Thailand is supported by substantial evidence and in accordance with law; (3) whether Commerce's decision to impose duties on the entire imported truck wheel is supported by substantial evidence and in accordance with law; and (4) whether importers lacked adequate notice that the truck wheels produced from mixed-origin components were covered by the Orders such that Commerce impermissibly directed U.S. Customs and Border Protection ("Customs") to continue to suspend liquidation of imports entered before the date of initiation of the scope inquiry. The court concludes that (1) Commerce did not impermissibly expand the scope of the Orders; that (2)

Commerce's determination that Asia Wheel's truck wheels were not substantially transformed is supported by substantial evidence and in accordance with law; that (3) Commerce's imposition of duties on the entire wheel based on a substantial transformation analysis is supported by substantial evidence and in accordance with law; and that (4) Asia Wheel and ZC Rubber had sufficient notice that the wheels were covered by the Orders. Therefore, the court denies Asia Wheel's motion and sustains the Final Scope Ruling.

## BACKGROUND

### I. Legal Background

#### A. Antidumping and Countervailing Duties and Scope Determinations

To facilitate fair trade, the Tariff Act of 1930 "permits Commerce to impose two types of duties on imports that injure domestic industries[.]" Guangdong Wireking Housewares & Hardware Co. v. United States, 745 F.3d 1194, 1196 (Fed. Cir. 2014) (citing 19 U.S.C. §§ 1671(a), 1673). Commerce assesses antidumping duties on foreign goods if it determines that the "merchandise is being, or is likely to be, sold in the United States at less than its fair value," and the U.S. International Trade Commission separately concludes that dumping materially injures, threatens, or impedes the establishment of an industry in the United States. 19 U.S.C. § 1673; **1323** see also Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017). Similarly, Commerce imposes countervailing duties if it determines that a good is receiving a "countervailable subsidy" from a foreign government. 19 U.S.C. § 1671(a).

The duty orders that Commerce issues must "include[ ] a description of the subject merchandise, in such detail as [Commerce] deems necessary ...." 19 U.S.C. § 1673e(a) (2). Under Commerce's regulations, an interested party may request that Commerce issue a scope ruling to clarify whether a certain article of merchandise is subject to an order. See 19 C.F.R. § 351.225(a).

#### B. Substantial Transformation Analysis.

Antidumping and countervailing orders "must specify both the class or kind of merchandise and the particular country from which the merchandise originates." Ugine & Alz Belg.,

Appx002

N.V. v. United States, 31 C.I.T. 1536, 1550, 517 F. Supp. 2d 1333, 1345 (2007) (citing Certain Cold Rolled Carbon Steel Flat Prods. from Arg., 58 Fed. Reg. 37062, 37065 (July 9, 1993)). In determining country of origin and whether an imported article falls within the scope of an order, Commerce may conduct a substantial transformation analysis. See Bell Supply Co. v. United States, 888 F.3d 1222, 1229 (Fed. Cir. 2018) ("Bell Supply IV"). [1] The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has affirmed substantial transformation analysis as "a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." Id. at 1229 (quoting E.I. DuPont de Nemours & Co. v. United States, 22 C.I.T. 370, 373–74, 8 F. Supp. 2d 854, 858 (1998)). The Federal Circuit has explained that if a product:

> originates from a country identified in the order, then Commerce need not go any further. On the other hand, if Commerce applies the substantial transformation test and concludes that the imported article has a country of origin different from the country identified in [the] order, then Commerce can include such merchandise within the scope ... **\*1324** only if it finds circumvention under [19 U.S.C.] § 1677j.

Id. at 1230 (citations omitted). Ultimately, in conducting a substantial transformation analysis, Commerce asks whether "as a result of manufacturing or processing, the product 'loses its identity and is transformed into a new product having a new name, character[,] and use.' " Id. at 1228 (internal quotation marks omitted) (quoting Bestfoods v. United States, 165 F.3d 1371, 1373 (Fed. Cir. 1999)). To determine whether substantial transformation has occurred, "Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment." Id. at 1228–29.

### C. Customs's EAPA Investigations.

The Enforce and Protect Act ("EAPA"), 19 U.S.C. § 1517 (2018), directs Customs to investigate agency referrals or interested-party allegations that "reasonably suggest[ ] that covered merchandise has been entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(b)(1); see also Diamond Tools Tech. LLC v. United States, 45 CIT ——, —— – ——, 545 F. Supp. 3d 1324, 1331–32 (2021). If Customs determines that covered merchandise entered the United States through evasion, it will suspend liquidation of unliquidated entries "that enter on or after the date of the initiation of the investigation ...." 19 U.S.C. § 1517(d)(1)(A)(i). If liquidation of entries has already been suspended, then that suspension will continue. See id. § 1517(d)(1)(A)(ii).

EAPA's purpose is to "empower the U.S. Government and its agencies with the tools to identify proactively and thwart evasion at earlier stages to improve enforcement of U.S. trade laws, including by ensuring full collection of [antidumping and countervailing] duties and, thereby, preventing a loss in revenue." Diamond Tools, 45 CIT at ——, 545 F. Supp. 3d at 1351. EAPA establishes the procedure for an "interested party" to submit allegations of importer evasion of antidumping and countervailing liability. 19 U.S.C. § 1517(b). Within fifteen days of a filed allegation, Customs will open an investigation. See id. § 1517(b)(1). Within ninety days, Customs must determine whether there is "reasonable suspicion" of evasion, at which point Customs imposes interim measures, including suspension of liquidation. Id. § 1517(e). Next, parties can submit factual information, written arguments, and responses before Customs reaches a final determination.[2] See 19 C.F.R. § 165.23(b), (c)(2); id. § 165.26(a)(1), (b)(1). If Customs cannot make a final determination of evasion, it refers the matter to Commerce through a "covered merchandise referral." 19 U.S.C. § 1517(b)(4)(A); 19 C.F.R. § 351.227(a). Upon receiving the referral, Commerce "shall determine whether the merchandise is covered merchandise and promptly transmit that determination to the Commissioner." 19 U.S.C. § 1517(b)(4)(B); 19 C.F.R. § 351.227(a).

### II. Factual Background
On May 24, 2019, Commerce issued antidumping and countervailing orders on imports of certain steel truck wheels from China in response to a petition from Accuride

Appx003

and Maxion Wheels Akron LLC (collectively, **\*1325** "Petitioners"). See Orders, 84 Fed. Reg. The truck wheels subject to the Orders are used on commercial vehicles including tractors, semi-trailers, dump trucks, garbage trucks, concrete mixers, and buses. See id. at 24100. These wheels consist of two components—a rim and a disc—that are welded together.



Steel Truck Wheel Production Process Description and Flowchart at 7 (Feb. 11, 2021), P.R. 1, C.R. 1, Attach. 4. The Orders account for certain types of processing in third countries:

> The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China.

Orders, 84 Fed. Reg. at 24100.

During the original investigation, both Asia Wheel, as an importer of the steel wheels at issue, and Petitioners, as producers of the domestic like product, sought Commerce's clarification on whether the scope includes steel wheels where only one component—that is, a disc—originates in China. See Letter from White & Case LLP to W. Ross, re: Resp. to Pet'rs' Req. for Clarification of Scope of Investigations, Case No. A-570-082, Bar Code: 3789670 (Feb. 4, 2019) ("Zhejiang Jingu's Resp."); Letter from W. Fennell to W. Ross, re: Pet'rs' Req. for Clarification of the Scope of the Investigations and Submission of Additional Factual Information Relevant to Scope, Case No. A-570-082, Bar Code: 3784194 (Dec. 20, 2018). Zhejiang Jingu Company Limited ("Zhejiang Jingu"), a Chinese mandatory respondent and affiliate of Asia Wheel, argued that Chinese-origin rims and discs that are

welded and painted in third countries should be considered outside the scope as wheel components that are "substantially transformed" into finished wheels in the third country. See Zhejiang Jingu's Resp. at 2–3. Alternatively, Zhejiang Jingu suggested that the third-country processing provision was "overly broad and vague, potentially expanding the scope," because it "does not explicitly require that both the rim and disc be produced in China for China to be considered the country of origin." Id. at 6. Thus, Zhejiang Jingu requested clarification and potential language changes to make clear that wheels with only one component from China would not fall within the scope. See id. Commerce declined to conduct a preemptive substantial transformation analysis, noting that:

> "[w]hile in some instances Commerce has relied on substantial transformation analysis to address country-of-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case. However, here, we find that we can properly **\*1326** frame the scope of the investigation and properly address issues concerning circumvention by incorporating the petitioners' proposed clarification of the scope ...."

Mem. from J. Maeder to G. Taverman, re: Issues and Decision Mem. for the Final Determination of the Less-Than-Fair-Value Investigation of Certain Steel Wheels from the People's Republic of China at 11 (Dep't Com. Mar. 21, 2019), P.R. 1, C.R. 1, Ex. 1 ("Final AD Mem."). Commerce agreed with Zhejiang Jingu that further clarifying language should be included, and subsequently added the qualifier "from China" to provision such that "rims and discs from China that have been further processed in a third country into finished steel wheels be included within scope." Id. at 12.

On February 11, 2021, Asia Wheel requested a scope ruling from Commerce asking whether its truck wheels manufactured in Thailand using discs from China and rims it produced in Thailand from steel plates from China or a third country fall under the scope of the Orders. See Scope Ruling Request at 6.

Customs initiated an EAPA investigation under 19 U.S.C. § 1517 to determine if mixed-component wheels, such as those manufactured by Asia Wheel, evaded the Orders. See Letter from B. Hoxie to N. Birch, re: Notice of Initiation of Investigation and Interim Measures – EAPA Case Number 7509 at 2 (CBP Nov. 23, 2020). Customs was unable to determine if these wheels were covered merchandise, and on June 9, 2021, issued a "covered merchandise referral" to Commerce under 19 U.S.C. § 1517(b)(4). See Certain

Steel Wheels from the People's Republic of China: Notice of Covered Merchandise Referral, 86 Fed. Reg. 38270, 38270–71 (Dep't Com. July 20, 2021).

In response to Asia Wheel's scope request and the covered merchandise referral, Commerce initiated a scope inquiry on May 12, 2021. See Letter from T. Gilgunn to All Interested Parties, re: Initiation of Asia Wheel Scope Inquiry (Dep't Com. May 12, 2021), P.R. 6. Commerce found that the original underlying investigation did not explicitly exclude these wheels produced using mixed-origin components from the scope, and that the Orders are ambiguous as to the inclusion of wheels produced from mixed-origin inputs. See Final Scope Ruling at 9. As a result, Commerce conducted a substantial transformation analysis based on the five factors outlined in Bell Supply IV, see 888 F.3d at 1228–29. Commerce concluded that the finished wheels processed in Thailand are not substantially transformed, and that those wheels' country of origin is therefore China. See Final Scope Ruling at 16–25. On December 13, 2022, Commerce issued a Preliminary Scope Ruling, finding that Asia Wheel's truck wheels manufactured in Thailand are within the scope of the Orders. See Mem. from S. Thompson to J. Maeder, re: Preliminary Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Dep't Com. Dec. 13, 2022), P.R. 59 ("Prelim. Scope Ruling").

Commerce issued its Final Scope Ruling on June 7, 2023, continuing to find that Asia Wheel's truck wheels manufactured in Thailand are in scope. See Final Scope Ruling at 1. Commerce stated that it "intend[ed] to instruct CBP to continue the suspension of liquidation for products found to be covered by the scope of the Orders of already suspended." Id. at 27.

### III. Procedural History

Asia Wheel brought this action against the Government on August 11, 2023 to challenge Commerce's Final Scope Ruling. See Compl., Aug. 11, 2023, ECF No. 8. **\*1327** Plaintiff-Intervenor ZC Rubber and Defendant-Intervenor Accuride moved to intervene in the instant action under USCIT Rule 24, and the court granted both motions. See Consent Mot. to Intervene as Pl.-Inter., Sept. 1, 2023, ECF No. 15; Order, Sept. 7, 2024, ECF No. 16; Consent Mot. to Intervene as Def.-Inter., Sept. 11, 2023, ECF No. 17; Order, Sept. 12, 2023, ECF No. 21.

On January 30, 2024 and February 13, 2024, respectively, Asia Wheel and ZC Rubber filed a Motion for Judgment on

the Agency Record under USCIT Rule 56.2. See Pl.'s Mot. for J. on the Agency R., Jan. 30, 2024, ECF No. 30; Pl.-Inter.'s Br. Asia Wheel filed an Amended Motion for Judgment on the Agency Record on February 22, 2024. See Pl.'s Br. The Government and Accuride filed their response briefs on April 30, 2024 and May 14, 2024, respectively. See Gov't Br.; Def.-Inter.'s Br. Asia Wheel and ZC Rubber filed replies on June 18, 2024 and July 2, 2024 respectively. See Pl.'s Reply Br.; Pl.-Inter.'s Reply Br.

With all papers filed, the court held oral argument on Wednesday, November 13, 2024. See Order, Sept. 17, 2024, ECF No. 53. Prior to oral argument, the court issued, and the parties responded to, questions regarding the case. See Letter re: Qs. for Oral Arg., Oct. 25, 2024, ECF No. 54; Pl.'s Resp. to Ct.'s Qs. for Oral Arg., Nov. 7, 2024, ECF No. 58; Pl.-Inter.'s Resp. to Ct.'s Qs. for Oral Arg., Nov. 7, 2024, ECF No. 55; Def.'s Resp. to Ct.'s Qs. for Oral Arg., Nov. 7, 2024, ECF No. 56; Def.-Inter.'s Resp. to Ct.'s Qs. for Oral Arg., Nov. 7, 2024, ECF No. 57. As directed by the court, the parties also filed briefs following oral argument. See Def.'s Post-Arg. Br., Nov. 22, 2024, ECF No. 61; Def.-Inter.'s Post-Arg. Br., Nov. 22, 2024, ECF No. 62; Pl. and Pl.-Inter.'s Post-Arg. Br., Nov. 22, 2024, ECF No. 63.

Concurrently with the procedures in this case, the court heard a parallel case, Asia Wheel Co. v. United States, Ct. No. 23-00096 (USCIT filed May 9, 2023) ("Asia Wheel I"). That case involves a relevant prior scope determination, where Commerce considered wheels much like those here: those with components originating in China but where processing culminates in Thailand. See Mem. from E. Begnal to J. Maeder, re: Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand at 8, Case No. A-570-090, Bar Code: 4364599-01 (Dep't Com. Apr. 11, 2023) ("Asia Wheel I Final Scope Ruling"). The court held Asia Wheel I in abeyance pending oral argument in this case. See Order, Asia Wheel I, Oct. 18, 2024, ECF No. 76. The opinion in Asia Wheel I is being released concurrently with this opinion. See Opinion, Asia Wheel I, Feb. 21, 2025, ECF No. 78.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(vi). Section 1516b(b)(1)(B)(i) provides the standard of review: "[t]he Court shall hold unlawful any determination, finding, or conclusion" by Commerce that is "unsupported by substantial

evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

A determination by Commerce "is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). This standard requires Commerce to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " **1328** Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)) (referring to the arbitrary and capricious standard); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (citing Amanda Foods (Viet.) Ltd. v. United States, 33 C.I.T. 1407, 1416, 647 F. Supp. 2d 1368, 1379 (2009)) (requiring the same of Commerce with respect to the substantial evidence standard). Substantial evidence may support Commerce's determination even if there is "evidence that detracts from the agency's conclusion or [if] there is a 'possibility of drawing two inconsistent conclusions from the evidence.' " Aluminum Extrusions Fair Trade Comm. v. United States, 36 C.I.T. 1370, 1373, 2012 WL 5201218 (2012) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)).

In issuing scope rulings in particular, Commerce has "substantial freedom to interpret and clarify its antidumping orders," leading to "significant deference in Commerce's interpretation of a scope order." Mid Continent Nail Corp. v. United States, 725 F.3d 1295, 1300 (Fed. Cir. 2013). However, the question of whether the scope set out in an original investigation is ambiguous such as to warrant substantial transformation analysis is reviewed by the court de novo. See Meridian Prods. LLC v. United States, 851 F.3d 1375, 1381 (Fed. Cir. 2017).

### DISCUSSION

### I. Commerce's Interpretation of the Orders Is Supported by Substantial Evidence and in Accordance with Law.

The text of the Orders here provides that "[t]he scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China." Orders, 84 Fed. Reg. at 24100. Asia Wheel and ZC Rubber argue that the phrase "rims and discs" unambiguously excludes wheels produced from mixed-origin components, suggesting that the word " 'and' does not mean 'or,' " such that only wheels consisting of both Chinese-origin discs and Chinese-origin rims fall within the scope. Pl.'s Br. at 17; Pl.-Inter.'s Br. at 12. The Government and Accuride counter that the words "including, but not limited to" in the scope indicate "that the 'welding and painting of rims and discs from China to form a steel wheel' are non-exhaustive examples of included processing," but the "plain language does not address what varieties of processing may otherwise exclude a product from the scope." Gov't Br. at 11 (quoting Final Scope Ruling at 10); Def.-Inter.'s Br. at 6–7. Therefore, the Government contends that the scope does not exclude Asia Wheel's wheels produced from mixed-origin components, and instead reflects that wheels produced from mixed-origin components are covered by the scope if the "processing would not otherwise exclude these items had the processing occurred in China." Gov't Br. at 11 (quoting Final Scope Ruling at 10).

Commerce's interpretation of the scope is supported by substantial evidence and in accordance with law because (1) "rims and discs that have been further processed in a third country" may be reasonably interpreted to include wheels produced from mixed-origin components and because (2) Commerce's later statements only addressed wheels produced from Chinese **1329** components such that they did not contradict the earlier interpretation that wheels produced from mixed-origin components fall within the scope of the Orders. Orders, 84 Fed. Reg. at 24100.

### A. Commerce did not err in determining the plain language of the Orders does not exclude Asia Wheel's steel wheels from the scope.

The terms of an order govern its scope. See Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002) ("[A] predicate for the interpretive process is language in the order that is subject to interpretation."); see also Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1071–72 (Fed. Cir. 2001); Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998). The first step in considering whether a product is within the scope of an

order is to consider the language of the order itself. See ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 87 (Fed. Cir. 2012). In analyzing the language of the scope, Commerce may also examine primary interpretive sources such as the descriptions of the merchandise in the petition and in the initial investigation, previous or concurrent determinations of the Secretary, and reports issued pursuant to the initial investigation. See 19 C.F.R. § 351.225(k)(1)(i). If the language of the order unambiguously covers or excludes a product, then that language governs Commerce's inquiry. See 19 C.F.R. § 351.225(k)(1); Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1382–83 (Fed. Cir. 2005).

"Scope orders may be interpreted as including merchandise only if they contain language that specifically includes merchandise or may be reasonably interpreted to include it." Duferco Steel, 296 F.3d at 1089. "[A]n interpretation that renders [a term in the scope language] meaningless and mere surplusage," is not reasonable. SMA Surfaces, v. United States, 47 CIT ——, ——, 617 F. Supp. 3d 1263, 1275 (2023) (internal quotation marks and citations omitted). Commerce "may reasonably define the class or kind of merchandise in a single set of orders," rather than "engage in a game of whack-a-mole" to specifically include every item of merchandise that could fall within an order in the language of that order. Canadian Solar, Inc. v. United States, 918 F.3d 909, 921–22 (Fed. Cir. 2019). "Commerce need only meet a low threshold to show that it justifiably found an ambiguity in scope language, but it is not justifiable to identify an ambiguity where none exists." Allegheny Bradford Corp. v. United States, 28 C.I.T. 830, 342 F. Supp. 2d 1172, 1184 (2004) (citing Novosteel SA v. United States, 284 F.3d 1261, 1272 (Fed. Cir. 2002)).

The original scope language as laid out at the outset of the antidumping and countervailing investigations included "steel wheels, discs, and rims" imported from China. Certain Steel Wheels from the People's Republic of China: Initiation of Less-Than-Fair Value Investigation, 83 Fed. Reg. 17798, 17802 (Dep't Com. Apr. 24, 2018). Commerce later modified this scope language to more explicitly include wheels that undergo further processing outside of China. During the investigations, Commerce established that "[t]he scope includes rims and discs that have been further processed in a third country." Final Scope Ruling at 3.[3] While this scope **1330 language does not specifically include wheels produced from mixed-origin components, it can be reasonably interpreted to include any wheels produced from mixed-origin components that still qualify as "steel wheels ...

from China," and whose processing "would not otherwise remove the merchandise from the scope of the investigations if performed in [China]." Id. Commerce also included an example of further processing, noting that this provision "include[s], but [is] not limited to, the welding and painting of rims and discs from China to form a steel wheel." Orders, 84 Fed. Reg. at 24100.

Asia Wheel and ZC Rubber argue that this example, and in particular the phrase "rims and discs from China," indicates that wheels produced from mixed-origin components are unambiguously excluded from the scope. See Pl.'s Br. at 17; Pl.-Inter.'s Br. at 12. However, the phrase "rims and discs from China" comes only after the phrase "including, but not limited to," indicating that "welding and painting of rims and discs from China" constitutes a single, non-exclusive example. The words "including, but not limited to" would be rendered meaningless if Commerce were to interpret the scope to unambiguously exclude wheels produced from mixed-origin components because they are not "rims and discs from China":

> The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China.

Orders, 84 Fed. Reg. at 24100 (emphasis added); Def.-Inter.'s Br. at 7–8. "The court cannot accept an interpretation that renders [a term in the scope language] meaningless and mere surplusage." SMA Surfaces, 47 CIT at ——, 617 F. Supp. 3d 1275 (internal quotation marks and citation omitted). A single, nonexclusive example of **1331 third-country processing that would certainly not remove wheels from the scope still leaves open what other types of third-country processing would similarly not remove the merchandise from the scope of the investigation.

The phrase "including, but not limited to" indicates that there are methods of third country processing that will fall within the scope of the Orders, even if not specifically outlined. Orders, 84 Fed. Reg. at 24100. The above excerpt from the

Appx007

<u>Orders</u> indicates that there are methods of processing that will be within the scope, though Commerce explicitly chose not to enumerate them all. To rule that any method of processing not explicitly outlined in the <u>Orders</u> is outside the scope would render certain key phrases superfluous. Therefore, this language does not, as Asia Wheel and ZC Rubber argue, indicate that wheels produced from mixed-origin components are unambiguously excluded from the scope.

The plain scope language includes rims, discs, and wheels that have undergone further processing that would not otherwise remove the merchandise from the scope of the investigations if performed in China. While the scope language notes that "welding and painting of rims and discs from China" is further processing that does not remove the merchandise from the scope, the scope language is ambiguous as to what other further processing would not remove the merchandise from the scope. <u>Id.</u> Therefore, Commerce did not err in determining that the scope language does not categorically exclude wheels produced from mixed-origin components.

### B. Commerce's Scope Determination Did Not Change the Scope of the Orders.

Asia Wheel suggests that Commerce "confirmed in the original investigations that wheels manufactured in third countries with only one wheel component—the disc—originating in China are outside the scope." Pl.'s Br. at 18. Thus, Asia Wheel argues, Commerce "recharacterized" its scope analysis from the antidumping and countervailing investigations by concluding that the scope of the <u>Orders</u> is ambiguous. <u>Id.</u> at 20. The Government counters that Commerce declined to modify the scope to expressly include wheels produced from rims or discs from China, but also "did not dictate that such wheels must be held to be out-of-scope." Gov't Br. at 13. Accuride further argues that, while Commerce explicitly included Chinese rims and discs that had been processed in a third country before importation to the United States, Commerce was also "explicit that the coverage <u>was wider than and not limited to</u> that stated example of welding and painting of a rim and disc [from] China." and therefore did not change the scope of the order or alter its express terms. Def.-Inter.'s Br. at 6.

"[A] scope determination is not in accordance with law if it changes the scope of an order or interprets an order in a manner contrary to the order's terms." <u>Allegheny Bradford, 28 C.I.T. at 843, 342 F. Supp. 2d at 1183</u> (citing <u>Duferco Steel,</u>

<u>296 F.3d at 1094–95</u>); <u>see also</u> <u>Wheatland Tube, 161 F.3d at 1370</u> ("Although Commerce enjoys substantial freedom to interpret and clarify its antidumping duty orders, it can neither change them, nor interpret them in a way contrary to their terms." (internal quotation marks and citations omitted)). A clarification of scope language does "not change the scope of the order or alter its express terms." <u>King Supply Co. v. United States, 674 F.3d 1343, 1351 (Fed. Cir. 2012)</u> (distinguishing <u>Duferco Steel</u> on the ground that Commerce in that case "had impermissibly relied upon language in the petitions rather than the orders to modify the **\*1332** scope of the orders by effectively importing a physical description of certain products that was not present in the text of the order." (citation omitted)).

Commerce's statements during the investigation did not "recharacterize" or change the scope of the <u>Orders</u>, but rather confirmed the scope was ambiguous as to which types of third-country processing would not remove a product from the scope. Pl.'s Br. at 20; Prelim. Scope Mem. at 9–13; Final Scope Mem. at 7–10. In refusing to accept suggested revisions, Commerce communicated that during the original investigation it would not address the inclusion of wheels produced from mixed-origin components. <u>See</u> Final Scope Mem. at 10. Commerce declined to modify the scope to expressly include wheels manufactured in a third country from rims or discs from China, stating that:

> "[w]hile in some instances Commerce has relied on a substantial transformation analysis to address country-of-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case. However, here, we find that we can properly frame the scope of the investigation and properly address issues concerning circumvention by incorporating the petitioners' proposed clarification of the scope ...."

Final AD IDM at 11. This language confirmed that Commerce deferred the issue of wheels produced from mixed-origin components and noted that further analysis would be necessary on a case-by-case basis.

While Commerce did, as Asia Wheel note, "agree with Zhejiang Jingu that the proposed scope amendment should include further language," this agreement was limited to the addition of the qualifier "from China" to the non-exhaustive example of further processing ("welding and painting"), not to the broader suggestion that the scope only covered wheels where both the rim and the disc were made in China. Final AD Mem. at 12; Pl.'s Br. at 19–20.

Appx008

The court concludes that Commerce's scope determination that the Orders did not exclude wheels produced from mixed-origin components was consistent with both the plain text of the Orders and with Commerce's statements during the investigations. Therefore, Commerce's scope determination did not "change[ ] the scope of [the] order or interpret[ ] [the] order in a manner contrary to the order's terms." Allegheny Bradford, 28 C.I.T. at 843, 342 F. Supp. 2d at 1183 (citing Duferco Steel, 296 F.3d at 1094–95). In lawfully determining that the scope of the Orders was ambiguous as to wheels produced from mixed-origin components, Commerce permissibly proceeded to conduct a substantial transformation analysis.

### II. Commerce's Determination that the Mixed-Origin Components Were Not Substantially Transformed into Thai-Origin Wheels Is Supported by Substantial Evidence and in Accordance with Law.

Asia Wheel and ZC Rubber argue that Commerce failed to apply the proper legal standard in conducting its substantial transformation analysis, and that Commerce's analysis is unsupported by substantial evidence. See Pl.'s Br. at 23. The court addresses each argument in turn and concludes that (1) Commerce's method of analysis is in accordance with the law, and that (2) Commerce's analysis and subsequent conclusion that Asia Wheels steel wheels were of Chinese origin is supported by substantial evidence.

### A. Commerce's Five-Factor Method of Analysis Is in Accordance with Law.

Recall that antidumping and countervailing orders apply based on the type **\*1333** of merchandise and the country of origin, and that in determining country of origin, Commerce may conduct a substantial transformation analysis. See Bell Supply IV, 888 F.3d at 1228, 1230. Substantial transformation analysis is a metric to determine "whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." Id. at 1229 (internal quotation marks and citation omitted).

Asia Wheel first contends that Commerce employed the incorrect test in performing its substantial transformation analysis. According to Asia Wheel, the "fundamental

question" is whether the Chinese-origin components became "a new product having a new name, character, and use," through Thai processing. Pl.'s Br. at 24 (citing Bell Supply IV, 888 F.3d at 1228 (internal quotation marks and citations omitted)). Instead, Asia Wheel argues, Commerce "had it backwards," employing the five factors noted in Bell Supply IV for determining whether substantial transformation had occurred as the primary test—disconnected from the fundamental question such that its analysis was "meaningless"—rather than using the factors to inform the "name, character, and use" question. See id. at 23 (citing Bell Supply IV, 888 F.3d at 1228–29). The Government contends that Commerce "may consider whether the third[-]country processing imparted 'a new name, character, and use' in consideration of the totality of the circumstances, [but] such findings may not supplant analysis of the record with respect to the" five factor test. Gov't Br. at 19. The Government also argues that implementation of this standard as the "sole basis of analysis would result in even minor finishing/assembly operations sufficient to determine country of origin and render the existing substantial transformation factors moot." Id. (citing Bell Supply IV, 888 F.3d at 1228–29).

Commerce's application of the five factors from Bell Supply IV, in analyzing whether the wheel components underwent substantial transformation in Thailand, is in accordance with law. See 888 F.3d at 1228–29. Recall that in Bell Supply IV, the Federal Circuit held that "[a] substantial transformation occurs where, as a result of manufacturing or processing steps ... [,] the [product] loses its identity and is transformed into a new product having a new name, character and use." Id. at 1228 (internal quotation marks and citation omitted). According to the Final Scope Ruling, Commerce's substantial transformation analysis here asked:

> (1) whether, as a result of the manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character, and use; and

> (2) whether through that transformation, the new article becomes a product of the country in which it was processed or manufactured.

Final Scope Ruling at 5 (footnotes omitted).

Thus, while Asia Wheel and ZC Rubber correctly note that whether a product "loses its identity and is transformed into a new product having a new name, character, and use" is relevant to the substantial transformation question here, this is not where the analysis ends. Pl.'s Br. at 28 (quoting Bell

Appx009

Supply IV, 888 F.3d at 1228–29). Recall that the court in Bell Supply IV went on to posit five (nonexclusive) factors for the substantial transformation analysis:

> To determine whether there has been a substantial transformation, Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and **\*1334** sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end-use; (4) the cost of production/value added; and (5) level of investment.

888 F.3d at 1228–29.

Consequently, while a product's "new name, character, and use" may be relevant, the five-factor test is the primary mechanism for determining whether substantial transformation has occurred.[4] Additionally, the five-factor test is a "totality of the circumstances" method of analysis such that the factors are not "divorced" from the fundamental question, as Asia Wheel and ZC Rubber allege. See Venus Wire Indus. Pvt. Ltd. v. United States, 43 CIT ——, ——, n.11, 424 F. Supp. 3d 1369, 1378 n.11 (2019) ("While the formulation of the factors Commerce considers in a substantial transformation test varies slightly across proceedings, in general, Commerce considers [these five factors.]" (citing Bell Supply IV, 888 F.3d at 1228–29)). Accordingly, Commerce's thorough analysis of the five factors outlined in Bell Supply IV in determining whether Asia Wheel's steel wheels underwent substantial transformation in Thailand is in accordance with law.

### B. Commerce's Substantial Transformation Analysis Is Supported by Substantial Evidence.

Asia Wheel next suggests that Commerce, in conducting its substantial transformation analysis, considered just one component—the discs—rather than the finished wheels, thus failing to apply the governing legal standard. See Pl.'s Br. at 28–29. The Government contends that the court rejected a similar argument in Peer Bearing, where it considered

whether unfinished and finished parts from China were substantially transformed into finished products in Thailand. See Gov't Br. at 21–22 (citing Peer Bearing Co.-Changshan v. United States, 39 CIT 1942, 128 F. Supp. 3d 1286 (2015) ("Commerce was not precluded from taking into consideration the uncontested fact that the [tapered roller bearing] production in Thailand was conducted upon parts, finished and unfinished, that ultimately were destined to become [tapered roller bearings].")).

While the parties agree that the disc component of the subject merchandise is of Chinese origin, Asia Wheel's characterization ignores Commerce's thorough analysis of the wheel as a whole and the other component of the finished wheel: the rim. The relevant question in Commerce's substantial transformation analysis was not whether the rectangular sheet of steel is substantially transformed when turned into a round rim. Rather, the question was whether both wheel components undergo substantial transformation to become a finished wheel. See Final Scope Ruling at 16–25. Thus, Commerce here asked whether an in-process component (a rim) and a **\*1335** finished component (a disc) are substantially transformed when processed and assembled into a finished wheel. Focusing only on the transformation from steel sheet to finished rim ignores the rest of the processing, much of which takes place in China: for example, the creation of the steel plate and the production of the finished disc. But again, the relevant question was not whether the in-process rim is substantially transformed when processed into a finished rim, but rather whether the in-process rim and finished disc are substantially transformed when processed and assembled into a finished wheel. See id.

Commerce's Final Scope Ruling demonstrates that the agency considered exactly this question at every stage of analysis. Contrary to Plaintiff's contention that Commerce only considered a single component rather than the finished wheel, see Pl.'s Br. at 28–29, Commerce found that: (1) the wheel components and finished wheel are of the same class or kind of merchandise included within the scope, (2) both major components continue to function as the only such component after incorporation into the finished wheel, and (3) the production in China culminates in a complete disc and an in-process rim, functionally creating an already designed wheel. See Final Scope Ruling at 16–25 (emphasis added). Commerce ultimately concluded that "the finished truck wheels Asia Wheel manufactures in its facilities in Thailand using discs from China and rims it produces in Thailand from steel plates from China or a third country are not substantially

transformed such that the third-country processing confers country of origin based on the totality of circumstances." Id. at 16 (emphasis added). This conclusion is supported by substantial evidence, as Commerce thoroughly considered all five factors in analyzing whether the in-process component and the finished component are substantially transformed into a finished wheel in Thailand.

Asia Wheel suggests that Commerce's analysis of the "essential component" factor "further illustrates its flawed approach." Pl.'s Br. at 26. To the extent that this argument serves as an example that Commerce only considered the discs, it fails, as Commerce considered both the components and the finished wheel throughout its analysis. To the extent that this argument raises an independent ground for finding Commerce's substantial transformation analysis to be unsupported by substantial evidence, it also fails, as Commerce extensively considered the properties and end uses of both the rim and the disc and the finished wheel. See Final Scope Ruling at 16–25. In doing so, Commerce noted that, while the essential characteristics of the finished wheel are not established until the rim and disc are assembled, the elements remain the same both before and after assembly. Id. at 19. Commerce found that "any given disc or rim continues to function as the only such component after incorporation into a finished wheel." Id. (quoting Prelim. Scope Ruling at 17). Commerce considered, for example, that the qualities of a disc do not change or transform through processing: the number, placement, and type of bolt holes; the mounting arrangement; and the materials used to produce the disc all remain the same. See id. at 20. Additionally, Commerce noted that the introduction of certain physical characteristics in Thailand, like the rim's diameter, is merely the finishing of a process that began in China. See id. at 22. This finding is therefore supported by substantial evidence.

### III. Commerce's Decision to Impose Duties on the Entire Wheel Is Supported by Substantial Evidence.

Asia Wheel also argues that Commerce impermissibly expanded the scope **\*1336** contrary to its terms when it determined that the entire wheel is covered by the scope of the Orders when "only one wheel component (a disc) was exported from China." Pl.'s Br. at 2–3, see also id. at 28–29. The Government counters that Asia Wheel begins the inquiry at the wrong point in the analysis, asking the court to determine whether some components of the wheel are not dutiable on their own when it has been determined that the entire wheel is subject merchandise. See Gov't Br. at 22. Accuride further argues that "precedent confirms that

Commerce's determination is to the origin of the imported article as a whole, not separately to each of what were only previously separate components." Def.-Inter.'s Br. at 21.

While Asia Wheel is correct that Commerce cannot interpret the scope of the Orders to change the scope or otherwise interpret it contrary to its terms, that is not the case here. See Pl.'s Br. at 28 (citing Eckstrom Indus., 254 F.3d at 1072). Commerce did not change or expand the scope, but merely conducted a substantial transformation analysis to confirm that the wheels here are Chinese and therefore fall within the scope.

Asia Wheel's argument on this point is based on its mischaracterization of Commerce's substantial transformation analysis as concluding that only the disc was of Chinese origin. See Pl.'s Br. at 28–29. As indicated above, this characterization overlooks Commerce's thorough analysis of both components and the finished wheel. Indeed, substantial transformation analysis assesses duty liability for a product assembled from multiple components upon its entry into the United States. See Bell Supply IV, 888 F.3d at 1229 ("Because a single article can be assembled from various components and undergo multiple finishing steps, Commerce must have some way to determine the country of origin during scope inquiries."). Subsequently, the substantial transformation analysis provides a metric "for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred." Id. (internal quotation marks and citation omitted) (emphasis added). In conducting substantial transformation analysis, Commerce sought to determine the country of origin for the resulting product as entered into the United States—that is, as an assembled wheel.

Asia Wheel does not provide any legal support for a different method of duty assessment that would first exclude specific components before determining what duties to assess. To the extent the Asia Wheel suggests Commerce should follow this method separately from conducting a substantial transformation analysis, the suggestion is moot. As Commerce already determined the entire wheel is within scope, it need not assess duties on individual wheel components. Therefore, Commerce's imposition of antidumping and countervailing duties on the entire wheel is supported by substantial evidence.

### IV. Commerce Permissibly Directed Customs to Continue to Suspend Liquidation of Imports Entered Before the Date of Initiation of the Scope Inquiry.

Asia Wheel argues that importers did not receive fair warning that trailer wheels produced in third countries from mixed-origin components are subject to the Orders until Commerce initiated the scope inquiry at Asia Wheel's request. See Pl.'s Br. at 30. Thus, Asia Wheel contends, Commerce impermissibly directed Customs to continue its prior suspension of liquidation of imports entered before the **\*1337** date of initiation of the scope inquiry. See id. This direction, according to Asia Wheel, will subject them to millions of dollars in retroactive antidumping and countervailing duties that they could not have anticipated. See Pl.'s Br. at 3. The Government and Accuride counter that Commerce expressly noted that future merchandise would need to be evaluated on a case-by-case basis. See Def.'s Br. at 29; Def.-Inter.'s Br. at 23. Even if Commerce did not provide adequate notice, the Government and Accuride argue, Commerce has no authority to direct the outcome of decisions that Commerce entrusted to Customs. See Def.'s Br. at 32–34; Def.-Inter.'s Br. at 26; 19 U.S.C. § 1517(b)(1) ("[Customs] shall initiate and investigation if [Customs] determines that the information provided in ... the referral ... reasonably suggests that the covered merchandise has been entered into the customs territory of the United States through evasion.").

Upon an affirmative scope determination, Commerce will "direct U.S. Customs and Border Protection to continue the suspension of liquidation of previously suspended entries and apply the applicable cash deposit rate until appropriate liquidation instructions are issued ...." 19 C.F.R § 351.225(*l*)(3). Additionally, Commerce "will direct U.S. Customs and Border Protection to begin the suspension of liquidation and require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product not yet suspended ... on or after the date of initiation of the scope inquiry ...." Id. Fair notice is particularly important in contexts like this one where importers may be subjected to substantial retroactive liability. The fair notice requirement reflects the "broader due-process principle that before an agency may enforce an order or regulation by means of a penalty or monetary sanction, it must 'provide regulated parties fair warning of the conduct [the order or regulation] prohibits or requires.' " Tai-Ao Aluminium Co. v. United States, 983 F.3d 487, 495 (Fed. Cir. 2020) (quoting Mid Continent Nail, 725 F.3d at 1300–01).

Commerce's statements expressly noting that "in some instances Commerce has relied on a substantial transformation analysis to address country-of-origin issues," but that "the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case" served as adequate notice. Final AD IDM at 11. Because Asia Wheel and ZC Rubber had adequate notice, Commerce permissibly directed Customs to continue is prior suspension of liquidation.

### A. Commerce Provided Lawful Notice That Mixed-Origin Wheels Could Be Subject Merchandise.

An antidumping and countervailing duty order must contain "a description of the subject merchandise, in such detail as the administering authority deems necessary," to provide adequate notice to the relevant importers. 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2). Adequate notice requires "that antidumping orders only be applied to merchandise that they may be reasonably interpreted to include." Mid Continent Nail, 725 F.3d at 1301 (internal quotation marks and citations omitted). Without adequate notice, "Commerce cannot suspend liquidation of entries entered 'on ... the date of initiation of the scope inquiry.' " Tai-Ao, 983 F.3d at 490 (quoting 19 C.F.R. § 351.225(*l*)(2)). This notice requirement reflects the "broader due-process principle" that Commerce must provide fair warning to regulated parties before enforcing a penalty or sanction. Id. at 495 (quoting Mid Continent Nail, 725 F.3d at 1300–01).

However, adequate notice is not the same as certainty that a product **\*1338** will or will not fall within the scope of an order. Instead, adequate notice need only allow an importer to reasonably interpret what merchandise is included in the order. Cf. Mid Continent Nail, 725 F.3d at 1301–02 ("The mere fact that the order in this case makes no explicit reference to mixed media items does not conclusively establish that Commerce lacked authority to consider the order's applicability to nails contained within such items."). Notice need not be certain because questions often later "arise as to whether a particular product is covered by the scope of an antidumping or countervailing duty order. Such questions, such as those regarding the country of origin of merchandise, may arise for a variety of reasons given that the description of the merchandise subject to the scope is written in general terms." 19 C.F.R. § 351.225(a); see also Bell Supply Co. v. United States, 43 CIT ——, ——, 393 F. Supp. 3d 1229, 1236 (2019) ("Bell Supply VI")

Appx012

("Issues arise regarding whether a product falls within the scope of an [antidumping or countervailing duty] order, in part because federal regulations require Commerce to write the descriptions in 'general terms.' "). As noted above, Commerce may use a substantial transformation analysis to resolve questions regarding the country of origin of an imported article. See Bell Supply IV, 888 F.3d at 1229. The existence of some ambiguity in scope language does not mean that notice is inadequate as to products requiring substantial transformation to determine country of origin, as it is impractical to require Commerce to anticipate every type of third-country processing. Cf. Canadian Solar, 918 F.3d at 921–22 ("It is unnecessary for Commerce to engage in a game of whack-a-mole when it may reasonably define the class or kind of merchandise in a single set of orders, and within the context of a single set of investigations, to include all imports causing injury.").

Here, Commerce explicitly included within the scope "rims and discs that have been further processed in a third country," and provided one type of processing that would certainly be included (the welding and painting of rims and discs from China). Final Scope Ruling at 3. However, by including "any other processing that would not otherwise remove the merchandise from the scope of the orders if performed in China," Commerce left open the question of what other types of third-country processing would not remove the merchandise from the scope of the orders. Id. While this language did not explicitly indicate that the exact processing here would be included, see supra section I.A., it contained the general statement that rims and discs processed in a third country may be included.

Even if the scope language itself was not enough to provide adequate notice on its own, Commerce went further. Commerce stated during the investigation that "in some instances Commerce has relied on a substantial transformation analysis to address country-of-origin issues," but that "the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case." Final AD IDM at 11. This statement indicated that particular types of processing would undergo substantial transformation analysis to address country-of-origin issues depending on the specific facts and circumstances. Commerce cannot be expected to anticipate every type of third-country processing, and thus cannot feasibly indicate with certainty every hypothetical product that would fall within the scope. Despite this ambiguity as to specific types of processing, Asia Wheel could anticipate that the wheels at issue fall

within Commerce's description and thus are covered by the scope based on the language of the Orders and Commerce's commentary during the **\*1339** investigation. Therefore, Commerce's commentary during the investigation provided further adequate notice that wheels produced from mixed-origin components could be subject investigation.

Beyond the language and commentary during this investigation, Commerce's commentary in Asia Wheel I, a relevant prior scope determination, provided further notice to the parties in this case. See Mem. from E. Begnal to J. Maeder, re: Certain Steel Wheels from the People's Republic of China: Final Scope Decision Memorandum for the Final Antidumping Duty and Countervailing Duty Determinations, Case No. A-570-090, Bar Code: 3857017 (Dep't Com. July 1, 2019) ("Asia Wheel I Final Scope Memo"); Mem. from E. Begnal to J. Maeder, re: Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Dep't Com. Apr. 11, 2023), P.R. 126 ("Final Scope Ruling"). In Asia Wheel I, Commerce considered wheels much like those here: those manufactured in Thailand using discs from China and rims it produces in Thailand from steel plates sourced from China or a third country. See Asia Wheel I Final Scope Ruling at 8. In fact, Commerce's commentary in Asia Wheel I is particularly relevant because it interpreted a prior scope ruling involving almost identical antidumping orders, and specifically, a nearly identical third-country processing provision. The antidumping orders in Asia Wheel I contain the following third-country processing provision:

> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China.

Certain Steel Trailer Wheels 12 to 16.5 Inches from the People's Republic of China: Antidumping Duty and Countervailing Duty Orders, 84 Fed. Reg. 45952, 45954 (Dep't Com. Sept. 3, 2019). The Orders in this case contain a substantially similar third-country processing provision:

Appx013

> The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China.

Orders, 84 Fed. Reg. at 24100. Thus, Commerce's commentary interpreting the third-country processing provision in Asia Wheel I is particularly relevant here. In Asia Wheel I, Commerce interpreted the third-country processing provision while conducting a substantially similar country-of-origin analysis on nearly identical wheels.[5] There, Commerce noted that it "does not foreclose a further analysis of substantial transformation should a product be completed in a third country from a mix of rim and disc parts from China and a third country." Asia Wheel I Final Scope **\*1340** Memo at 24. In declining to foreclose this further analysis, Commerce clearly contemplated the exact wheels at issue in Asia Wheel I, which are substantially similar to the wheels at issue in this case such that Asia Wheel and ZC Rubber could reasonably anticipate that the wheels here would fall within the scope of the Orders subject to a substantial transformation analysis.

There is no question that Asia Wheel was aware that the language from Asia Wheel I was instructive here, as Asia Wheel suggested in their scope request that Commerce's interpretation of the scope language in Asia Wheel I is relevant and submitted excerpts of the AD/CVD Orders and the Final Scope Memo from Asia Wheel I as exhibits to their request for a scope ruling. See Request for Scope Ruling at 5 (Dept. Com. Feb. 11, 2021), P.R. 1; see also Asia Wheel I Final Scope Memo. Similarly, Commerce's commentary in Asia Wheel I provided additional notice to ZC Rubber, though it was not a named party in that case, because scope determinations are made based on the type of merchandise, not the particular parties. Therefore, responsible importers should consider publicly available prior scope rulings interpreting antidumping orders on substantially similar merchandise regardless of whether or not they are explicitly named. See Mid Continent Nail, 725 F.3d at 1304 ("In some cases ... guidance may be found in the third of

the (k)(1) criteria ... so long as these prior determinations were publicly available at the time that the antidumping order was issued." (footnote omitted)). Because Commerce's commentary in Asia Wheel I involved substantially similar merchandise, interpreted a nearly identical third-country processing provision, and was publicly available, it provided additional notice to the parties in this case.

Asia Wheel and ZC Rubber had adequate notice that steel wheels produced from mixed-origin components would fall within the scope based on the language of the scope order itself, Commerce's additional commentary during the investigation, and Commerce's commentary in its prior scope determination in Asia Wheel I.

### B. *Tai-Ao* and *Trans Texas* Do Not Support Plaintiff's Argument that Commerce Failed to Provide Fair Notice Here.

Asia Wheel provides two cases to support its assertion that Commerce's statements clarifying the original scope did not provide adequate notice. See Tai-Ao Aluminium Co. v. United States, 983 F.3d 487 (Fed. Cir. 2020); Trans Tex. Tire, LLC v. United States, 45 CIT ——, 519 F. Supp. 3d 1275 (2021). However, those cases differ in important ways from the present case. In Tai-Ao, Commerce expanded the scope of its inquiry. See 983 F.3d at 495–96. In Trans Texas, Commerce did not suggest the relevant products were included in the scope until the final scope ruling. See 45 CIT at ——, 519 F. Supp. 3d at 1281. Those cases are unlike the present case, where a reasonable importer could interpret Commerce's original scope language to include the wheels at issue and where Commerce provided additional commentary noting that substantial transformation analysis would be used on a case-by-case basis. See Orders, 84 Fed. Reg. at 24100; Final Scope Ruling at 27–28.

Asia Wheel argues that Tai-Ao "confirms that statements of intent to consider the potential application of antidumping and countervailing duties in the future do not constitute fair warning." Pl.'s Br. at 35. However, the court in Tai-Ao did not hold that a statement of intent can never provide adequate notice, but only that a statement of intent contemplating whether the inquiry should be expanded does not provide adequate notice. Tai-Ao, 983 F.3d at 495. This **\*1341** holding was supported by Commerce's statements and conduct suggesting the scope was limited to a single importer. For example, in Tai-Ao, the Initiation Notice only named

Appx014

one importer, Commerce's explanation for why it initiated the inquiry focused primarily on one importer, and Commerce issued a questionnaire to only one importer. See id. at 495–96. Unlike in Tai-Ao, where the statement of intent contemplated expansion of the scope and contradicted Commerce's other statements and conduct, Commerce's statement that it would not conduct fact specific substantial transformation analysis merely clarified the original scope and was consistent with Commerce's other statements and conduct. Final Scope Mem. at 27–28. Therefore, unlike in Tai-Ao, Commerce's statement here that it would not foreclose future analysis of wheels produced from mixed-origin components served as adequate notice that wheels produced from mixed-origin components could be included within the scope.

Trans Texas similarly does not support the Asia Wheel and ZC Rubber's argument that Commerce did not provide adequate notice here. See 45 CIT ——, 519 F. Supp. 3d 1275. In Trans Texas, Commerce expressly excluded certain on-the-road steel wheels that are coated entirely in chrome from its preliminary determination and reiterated this position throughout the investigation. Id. at ——, 519 F. Supp. 3d 1281. However, Commerce ultimately included PVD chrome wheels in its final scope ruling despite chrome coating. See id. While the court confirmed that Commerce can "alter the scope of the investigation until the final order," Commerce did not alter the scope to include PVD chrome wheels until publication of the final scope ruling, and thus did not provide adequate notice until then. Id. at ——, ——, 519 F. Supp. 3d 1284, 1288. This is unlike the present case

where wheels produced from mixed-origin components can reasonably be considered within the original scope and where Commerce expressly indicated they might be included subject to a substantial transformation analysis during the initial investigation. See Final Scope Mem. at 28.

Ultimately, Commerce's initial scope language, Commerce's statements during the investigation, the decision to conduct substantial transformation is fact specific, and Commerce's commentary in Asia Wheel I provided Asia Wheel and ZC Rubber with adequate notice that their wheels could reasonably be subject to the Orders. Because Commerce provided Asia Wheel and ZC Rubber with adequate notice, Commerce's instructions to Customs to continue its prior suspension of liquidation were proper.

### CONCLUSION

For the reasons stated above, Commerce's determination is supported by substantial evidence and in accordance with law. The court thus denies Asia Wheel's motion and sustains Commerce's Final Scope Ruling. Judgment will enter accordingly.

**SO ORDERED.**

**All Citations**

762 F.Supp.3d 1316

---

### Footnotes

1    Commerce published revisions to its scope regulations in September 2021, adding a new relevant provision titled "[c]ountry of origin determinations." 19 C.F.R. § 351.225(j)(1). Under the new provision, Commerce "may use any reasonable method" to "determine the country of origin of the product," to ultimately "consider[ ] whether a product is covered by the scope of the order at issue ...." Id. § 351.225(j). The provision goes on to state that "the Secretary may conduct a substantial transformation analysis that considers relevant factors that arise on a case-by-case basis," and includes the factors outlined in Bell Supply IV. Id. § 351.225(j)(1); see also Bell Supply IV, 888 F.3d at 1228–29. While this revision codified the substantial transformation test, the parties agree that because Asia Wheel filed its scope ruling request on February 11, 2021, before the effective date of the new regulations, the pre-revision version of the regulations applies. See Pl.'s Br. at 16 n.2; Def.'s Br. at 9–10 (citing to (k)(1) rather than (j)(1)); see also Scope Ruling Request; Regulations to Improve Administrative and Enforcement of Antidumping and Countervailing Duty Laws, 86 Fed. Reg. 52300 (Dep't Com. Sept. 20, 2021) ("Amendments to § 351.225 ... apply to scope inquiries for which a scope ruling application is filed ... on or after November 4, 2021."). The parties also agree that substantial transformation

was relevant in determining whether a product falls within scope even before Commerce's revision of its scope regulations. See Pl.'s Br. at 23 (arguing that Commerce applied the wrong standard, but not challenging the use of substantial transformation analysis itself); Def.'s Br. at 15 ("Commerce reasonably decided to apply a substantial transformation analysis to determine country of origin ....").

2 Customs typically must reach this final determination within 300 days of the initiation of the original investigation, though that timeline can be extended in extraordinarily complicated situations. See 19 U.S.C. § 1517(c)(1).

3 In Asia Wheel I, which the court discusses below—a different Final Scope Ruling (which predated the scope ruling now before the court)—the third-country processing provision includes "rims, discs, and wheels that have been further processed in a third country, including, but not limited to, ... the welding and painting of rims and discs from China," such that Commerce's commentary on the term "rims and discs" clearly refers to its only appearance in the second half of the third-country provision. Asia Wheel I Final Scope Ruling at 6. In contrast, the third-country processing provision here includes only "rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China," such that Commerce's commentary on the term "rims and discs" could refer to its appearance either in the first half of the provision, the second half of the provision, or in both locations. Certain Steel Wheels from the People's Republic of China, 84 Fed. Reg. 11746, 11748 (Dep't Com. Mar. 28, 2019). However, Asia Wheel and ZC Rubber have focused on the phrase "rims and discs" that appears in the second half of the third-country provision, arguing that this language indicates that the rim and disc must both be from China. See Pl.'s Br. at 19 (emphasizing "rims and discs" only in the second half of the provision); id. at 22 (suggesting that the "including, but not limited to" language indicates that the scope may include scenarios of third-country processing of Chinese-origin rims, discs, and wheels); Pl.-Inter.'s Br. at 6 (emphasizing only "rims and discs" in the second half of the provision); Pl.-Inter.'s Resp. to Qs. for Oral Arg. at 1, Nov. 7, 2024, ECF No. 58 ("[T]his difference in wording should not lead to a different result ... because neither case involves a situation where a Chinese-origin wheel is further processed in a third country.").

Because the Government has interpreted the third country provision in Asia Wheel II to reflect that "rims, discs, and wheels further processed in a third country are covered by the scope," Preliminary Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand at 11 (Dep't Com. Dec. 13, 2022), P.R. 59 ("Preliminary Scope Ruling"), and because Asia Wheel and ZC Rubber focus exclusively on the second half of the third-country provision, the court does not address whether Commerce's commentary applies to the same phrase, "rims and discs," in the first half of the third-country provision.

4 This court previously addressed the Federal Circuit's mention of a "new name, character[,] and use" in Bell Supply IV, noting that "[a]lthough the Court of Appeals quotes Bestfoods to invoke the name, character[,] or use test, Bestfoods involved a North American Free Trade Agreement country of origin determination applying statutory tariff-shift rules as opposed to Gibson-Thomsen's 'name, character[,] and use' test, which evolved in Customs law." Bell Supply Co. v. United States, 42 CIT ——, —— n.6, 348 F. Supp. 3d 1281, 1287 n.6 (2018) ("Bell Supply V"). The Federal Circuit "[spoke] of the name, character or use test, [but did] not invoke any of the factors used in Customs cases and specifically states the factors Commerce considers to determine whether there has been a substantial transformation." Id. Because Commerce itself noted the new name, character, and use question within the Final Scope Ruling, we consider it here just as courts did in Bell Supply IV and V: as merely a framework for the more essential five factors outlined below.

5 ZC Rubber argues that the differences between the scope language in Asia Wheel I and Asia Wheel II suggest that Commerce's commentary in Asia Wheel I cannot serve as sufficient notice. However, ZC Rubber only points to immaterial differences such as the differences in wheel diameter, and the use for the wheels in Asia Wheel I for road and highway trailers versus the use for the wheels in Asia Wheel II for Class 6, 7, and 8 commercial vehicles. See Pl.-Inter.'s Resp. to Qs. for Oral Arg. at 2–3, Nov. 7, 2024, ECF No. 55.

These differences do not suggest that Commerce's ultimate decision would be any different in the two cases, and do not indicate why the statement in Asia Wheel I that Commerce does not foreclose future substantial transformation analysis would not be applicable here.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

*Antidumping and Countervailing Duty Orders on Certain Steel Wheels 22.5-24.5 Inches in Diameter from the People's Republic of China, Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Asia Wheel)*
Appx018 – Appx052

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-082, C-570-083
Scope Inquiry:  Asia Wheel
**Public Document**
E&C/OVII:  EB

June 7, 2023

| | |
|---|---|
| **MEMORANDUM TO:** | James Maeder<br>Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **FROM:** | Jill Pollack<br>Senior Director, Office VII<br>Antidumping and Countervailing Duty Operations |
| **RE:** | Antidumping and Countervailing Duty Orders on Certain Steel Wheels 22.5-24.5 Inches in Diameter from the People's Republic of China |
| **SUBJECT:** | Final Scope Ruling:  Asia Wheel's Steel Wheels Processed in Thailand |

## I.    SUMMARY

In accordance with 19 CFR 351.225(f)(3) and 351.225(k)(1), we recommend that the U.S. Department of Commerce (Commerce) determine that certain types of truck wheels that Asia Wheel Co., Ltd. (Asia Wheel) manufactures in its facilities in Thailand and exports to the United States and described in its scope requests are subject to the antidumping duty (AD) and countervailing duty (CVD) orders (collectively, *Orders*) on certain steel wheels 22.5 to 24.5 inches in diameter (certain steel wheels) from the People's Republic of China (China).[1]

Commerce intends to use the final determination in this case as a basis to respond to the covered merchandise referral (CMR) from U.S. Customs and Border Protection (CBP)[2] concerning certain truck wheels imported from Thailand into the United States by Vanguard National Trailer Corporation (Vanguard).

---

[1] *See Certain Steel Wheels from the People's Republic of China:  Antidumping and Countervailing Duty Orders*, 84 FR 24098 (May 24, 2019) (*Orders*).

[2] *See* Memorandum, "Placement of Covered Merchandise Referral Documents on the Record," dated July 14, 2021 (containing CBP's Letter, "Covered Merchandise Referral Request for EAPA Investigation 7509, Imported by Vanguard National Trailer Corporation:  Antidumping and Countervailing Duty Orders on Certain Steel Wheels 22.5 and 24.5 Inches in Diameter from the People's Republic of China," dated June 9, 2021 (CBP's EAPA Letter)); *see also Certain Steel Wheels from the People's Republic of China:  Notice of Covered Merchandise Referral*, 86 FR 38270 (July 20, 2021) (*EAPA Initiation Notice*).



INTERNATIONAL
**TRADE**
ADMINISTRATION

## II.    BACKGROUND

On December 13, 2022, Commerce issued its Preliminary Scope Ruling, preliminarily finding that the steel wheels that Asia Wheel manufactures in its facilities in Thailand and exports to the United States, as described in Asia Wheel's Scope Ruling Request, are subject of the scope of the *Orders*.[3]  In the Preliminary Scope Ruling, Commerce set aside a period of time for parties to comment on the determination.[4]  We received timely-filed case briefs from Asia Wheel and ZC Rubber America Inc. (ZC Rubber), an interested party.[5]  In addition, we received a timely-filed rebuttal brief from Accurite Corporation and Maxion Wheel Akron LLC (the petitioners).[6]

*Covered Merchandise Referral*

On February 24, 2016, the Trade Facilitation and Trade Enforcement Act of 2015 was signed into law, which contains Title IV – Prevention of Evasion of Antidumping and Countervailing Duty Orders (short title, Enforce and Protect Act of 2015 or EAPA) (Pub. L. 114-125, 130 Stat. 122, 155, February 24, 2016).  Effective August 22, 2016, section 421 of the EAPA added section 517 to the Tariff Act of 1930, as amended (the Act), which establishes a formal process for CBP to investigate allegations of the evasion of AD and/or CVD orders.  Section 517(b)(4)(A) of the Act provides that if, during the course of an EAPA investigation, CBP is unable to determine whether the merchandise at issue is covered merchandise within the meaning of section 517(a)(3) of the Act, it shall refer the matter to Commerce to make such a determination.  Section 517(a)(3) of the Act defines covered merchandise as merchandise that is subject to an AD or CVD order issued under section 736 or 706 of the Act, respectively.  Section 517(b)(4)(B) of the Act states that Commerce, after receiving a covered merchandise referral from CBP, shall determine whether the merchandise is covered merchandise and promptly transmit its determination to CBP.  The Act does not establish a deadline by which Commerce must issue its determination.

On July 20, 2021, Commerce received a covered merchandise referral from CBP regarding CBP EAPA Investigation No. 7509, which concerns the *Orders*.  Specifically, CBP requested that Commerce issue a determination as to whether certain steel wheels produced in Thailand by Asia Wheel from Thai-origin steel wheel rims and Chinese-origin steel wheel discs are covered merchandise.  Notice of this referral was published in the *Federal Register* on July 20, 2021.[7]  In this notice, we explained that, because the covered merchandise referral requests a determination on merchandise identified in a request for a scope ruling previously submitted to Commerce and

---

[3] *See* Memorandum, "Antidumping and Countervailing Duty Orders on Certain Steel Wheels 22.5 – 24.5 Inches in diameter from the People's Republic of China:  Preliminary Scope Ruling:  Asia Wheel's Steel Wheels Processed in Thailand," dated December 13, 2022 (Preliminary Scope Ruling).

[4] *Id.* at 22.

[5] *See* Asia Wheel's Comments, "Certain Steel wheels ((22.5 – 24.5 Inches in diameter) from the People's Republic of China:  Asia Wheel Steel Truck Wheels – Case Brief," dated January 9, 2023 (Asia Wheel's Case Brief); and ZC Rubber's Case Brief, "Steel Wheels from the People's Republic of China:  ZC Rubber Case Brief," dated January 9, 2023 (ZC Rubber's Case Brief).

[6] *See* Certain Steel Wheels from the People's Republic of China, Asia Wheel Scope Inquiry – Petitioners' Rebuttal Brief," dated January 19, 2023 (Petitioners' Rebuttal Brief).

[7] *See EAPA Initiation Notice*, 86 FR at 38270.

currently under consideration, we would address the covered merchandise referral and Asia Wheel's Scope Ruling Request in the ongoing scope segments of the AD and CVD proceedings.[8]

## III.    SCOPE OF THE *ORDERS*

The products covered by the *Orders* are certain on-the-road steel wheels, discs, and rims for tubeless tires, with a nominal rim diameter of 22.5 inches and 24.5 inches, regardless of width. Certain on-the-road steel wheels with a nominal wheel diameter of 22.5 inches and 24.5 inches are generally for Class 6, 7, and 8 commercial vehicles (as classified by the Federal Highway Administration Gross Vehicle Weight Rating system), including tractors, semi-trailers, dump trucks, garbage trucks, concrete mixers, and buses, and are the current standard wheel diameters for such applications. The standard widths of certain on-the-road steel wheels are 7.5 inches, 8.25 inches, and 9.0 inches, but all certain on-the-road steel wheels, regardless of width, are covered by the scope. While 22.5 inches and 24.5 inches are standard wheel sizes used by Class 6, 7, and 8 commercial vehicles, the scope covers sizes that may be adopted in the future for Class 6, 7, and 8 commercial vehicles.

The scope includes certain on-the-road steel wheels with either a "hub-piloted" or "stud-piloted" mounting configuration, and includes rims and discs for such wheels, whether imported as an assembly or separately. The scope includes certain on-the-road steel wheels, discs, and rims, of carbon and/or alloy steel composition, whether cladded or not cladded, whether finished or not finished, and whether coated or uncoated. All on-the-road wheels sold in the United States are subject to the requirements of the National Highway Traffic Safety Administration and bear markings, such as the "DOT" symbol, indicating compliance with applicable motor vehicle standards. *See* 49 CFR 571.120. The scope includes certain on-the-road steel wheels imported with or without the required markings. Certain on-the-road steel wheels imported as an assembly with a tire mounted on the wheel and/or with a valve stem attached are included. However, if the certain on-the-road steel wheel is imported as an assembly with a tire mounted on the wheel and/or with a valve stem attached, the certain on-the-road steel wheel is covered by the scope, but the tire and/or valve stem is not covered by the scope.

The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China.

Excluded from the scope are:

      1) steel wheels for tube-type tires that require a removable side ring;
      2) aluminum wheels;
      3) wheels where steel represents less than fifty percent of the product by weight; and
      4) steel wheels that do not meet National Highway Traffic Safety Administration requirements, other than the rim marking requirements found in 49 CFR 571.120S5.2.

---

[8] *Id.*

Imports of the subject merchandise are currently classified under the following Harmonized Tariff Schedule of the United States (HTSUS) subheadings: 8708.70.4530, 8708.70.4560, 8708.70.6030, 8708.70.6060, and 8716.90.5059. Merchandise meeting the scope description may also enter under the following HTSUS subheadings: 4011.20.1015, 4011.20.5020, and 8708.99.4850. While HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the *Orders* is dispositive.

## IV.  LEGAL FRAMEWORK

When a request for a scope ruling is filed, Commerce examines the scope language of the order(s) at issue and the description of the product contained in the scope-ruling request.[9] Pursuant to Commerce's regulations, Commerce may also examine other information, including the description of the merchandise contained in the petition, the records from the investigation, and prior scope determinations made for the same product.[10] If Commerce determines that these sources are sufficient to decide the matter, it will issue a final scope ruling as to whether the merchandise is covered by an order.

Conversely, where the plain scope language in the order and the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the factors set forth in 19 CFR 351.225(k)(2). These factors are: (i) the physical characteristics of the product; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed. The determination as to which analytical framework is most appropriate in any given scope proceeding is made on a case-by-case basis after consideration of all evidence before Commerce.

Because AD and CVD orders apply to merchandise from particular countries, determining the country where the merchandise is produced is fundamental to proper administration and enforcement of the AD and CVD statute. The scope of an AD or CVD order is limited to merchandise that originates in the country covered by the orders.[11] Commerce has explicitly stated that the scope of an AD order is "defined by the type of merchandise and the country-of origin."[12]

---

[9] *See Walgreen Co. v. United States*, 620 F. 3d 1350, 1356-57 (Fed. Cir. 2010) (*Walgreen*).

[10] *See* 19 CFR 351.225(k)(1).

[11] *See Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 69 FR 74495 (December 14, 2004) (*SSPC from Belgium*), and accompanying Issues and Decision Memorandum (IDM) at Comment 4.

[12] *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina*, 58 FR 37062, 37065 (July 9, 1993) (where Commerce stated that "{the} scope of an antidumping or countervailing duty order is defined by the type of merchandise and by the country of origin (*e.g.*, widgets from Ruritania). For merchandise to be subject to an order it must meet both parameters, *i.e.*, product type and country of origin. In determining country of origin for scope purposes, Commerce applies a 'substantial transformation' rule." This language was quoted by the U.S. Court of International Trade (CIT) in *Advanced Tech & Materials Co., Ltd. v. United States*, 35 CIT 1380, 1384 (October 12, 2011); and *Ugine and ALZ Belgium, N.V. v. United States*, 517 F. Supp. 2d 1333,1345 (CIT 2007) (*Ugine CIT 2007*)).

In determining the country of origin of a product, Commerce's practice has been to conduct a substantial transformation analysis.[13] The CIT has upheld Commerce's "substantial transformation" analysis as a means to carry out its country of origin analysis.[14] The CIT has held, and the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has affirmed, that the "'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."[15]

Commerce's substantial transformation analysis asks:

(1) whether, as a result of the manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character, and use;[16] and

(2) whether through that transformation, the new article becomes a product of the country in which it was processed or manufactured.[17]

Commerce may examine a number of factors in conducting its substantial transformation analysis, and the weight of any one factor can vary from case to case and depends on the particular circumstances unique to the products at issue.[18] For this scope inquiry, Commerce considered the following factors when performing our substantial transformation analysis:

1. Class or Kind of Merchandise
2. Product Properties, the Essential Component of the Merchandise, and Intended End Use
3. Nature/Sophistication of Processing in the Country of Exportation
4. Cost of Production/Value Added
5. Level of Investment.[19]

Because the scope request addresses certain steel wheels assembled in a third country that contain wheel components manufactured in China, we have used a substantial transformation

---

[13] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value: Glycine from India*, 73 FR 16640 (March 28, 2008), and accompanying IDM at Comment 5; *see also SSPC from Belgium* IDM at Comment 4.

[14] *See Bell Supply Co. v. United States*, 888 F.3d 1222, 1229 (Fed. Cir. 2018) (*Bell Supply CAFC 2018*) (citing *E.I. DuPont De Nemours & Company v. United States*, 8 F. Supp. 692, 695 (CIT 1993) ("noting that in determining if merchandise exported from an intermediate country is covered by an antidumping order, Commerce identified the country of origin by considering whether the essential component is substantially transformed in the country of exportation.").

[15] *Id.*

[16] *See, e.g.*, *Bell Supply CAFC 2018*, 888 F.3d at 1228-29.

[17] *See Ugine CIT 2007*, 517 F. Supp. 2d at 1337 n.5.

[18] *See Laminated Woven Sacks from the People's Republic of China: Final Results of First Antidumping Duty Administrative Review*, 76 FR 14906 (March 18, 2011) (*Laminated Woven Sacks*), and accompanying IDM at Comment 1b.

[19] *See, e.g.*, *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review*, 76 FR 3086 (January 19, 2011), and accompanying IDM at Comment 6; *Laminated Woven Sacks* IDM at Comment 1b; *Final Determination of Sales at Less Than Fair Value: Certain Artist Canvas from the People's Republic of China*, 71 FR 16116 (March 30, 2006), and accompanying IDM at Comment 1; and *Bell Supply CAFC 2018*, 888 F.3d at 1228-29.

analysis, as appropriate, to determine whether certain of Asia Wheel's products exported to the United States are covered by the scope of the *Orders*.

## V.    DESCRIPTION OF THE MERCHANDISE SUBJECT TO THE SCOPE REQUEST

The products subject to Asia Wheel's Scope Ruling Request are truck wheels that Asia Wheel processes in Thailand using discs from China and rims produced in Thailand from rectangular steel plates sourced from China or a third country.[20]  Asia Wheel did not identify specific model numbers of wheels otherwise covered by the scope of the *Orders* if produced in China and finished in Thailand.  Asia Wheel explains that it does not have a product catalog for the limited number of basic steel truck wheel sizes that differ in design based on customer-specific requirements.[21]  Specifically, Asia Wheel has neither product brochures nor "external documentation detailing the specific products subject to its request,"[22] and maintains in its warehouse system its complete product list, containing the internal merchandise code assigned and the product description.[23]  However, we note the product list provided by Asia Wheel indicates that its truck wheels all possess diameters in the range of 22.5 to 24.5 inches covered by the scope of the *Orders* and would thus be covered by the scope of the *Orders* if manufactured in China.[24]

In supplemental questionnaires, Commerce inquired as to:  (1) the specific products covered by the request; (2) whether the same product could be produced using two or more different production methods; and (3) where on the product and/or mill certificate it indicates that the rim of the truck wheel was produced in Thailand and the disc in China.  In response, Asia Wheel notes that that all truck wheels it produces are subject to this scope ruling request and are manufactured using one method of production.[25]  Further, it only uses internal merchandise codes, as assigned in the system, and product descriptions to identify its products; these are not further applied to its invoices and shipment documents.[26]  Asia Wheel notes that, thus far, for its exports of truck wheels subject to the scope ruling request, it has applied for and obtained non-preferential certificates of origin issued by the Thai Department of Foreign Trade (DFT) through its Thai customs brokers.[27]  However, although Asia Wheel import and production documents demonstrate that the rim was produced in Thailand and the disc was produced in China, to ensure

---

[20] *See* Asia Wheel's Letter, "Request for Scope Ruling for Asia Wheel's Steel Truck Wheels," dated February 11, 2021 (Asia Wheel's Scope Ruling Request), at Exhibit 4 (Steel Truck Wheel Production Process Description and Flowchart).

[21] *See* Asia Wheel's Letter, "Supplemental Questionnaire Response," dated June 29, 2021 (Asia Wheel's SQR1), at 9.

[22] *See* Asia Wheel's Letter, "Responses to the Request for Information for All Interested Parties and the Second Supplemental Questionnaire Response for Asia Wheel," dated July 11, 2022 (Asia Wheel's SQR2 and RFI Response), at RFI-3 and Exhibit S2-6.

[23] *Id*. at RFI-3.

[24] *Id*. at RFI-7-8, RFI-10, and Exhibit S2-6.

[25] *Id*. at RFI-9-10.

[26] *Id*. at RFI-3-4 and Exhibits S2-8-9; and Asia Wheel's SQR1 at Exhibit S1-6.

[27] Asia Wheel explains that, with effect of November 1, 2019, the Thai DFT began issuing country of origin certificates for the export of certain products from Thailand to the United States and the European Union, upon presenting the company registration certificate and the list of raw materials used in the production to certify the products.

that CBP can identify truck wheels manufactured by Asia Wheel, it proposes: (1) to indicate on its invoices to its customers the country of origin for the rim of the steel wheel and the steel wheel itself; (2) to issue product certificates for rims or discs specifying the country of origin, with Commerce's approval; (3) to permanently stamp a marking on the rims of truck wheels "produced Thailand," if Commerce and Asia Wheel's customers agree; and/or (4) to include the import/export documents (Chinese customs export declaration forms, Thai customs import declaration), bill of lading, and packing lists for the discs imported from China.[28]

## VI.  RELEVANT SCOPE DETERMINATIONS

Asia Wheel I Scope Ruling[29]

In the final ruling for the Asia Wheel I proceeding, Commerce found that the finished trailer wheels Asia Wheel assembled in Thailand using discs from China and rims produced in Thailand from rectangular steel plates from China or a third country (Production Method A), and the dual wheels Asia Wheel assembled using discs produced in Thailand from disc blanks from China and rims from China (Production Method C) were subject to the scope of the *Orders*. Commerce further found that the finished trailer wheels assembled in Thailand using discs produced in Thailand from circular steel plates from China or a third country and rims produced in Thailand from rectangular steel plates from China or a third country were not subject to the scope of the *Orders*. Additionally, Commerce made certain amendments to draft certifications for importers and exporters.

## VII.  DISCUSSION OF THE ISSUES

**Comment 1:  Whether Asia Wheel's Steel Wheels Manufactured in Thailand from Chinese-Origin Discs and Thai-Origin Rims Manufactured from Steel Plate from China or a Third Country are Excluded Under the Plain Language of the Scope**

*Asia Wheel and ZC Rubber's Comments*
- The third country-processing provisions of the scope of the *Orders*, as requested by the petitioners and clarified by Commerce, clearly indicate that both rims and discs assembled in a third country must be of Chinese origin to be included under the *Orders*.[30]
- The scope specifically includes steel wheels that are welded and painted in a third country from rims and discs from China. Interpreting the scope to include steel wheels welded and painted in a third country from rims **or** discs from China would result in an impermissible expansion of the scope.[31]
- While the phrase "including, but not limited to" in the scope can apply to situations other than "welding and painting," it cannot be interpreted to encompass the welding and

---

[28] *See* Asia Wheel's SQR2 and RFI Response at RFI-4 and RFI-8.
[29] *See* Memorandum, "Antidumping and Countervailing Duty Orders on Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China; Final Scope Ruling: Asia Wheel's Steel Wheels Processed in Thailand (Asia Wheel)," dated April 11, 2023 (Trailer Wheels Scope Ruling).
[30] *See* Asia Wheel's Case Brief at 3-4; and ZC Rubber's Case Brief at 4-5.
[31] *See* Asia Wheel's Case Brief at 4 (emphasis in original).

painting of rims or discs from China and is inconsistent with the petitioners' intent to include steel wheels assembled in a third country from both, Chinese-origin discs and rims.[32]

- In the Preliminary Scope Ruling, Commerce denies having ruled in the investigation that wheels assembled in a third country from rims **or** discs from China, are out-of-scope and declined a substantial transformation analysis then. Commerce cannot now expand the *Orders* to include wheels made in third countries from Chinese-origin discs, only. This is now raised in Asia Wheel's Scope Ruling Request.[33]

*Petitioners' Rebuttal*

- By relying on a partial quote of the third county processing language in the scope of the *Orders*, Asia Wheel and ZC Rubber ignore the full language of the paragraph. The plain language of the scope is explicit that the scope's coverage includes, but is not limited to, the given example and extends to "any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China."[34]
- Commerce should reject Asia Wheel and ZC Rubber's reading of the scope's third country processing language, because it willingly ignores Commerce's complete statements during the investigations, thereby making parts of Commerce's determination mere surplusage.[35]
- Commerce's addition of "from China" in the scope of the investigations, does not limit the entire scope to the phrase "rims and discs." Here, Commerce neither added nor subtracted from the coverage of the scope, it merely clarified the scope. The inclusion of one product does not exclude other products, unless indicated in the terms of the scope.[36]
- In the investigation, Commerce left open the question of whether wheels with components produced in China up to a point and then finished elsewhere were substantially transformed in a third country. Therefore, Commerce properly addressed the question in this scope inquiry.[37]

**Commerce's Position:** For this final ruling, we continue to find it appropriate to apply a substantial transformation analysis to determine country of origin for Asia Wheel's steel wheels manufactured from Chinese-origin discs and Thai-origin rims produced from steel plate from China or a third country. In the *Final Determinations*,[38] Commerce stated that it has the authority to set the scope of the investigation to describe with adequate clarity the subject merchandise that the petitioners are seeking to address; that is, the merchandise subject to that proceeding. Therein, Commerce found that the language of the scope was administrable, and that, although argued by both respondents and the petitioners in their briefs, it was, therefore,

---

[32] *Id*. at 5.

[33] *See* Asia Wheel's Case Brief at 5-6 (emphasis in original); and ZC Rubber's Case Brief at 5.

[34] *See* Petitioners' Rebuttal Brief at 3-4.

[35] *Id*. at 4-5.

[36] *Id*. at 5-6.

[37] *Id*. at 6-7.

[38] *See Certain Steel Wheels from the People's Republic of China: Final Determination of Sales at Less-Than-Fair-Value*, 84 FR 11746 (March 28, 2019) (*Steel Wheels from China AD Final Determination*), and accompanying IDM at Comment 1; and *Certain Steel Wheels from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 84 FR 11744 (March 28, 2019) (*Steel Wheels from China CVD Final Determination*), and accompanying IDM at Comment 1 (collectively, *Final Determinations*).

unnecessary to further consider whether to include language on substantial transformation within the scope.[39]  Specifically, Commerce stated that, "{w}hile in some instances Commerce has relied on a substantial transformation analysis to address country-of-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case."[40]  In the *Final Determinations*, Commerce found it could properly address issues concerning circumvention by including the petitioners' proposed revisions to the scope language to include:[41]

> rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China.

However, the processing at issue was not addressed in the scope language of the underlying investigations.  The plain language of the scope is ambiguous as to the status of finished wheels processed in a third country from a mix of one wheel component sourced from China and one component originating from a third country, and the need to perform such an analysis to address this ambiguity left in the underlying investigations is addressed in this scope ruling.

As discussed at length and addressing nearly identical arguments in the Preliminary Scope Ruling, we declined to clarify the scope language as requested by the respondents or as requested by the petitioners in the underlying investigations beyond the merchandise subject to those investigations.[42]  Asia Wheel and ZC Rubber's arguments that the plain language is clear that wheels made in a third country from rims or discs from China, but not both, are outside the scope of the *Orders*, are reliant on a mischaracterization of the investigation record.  They characterize this as both a wholesale rejection foreclosing any subsequent consideration of the topic and as a primary finding that such products are not covered based on the plain language.  Thus, the context that Asia Wheel and ZC Rubber argue must be considered in our analysis belies all of their arguments on this issue, as we made no such overall determination.  By including the above third country processing language, Commerce did not automatically exclude an array of products, such as steel wheels assembled in a third country of Chinese-origin and third country components.  Instead, Commerce explained that it considered the most appropriate resolution to the question to be an evaluation of specific examples on a case-by-case basis in the context of future scope or circumvention inquiries, in consideration of information regarding substantial transformation, if appropriate.  As stated in the *Final Determinations*, "{w}hile in some instances Commerce has relied on a substantial transformation analysis to address country-of-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case."[43]

---

[39] *Id.*

[40] *See, e.g.*, *Steel Wheels from China AD Final Determination* IDM at Comment 1 (citing *Canadian Solar, Inc. et al. v. United States*, 918 F.3d 909, 915 (Fed. Cir. 2019) (*Canadian Solar*)).

[41] *See Certain Steel Wheels from the People's Republic of China:  Antidumping and Countervailing Duty Orders*, 84 FR 24098 (May 24, 2019) (*Orders*).

[42] *See* Preliminary Scope Ruling at Issue 1.

[43] *See Steel Wheels from China AD Final Determination* IDM at 11 (citing *Canadian Solar*).

Asia Wheel and ZC Rubber argue that the scope explicitly provides that steel wheels assembled in third countries using "rims and discs from China" are within the scope and if steel wheels made in a third country from rims or discs (but not both) from China were also included, the scope description would have stated "the welding and painting of rims or discs from China to form a steel wheel," but it does not.[44]  However, Asia Wheel and ZC Rubber's focus on the terms "and" versus "or" in their arguments with respect to the scope's third country processing language ignores major parts of the third country processing language.  As we emphasized in the Preliminary Scope Ruling, "{t}he 'including, but not limited to' clause indicates that the 'welding and painting of rims and discs from China to form a steel wheel' are non-exhaustive examples of included processing.  The plain language does not address what varieties of processing may otherwise exclude a product from the scope."[45]  In fact, the plain language of the scope extends to "any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China."[46]  The petitioners are correct to note that Asia Wheel and ZC Rubber's arguments are relying on a partial quotation of the third country processing language in the scope of the *Orders*.  We agree with the petitioners that Asia Wheel and ZC Rubber ignore the full language of the third country processing paragraph.  Their claim that products are covered by the plain meaning of the third country processing paragraph, which needs no further analysis, relies on overlooking all context the source materials cited.  Their discussion consists of a selective omission of critical phrases which directly contradict the arguments.  As Commerce emphasized in the Preliminary Scope Ruling, a plain reading of the scope language in question reflects that rims, discs, and wheels further processed in a third country are covered by the scope if such processing would not otherwise exclude these items had the processing occurred in China, and did not focus on rims and discs from China, as Asia Wheel suggests.[47]

Asia Wheel and ZC Rubber are correct that the scope of an order may be clarified but not changed contrary to its terms.[48]  However, the instant scope ruling merely seeks to provide specific clarification, as requested by Asia Wheel, as to whether the requested products are subject to this clause.  Our preliminary finding that wheels made in a third country from rims or discs from China, but not both, are not addressed by the explicit language of the scope and that the source materials otherwise direct Commerce to further evaluate coverage of such products based on case-specific factors, which may include substantial transformation information, is fully supported by the record and consistent with relevant precedent upholding the application of this methodology to resolve questions of country of origin.[49]

---

[44] *See* Asia Wheel's Case Brief at 4-5; and ZC Rubber's Case Brief at 5.
[45] *See* Preliminary Scope Ruling at 11.
[46] *See Orders*.
[47] *See* Preliminary Scope Ruling at 11; and Petitioners' Rebuttal Brief at 4-7.
[48] *See* Asia Wheel's Case Brief at 4-5; and ZC Rubber's Case Brief at 5.
[49] *See, e.g.*, *Bell Supply CAFC 2018*, 888 F.3d at 1229.

10

**Comment 2:  Whether Commerce's Preliminary Substantial Transformation Analysis Was Correct and Supported by the Record**

*Asia Wheel and ZC Rubber's Comments*

- Commerce's preliminary substantial transformation analysis is flawed and insufficiently demonstrates that the Chinese-origin discs are not substantially transformed in Thailand.[50]

- A substantial transformation analysis serves to determine the country of origin for an imported product, but Commerce often limited its analysis to the Chinese-origin disc and whether it undergoes substantial transformation in Thailand, *i.e.*, product properties, essential component of merchandise, and intended end use, rather than the truck steel wheel imported into the United States.[51]

- Not the disc incorporated into the truck steel wheel, but, rather, the imported new truck steel wheel (with its own distinct character and use into which the disc is incorporated) must undergo the substantial transformation analysis.[52]

- In the Preliminary Scope Ruling, Commerce stated that parties agreed that rims, discs, and finished truck wheels are of the same class or kind of merchandise but failed to explain or support its conclusion for determining that Chinese-origin discs used to produce truck wheels are not substantially transformed in Thailand.[53]

- Commerce has previously indicated that the "class or kind" factor is not dispositive with respect to a substantial transformation analysis and determined that substantial transformation can occur between upstream and downstream products within the same class or kind, as is the case here.[54]

- Although Chinese-origin discs, rims, and truck steel wheels are within the scope of the *Orders*, they are not interchangeable, because of the different physical characteristics and functions of each.  The wheel cannot function without both the disc and the rim, and substantial transformation occurs in Thailand because the Chinese-origin discs become a new product with a new name and character with its incorporation into the truck steel wheel in Thailand.[55]

- Commerce's essential characteristics factor is flawed, focusing on the essential qualities and purpose of the Chinese-origin discs change, rather than on how the essential characteristics of those discs differ from the characteristics of the imported truck wheels, thereby misinterpreting the WorldPac and Solaria Solar Cells scope rulings.[56]  The

---

[50] *See* Asia Wheel's Case Brief at 7.

[51] *Id.* (citing *Bell Supply CAFC 2018*, 888 F.3d at 1229) (citing *E.I. DuPont De Nemours & Company v. United States*, 8 F. Supp. 2d 854, 859 (CIT 1998))).

[52] *See* Asia Wheel's Case Brief at 7.

[53] *Id*. at 8; and ZC Rubber's Case Brief at 6-7.

[54] *See* Asia Wheel Case Brief at 8-9 (citing *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances*, 71 FR 29303 (May 22, 2006) (*Diamond Sawblades from China*), and accompanying IDM at 18; and *Diamond Sawblades Mfrs. Coal. v. United States*, 37 CIT 1501, 1517 (U.S. 2013)).

[55] *Id*. at 10; and ZC Rubber's Case Brief at 7-8.

[56] *See* Memoranda, "Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Final Scope Ruling on WorldPac Inc.'s Wheel Hub Assemblies," dated September 11, 2019 (WorldPac Scope Ruling) (provided to the instant record in Asia Wheel's SQR2 and RFI

former actually supports that substantial transformation has occurred in Thailand, whereas the latter actually stated in the third country provision that the assembly of in-scope parts in the third country is within the scope.[57]

- In the Solaria Solar Cells Scope Ruling, Commerce determined that the "module assembly" process in the third country did not substantially transform the Chinese and Taiwanese-origin solar cells, whereas the "essential characteristics" of the finished truck wheel are not established until the rim and disc are assembled and painted.[58]

- Commerce's conclusion that the Chinese-origin discs maintain their essential characteristics through processing in Thailand is flawed and inconsistent with its longstanding substantial transformation test, as upheld by the Federal Circuit, because the fact that the disc is meant to be incorporated into a specific finished wheel does not mean that the disc shares the same essential characteristics as the finished wheel, to which it needs to be compared in the analysis.[59]

- Neither the disc nor the rim is usable unless assembled into a wheel, and their individual properties define the name, character, or use as part of a finished truck wheel. Because none of the two individual parts possess the essential character of the finished wheel, acquired through its assembly in Thailand, the components are substantially transformed.[60]

- Commerce understates the level of processing in Thailand, which is extensive and sophisticated and includes rim manufacturing from steel plate (establishing the wheel's diameter), assembling, welding, e-coating, painting, and galvanizing, *e.g.*, while it overstates the level of processing in China.[61]

- Commerce incorrectly approaches its substantial transformation analysis by asking whether the Chinese-origin discs are dedicated to the production of the finished truck wheel, when it should be analyzing whether the imported truck wheels are new products in name, character, and use.[62]

- The production steps for the rims include coiling, planing, butt-welding, rolling, and valve hole punching, activities that substantiate the level of sophistication of Asia Wheel's production activities in Thailand, whereas the only in-scope component from China is the disc.[63]

- Commerce wrongly focuses on design and engineering in China for its substantial transformation analysis, instead of where the merchandise was physically produced. Moreover, Commerce wrongly focused on processing in China, when the plain language

---

Response at Exhibit RFI-ALL-1); and "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China, and Certain Crystalline Silicon Photovoltaic Products from Taiwan: The Solaria Corporation Scope Ruling," dated April 8, 2021 (Solaria Solar Cells Scope Ruling)

[57] *See* Asia Wheel's Case Brief at 10-11 and 13-14 (citing Preliminary Scope Ruling at 17-18).

[58] *Id*. at 15.

[59] *Id*. at 11 (citing *Cyber Power Sys. (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1350 (CIT 2022) (*Cyber Power Sys.*) (citing *Torrington Co. v. United States*, 764 F.2d 1563, 1568 (Fed. Cir. 1985))).

[60] *Id.* at 12-15 (citing Asia Wheel's SQR2 and RFI Response at RFI-10-11 (citing WorldPac Scope Ruling)); *see also Peer Bearing Co. – Changshan v. United States*, 914 F. Supp. 2d 1343, 1352 (CIT 2013).

[61] *Id.* at 15-16.

[62] *Id.* at 16.

[63] *Id.* at 17.

of the third country processing provision focuses on "rims and discs" from China that have been further processed, and not steel plates or other steel inputs. [64]

- Contrary to Commerce's finding that Asia Wheel's processing steps resemble those previously found to not constitute substantial transformation, the scope of that proceeding specified that the country of origin was the country where the main input, *i.e.*, subject part, was produced. However, the scope of the *Orders* does not include country of origin language. Furthermore, the third country assembly involves subject and non-subject inputs. [65]

- Commerce should accept the cost ratios submitted by Asia Wheel and find that the value added to the manufacture of the truck wheel in Thailand by Asia Wheel is significant and that the value added constitutes more than half of the manufacturing costs of the truck wheel. [66]

- The Thai-origin rim components should be attributed to Asia Wheel's production costs in Thailand, and not to processing costs in China. Specifically, the processing costs attributable to China should be limited to the input steel and initial fabrication steps for the Chinese-origin discs. [67]

- The steel plate sourced from China, or another country, is substantially transformed and made into a rim in Thailand through multiple production steps and is thus non-subject. Therefore, the costs to produce the rim should be attributed to Asia Wheel's production costs in Thailand.

- Asia Wheel purchased affiliated steel inputs at prices comparable to the market prices, as established by the record. [68]

- Asia Wheel provided extensive evidence on the record supporting that its investment for the production of truck wheels in Thailand is significant, including its ownership of the production facilities and the land they are on, its truck wheel production lines to manufacture all but the discs for the truck wheel. [69]

- In the Preliminary Scope Ruling, Commerce wrongly compared Asia Wheel's investment to Zhejiang Jingu Co., Ltd.'s (Zhejiang Jingu) [70] investment in China. Zhejiang Jingu operates a much larger factory than Asia Wheel and is the largest automotive steel wheel manufacturing base in midwest China. [71]

- Asia Wheel's level of investment was sufficient to produce the truck wheels with only one in-scope component sourced from China. [72]

- Commerce notes that Asia Wheel "lacks basic knowledge of its own production process," relying on sampling weight data "compiled by its affiliate," and that Zhejiang Jingu

---

[64] *Id.* at 17-18 (citing *Bestfoods v. United States*, 165 F.3d 1371, 1372 (Fed. Cir. 1999) (*Bestfoods*); and *Smith Corona Corp. v. United States*, 811 F. Supp. 692, 696 (1993) (*Smith Corona*)).

[65] *Id.* at 18 (citing Preliminary Scope Ruling at 19 (citing Memorandum, "Antidumping and Countervailing Duty Orders on Stainless Steel Flanges from the People's Republic of China and India: Final Scope Ruling for the Scope Request from the Coalition of American Flange Producers," dated April 1, 2019 (Flanges from China and India Scope Ruling)).

[66] *See* Asia Wheel's Case Brief at 19.

[67] *Id.* at 20.

[68] *Id.* at 20.

[69] *Id.* at 21-22.

[70] Zhejiang Jingu was a respondent in the underlying investigations and is Asia Wheel's affiliate.

[71] *Id.* at 22.

[72] *Id.* at 22-23.

13

maintains oversight over Asia Wheel's production of truck tires, but fails to explain why that fact suggests that Asia Wheel does not substantially transform Chinese-origin discs into a new product having a new name, character, and use.[73]

*Petitioners' Rebuttal*

- As the scope of the *Orders* includes rims, discs and finished wheels, Commerce recognized in the Preliminary Scope Ruling that the parties agree that the steel wheels exported from Thailand remain the same class or kind of product as Chinese-origin rims or discs.[74]

- Contrary to Zhejiang Jingu's claims that Commerce has modified its practice where both, the component and the finished products are in scope, to dismiss the importance of the class or kind factor in its analysis, Commerce actually determines that no substantial transformation has taken place when both products remain within the same class or kind, as is the case here. Hence, only if the other substantial transformation factors project uncommonly high weight, will Commerce determine otherwise.[75]

- Zhejiang Jingu wrongly relies on the diamond sawblades from China investigation,[76] as in that case Commerce found that factors other than class or kind had greater weight directing a determination of substantial transformation, such as significant capital investment and technical expertise as indicators of substantial transformation, attributes, Commerce found in the Preliminary Scope Ruling, Asia Wheel lacks.[77]

- Zhejiang Jingu's argues that the Federal Circuit has directed that the proper consideration is a "name, character, or use" test, relying on the CIT's recent *Cyber Power Sys.* decision, however, that addresses CBP's substantial transformation test. However, the courts have upheld Commerce's use of its five-factor substantial transformation test, and Commerce correctly examined those factors.[78]

- The product properties, essential component of the merchandise, and intended end use do not change here and weigh against finding substantial transformation. If the essential nature of a product could only be imparted when it is assembled and finished, as Zhejiang Jingu contends, Commerce's substantial transformation test would be moot, because the country of origin would always be where the product was finished for use. However, it is the substantial transformation test that determines the country of origin.[79]

- In the Preliminary Scope Ruling, Commerce found that the sole purpose of the Chinese-origin disc is to be used to make the finished wheel and does not change with further finishing operations. Likewise, the rim's character and diameter are set because it has to fit the disc, and those are determined by the diameter of the final wheel, as set in China.[80]

---

[73] *Id.* at 23-24.
[74] *See* Petitioners' Rebuttal Brief at 7.
[75] *Id.* at 8-9.
[76] *Id.* at 9-10 (citing *Diamond Sawblades from China* IDM at 19).
[77] *Id.*
[78] *Id.* at 10-11 (citing *Bell Supply Co., LLC v. United State*s, 348 F. Supp. 3d 1281, 1288 (n.6) (CIT 2018) ) (*Bell Supply V*); *Bell Supply CAFC 2018*, 888 F.3d at 1228-29 (Commerce looks to factors such as (1) the class or kind of merchandise; (2) the nature and sophistication of processing in the country of exportation; (3) the product properties, essential component of the merchandise, and intended end use; (4) the cost of production (COP)/value added; and (5) level of investment); and *Cyber Power Sys.*, 560 F. Supp. 3d ).
[79] *Id.* at 12 (citing Solaria Solar Cells Scope Ruling).
[80] *Id.* at 12-13.

- Commerce noted that the complex parts of the wheel production, like engineering, remained in China, and that Asia Wheel continued to be dependent on Zhejiang Jingu for basic information on its manufacturing steps and finishing operations of the wheels. This fact is apparent in the low level of sophistication of the processing performed in Thailand, where it is performed without even knowing the relevant weight of the finished products.[81]

- Zhejiang Jingu wrongly relies on *Bestfoods* which concerns Customs' "name, character, or use" test,[82] but not Commerce's five-factor analysis, and the CIT's decision in *Smith Corona*[83] in support of its claim that Commerce cannot take steps like engineering and designing into account for its substantial transformation analysis. In *Smith Corona* all parties agreed that substantial transformation had occurred in a third country, and the CIT noted that the only relevant country was the country was where the recognized substantial transformation occurred.[84]

- Contrary to Zhejiang Jingu's claim that design is completely separate from production and the scope does not cover such unfinished wheel parts, such as the steel plates in China, the CIT stated that "design and engineering" is "a first step *in production*." In the Hardwood Plywood Scope Ruling, Commerce stated that its analysis "must include all production steps required to produce" the product, regardless of where those steps occurred.[85]

- Commerce noted in the Preliminary Scope Ruling that Zhejiang Jingu's transfer prices to its affiliate are unreliable and that the record lacks Zhejiang Jingu's factors of production (FOP) for its production steps performed in China. Commerce also noted that it cannot calculate a fair market value for those steps and that the record indicates that production in China contributes a significant portion of the value added. Therefore, the value-added factor does not outweigh the findings of the other four factors.[86]

- Citing no authority, Zhejiang Jingu insists that it is Commerce's practice not consider the steps performed in China, and only include those performed in Thailand for its substantial transformation analysis. However, Zhejiang Jingu's own statements and those of another respondent in a subsequent proceeding on steel wheels demonstrated that those were important steps, consuming steel coils, electricity, water, and labor in China at significant cost, *i.e.*, steps that need to be accounted for in Commerce's analysis.[87]

- It is Commerce's practice to value subject country merchandise used as an input for third country processing as part of the subject country costs, as it did here, rather than attribute it to the third country processing costs, as demanded by Zhejiang Jingu. This also explains Zhejiang Jingu's overstatement of its steel plate costs in its reporting, as it assumed these costs to be accounted for in Asia Wheel's Thai processing costs. This

---

[81] *Id.* at 14.
[82] *Id.* at 10-11 (citing *Bestfoods*, 165 F.3d at 1373).
[83] *Id.* at 14-15 (citing *Smith Corona*, 811 F. Supp. at 696).
[84] *Id.* at 15.
[85] *Id.* at 16 (citing *Smith Corona*; and Memorandum, "Antidumping Duty and Countervailing Duty Orders on Certain Hardwood Plywood Products from the People's Republic of China, Enforcement and Protect Act (EAPA) Investigation No. 7252: Final Scope Ruling," dated January 21, 2022 (Hardwood Plywood Scope Ruling), at 34-35).
[86] *Id.* at 17-18.
[87] *Id.* at 18-19.

very point corroborates that Zhejiang Jingu's transfer price is unreliable and unusable, and susceptible to manipulation.[88]

- Zhejiang Jingu wrongly claims that Commerce's comparison of levels of investments is invalid because it does not address substantial transformation, and the evidence of lack of sophistication and process knowledge in its Thai operation is irrelevant for the analysis. Zhejiang Jingu further contends that Commerce, in comparing its China operations with its facility in Thailand ignores the different sizes of the operations; however, Zhejiang Jingu does not support that claim.[89]

- As confirmed by the courts, Commerce has the authority/discretion to adapt to different factual circumstances. In particular, to analyze the level of investment, the investment at hand has to be compared to the investment needed to perform the entire production process, and whether that investment shows that the Thai processing is substantial enough to transform the product from China into a Thai product.[90]

- Even considering Zhejiang Jingu's argument of size of the facility, the apparent differences in the levels of investment point to a minimal level of investment in Thailand, further supported by the documented non-sophisticated nature of that investment. In addition, the CIT affirmed Commerce's comparative analysis of an investment in a third country facility with the investment necessary for a similar set-up in the United States, as also provided on the record.[91]

**Commerce's Position:** For this final scope ruling, we continue to find the finished truck wheels Asia Wheel manufactures in its facilities in Thailand using discs from China and rims it produces in Thailand from steel plates from China or a third country are not substantially transformed such that the third-country processing confers country of origin based on the totality of circumstances. As discussed in the Preliminary Scope Ruling, to determine whether there has been a substantial transformation, Commerce considers factors such as: (1) the class or kind of merchandise; (2) the product properties, essential component of the merchandise, and intended end use; (3) the nature and sophistication of processing in the country of exportation; (4) the COP/value added; and (5) level of investment.[92] We are not altering our assessment of any individual factor, but address parties' comments regarding each below.

*Class or Kind*

As we noted in the Preliminary Scope Ruling, parties agree that the requested products remain the same class or kind of product as the Chinese-origin wheel components processed in Thailand.[93] Asia Wheel points to *Diamond Sawblades from China* as an example where

---

[88] *Id.* at 19-20 (citing *Oil Country Tubular Goods from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention*, 86 FR 43627 (August 10, 2021), and accompanying IDM at 11-14, unchanged in *Oil Country Tubular Goods from the People's Republic of China: Final Affirmative Determination of Circumvention*, 86 FR 67443 (November 26, 2021)).
[89] *Id.* at 21-23.
[90] *Id.* at 22 (citing *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1368 (CIT 2021); and *Bell Supply V*, 348 F. Supp. 3d at 1295 (affirming Commerce's comparative determination of the level of investment)).
[91] *Id.* at 23-25 (citing *Bell Supply V*, 348 F. Supp. 3d at 1295).
[92] *See* Preliminary Scope Ruling at 6-7 and Issue 2 (citing *Bell Supply CAFC 2018*, 888 F.3d at 1228).
[93] *Id.* at 17 (citing Asia Wheel's SQR2 and RFI Response at RFI-7-8; Asia Wheel's Letter, "Responses to

substantial transformation occurred despite relevant products remaining of the same class or kind, noting that this factor is "not dispositive."[94] Asia Wheel notes that wheel components are not interchangeable with finished wheels, as they possess different physical characteristics and different functions. The petitioners counter that Commerce continues to rely on this factor when ascertaining whether substantial transformation occurs.[95] The arguments from both parties support our practice of considering class or kind as one of several factors contributing to our totality of the circumstances analysis. In *Diamond Sawblades from China*, Commerce emphasized the case-by-case nature of its analysis, and we note that any differences or similarities in physical characteristics and functions between products, as mentioned by Asia Wheel, are addressed by subsequent factors in our substantial transformation analysis.[96]

Commerce continues to consider the class or kind of merchandise factor in its substantial transformation analysis because it serves, generally, as an indicator of the degree of transformation. That is, if a product is of a certain class or kind of merchandise and through processing is transformed into a different class or kind of merchandise, the change is indicative (but not dispositive) of a more significant transformation than if the merchandise were of the same class or kind of merchandise both before and after processing. If the downstream product becomes a different class or kind of merchandise, this weighs in favor of a finding that the product is a new and different article of commerce (*i.e.*, substantially transformed) in the third country. Conversely, where the upstream and downstream products are within the same class or kind, Commerce has found that it weighs against a finding of substantial transformation.[97] It is, thus, reasonable to continue to consider this factor when analyzing the nature and degree of the transformation that has occurred. The Chinese-origin discs used in, and the finished wheels resulting from, the assembly therein are, when ignoring country of origin, otherwise included within the scope of the *Orders*, meaning they are of the same class or kind of merchandise, *i.e.*, that they are "certain on-the-road steel wheels, discs, and rims {…}." Here, the individual components to manufacture the wheel, as well as the steel wheel itself, continue to be within the scope after assembly into a steel wheel, supporting a determination that no substantial transformation has occurred. In the Preliminary Scope Ruling, we noted that "Asia Wheel does not argue that any given component could be used to produce wheels that would not be covered by the scope," and parties have not provided evidence that we should reconsider our finding.[98]

---

Petitioners' Substantial Transformation Comments," dated July 21, 2022 (Asia Wheel's Rebuttal 2), at 17-18; and Petitioners' Letter, "Petitioners' Substantial Transformation comments," dated July 11, 2022 (Petitioners' RFI Response), at 14-15).

[94] *See* Asia Wheel's Case Brief at 8-9 (citing *Diamond Sawblades from China* IDM at 18).

[95] *See* Petitioners' Rebuttal Brief at 8-9.

[96] *See Diamond Sawblades from China* IDM at 17-19.

[97] *See, e.g.*, *Notice of Final Determination of Sales at Not Less Than Fair Value: Wax and Wax/Resin Thermal Transfer Ribbon from the Republic of Korea*, 69 FR 17645, 17647 (April 5, 2004) (citing *Notice of Initiation of Countervailing Duty Investigation: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 67 FR 70927, 70928 (November 27, 2002)); *Dynamic Random Access Memory Semiconductors of 256 Kilobits and Above from Japan; Suspension of Investigation and Amendment of Preliminary Determination*, 51 FR 28396, 28397 (August 7, 1986); *Notice of Preliminary Determination of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products from the People's Republic of China*, 66 FR 22183, 22186 (May 3, 2001); and *Final Determination of Sales at Less Than Fair Value: Certain Carbon Steel Butt-Weld Pipe Fittings from India*, 60 FR 10545, 10546 (February 27, 1995).

[98] *See* Preliminary Scope Ruling at 18.

Accordingly, we continue to find that this factor weighs against finding that substantial transformation has occurred.

*Essential Characteristics*

Asia Wheel's application of rulings concerning CBP country-of-origin findings to the examination of essential characteristics in a substantial transformation analysis for a scope determination is misplaced. The company asks Commerce to focus on whether the requested products obtained "a new name, character, and use" as a result of third country processing, without consideration of the totality of processing in the context of the enumerated prongs of the substantial transformation analysis.[99] However, in referencing CBP's country-of-origin findings in *Bestfoods* and in *Bell Supply CAFC 2018*, the Federal Circuit noted the differences between CBP's analysis and the factors used by Commerce to address substantial transformation: "although the {Federal Circuit} speaks of the name, character or use test, it does not invoke any of the factors used in {CBP} cases and specifically states the factors Commerce considers to determine whether there has been a substantial transformation."[100] Whereas Commerce may consider whether the third country processing imparted "a new name, character, and use" in consideration of the totality of circumstances, any such finding may not supplant an analysis of the record otherwise with respect to the substantial transformation factors and evidence. This suggests that the further processing did not substantially transform the merchandise, regardless of whether a new name, character, and use was obtained as a result of such processing.[101] Adopting any such standard as the sole basis of analysis would result in even minor finishing/assembly operations sufficient to determine country of origin and render the existing substantial transformation factors moot, which is plainly not the intent of the reference to CBP's "name, character, and use" analysis in *Bell Supply CAFC 2018*.

Prior to our Preliminary Scope Ruling, Asia Wheel contended that the WorldPac Scope Ruling supported its essential characteristics argument because, in that inquiry, Commerce found that the in-scope Chinese-origin tapered roller bearing (TRB) set lost its function, acting in unison with a Polish TRB set as part of an assembly.[102] In the Preliminary Scope Ruling, we noted that this comparison was inapt, as the WorldPac Scope Ruling addressed a more complex assembly of TRBs from China combined with a non-subject equivalent (a TRB set from Poland), a shaft seal with an anti-lock brake sensor, and one bare wheel hub from Germany.[103] In its case brief, Asia Wheel notes that it produces one wheel component in Thailand (or a "non-subject equivalent"), whereas the second TRB set was "simply" purchased from a third country in the WorldPac Scope Ruling, arguing that the instant record is even more supportive of a finding of substantial transformation as a result.[104] Our use of the phrase "non-subject equivalent" in the Preliminary Scope Ruling emphasized the differences between the WorldPac Scope Ruling and the instant inquiry. Specifically, we are not examining finished wheels processed from two

---

[99] *See* Asia Wheel's Case Brief at 7 (citing *Bell Supply CAFC 2018*, 888 F.3d at 1228; and *Bestfoods*, 165 F.3d at 1373).

[100] *See Bell Supply CIT 2018*, 348 F. Supp. 3d at 1287 (n. 6).

[101] *Id.*

[102] *See* Asia Wheel's SQR2 and RFI Response at RFI-10-11 (citing WorldPac Scope Ruling).

[103] *See* Preliminary Scope Ruling at 17-18 (citing WorldPac Scope Ruling at 1-4).

[104] *See* Asia Wheel's Case Brief at 10-11 and 13-14 (citing Preliminary Scope Ruling at 17-18).

18

discs, one Chinese-origin disc and another disc processed in Thailand, for example. Rather, we emphasized in the Preliminary Scope Ruling that,

> {t}he assembly in the instant proceeding is much simpler, utilizing only two major components, both otherwise subject to the *Orders* as components. Additionally, any given disc or rim continues to function as the only such component after incorporation into a finished wheel. In other words, unlike the TRBs in {the WorldPac Scope Ruling}, a finished wheel does not make use of multiple of the same component, sourced from different countries.[105]

Asia Wheel does not address Commerce's statement that the WorldPac Scope Ruling is not an appropriate parallel due to the many non-subject components involved and the complexity of the assembly involved in the WorldPac Scope Ruling.[106]

Asia Wheel's first argument against the applicability of the Solaria Solar Cells Scope Ruling is that the plain language of the scope of the *Orders* does not contemplate processing of finished wheels from discs *or* rims from China. As we explain above in Comment 1, we are addressing the ambiguity in the scope where one component is sourced from a third country, and that was not commented on in the underlying investigations. Next, Asia Wheel notes that the circumstances in this inquiry differ from the Solaria Solar Cells Scope Ruling, because the solar cells in question imparted the sole purpose of the finished product (*i.e.*, the input itself, as imported, contains the essential characteristics of the further manufactured product) whereas the essential characteristics of a finished truck wheel, "are not established until the rim and disc are assembled into a wheel," and that "{t}he properties of rim and disc define the properties of the wheel and its end-use."[107] Asia Wheel further cites language in the subsequent trailer wheels investigations that wheel components are "not useable without being assembled into a wheel."[108] However, as noted by the petitioners in the investigation of this proceeding, "{l}ike the assembly of solar cells into solar modules, the assembly of the rim and disc into a wheel enables the two elements to perform their functions, ***but they remain the same both before and after assembly***."[109]

Asia Wheel's primary contention with respect to this factor is that a finished wheel's use is determined after assembly of both a rim and disc, and, consequently, neither wheel component alone possesses the same name, character, or use as a finished wheel.[110] Asia Wheel argues that this inquiry is similar to *Diamond Sawblades from China*, where Commerce noted that the finished product is not functional until two components are assembled, imparting an essential

---

[105] *See* Preliminary Scope Ruling at 17.
[106] Furthermore, in the WorldPac Scope Ruling we found "the value that the single Chinese set adds to the complete wheel hub assembly is a minor and insignificant portion of the total cost of manufacturing," and note that Asia Wheel is not contending that a single rim or disc contributes only a minor amount to the cost of manufacturing. *See* WorldPac Scope Ruling at 5.
[107] *See* Asia Wheel's Case Brief at 12 (citing Asia Wheel's SQR2 and RFI Response at RFI-9).
[108] *See* Asia Wheel's Case Brief at 12 (citing Asia Wheel's SQR2 and RFI Response at RFI-4.).
[109] *See* Petitioners' Letter, "Petitioners' Request for Clarification of the Scope of the Investigations and Submission of Additional Factual Information Relevant to Scope," dated December 19, 2018, at 8 (emphasis added).
[110] *See* Asia Wheel's Case Brief at 11.

quality to the finished product.[111]  However, Asia Wheel does not indicate what specific qualities are imparted by assembly that we should consider as essential besides end use and does not revisit the physical characteristics it identified before our preliminary ruling as imparted by assembly, such as wheel offset and load rating.[112]  Moreover, Asia Wheel does not address the specific finished wheel characteristics identified in the preliminary ruling as belonging to individual components, such as the number, placement, and type of bolt holes in a disc.[113]

*Nature and Sophistication of Processing*

Asia Wheel contends that Commerce was incorrect to consider the end use of wheel components when discussing the nature and sophistication of its Thai processing:  "{t}he principal question under the substantial transformation analysis is not whether the Chinese-origin discs are dedicated for the production of finished truck wheels, but whether the imported truck wheels are new products – 'having a new name, character, and use' – or otherwise remain discs."[114]  Consideration of whether further processing imparts a new name, character, and use to a product must be considered in the context of the enumerated factors and the totality of evidence regarding substantial transformation.  Application of any such standard on its own and without consideration of the totality of circumstances required to produce the merchandise would necessarily limit the focus of analysis to only the third country processing itself, and myopically disregard the entirety of the production process otherwise.  To determine whether substantial transformation has occurred, Commerce must consider the nature and sophistication of all production steps required to produce the merchandise, regardless of where those steps occurred.  Accordingly, the totality of circumstances finding regarding whether substantial transformation has occurred may consider *both* conclusions regarding the *absolute* nature and sophistication of third country processing, on its own, but also conclusions regarding the *relative* nature and sophistication of third country processing in the context of all production steps required to produce the merchandise, including those in the order country.

Citing *Bestfoods* and *Smith Corona*, Asia Wheel argues that Commerce should not take into consideration the design or engineering of the requested products.[115]  Asia Wheel simply cites the use of "as a result of manufacturing or processing" language as support that design and engineering are not relevant to a substantial transformation analysis, but, rather, the analysis should focus on where the merchandise was "physically produced."[116]  *Bestfoods* is not relevant to the instant inquiry, as it concerns CBP's assessment of substantial transformation in the context of North American Free Trade Agreement country of origin marking requirements.[117]

---

[111]  *Id.* at 12-15 (citing *Diamond Sawblades from China* IDM at 18).
[112]  *Id.* at 12; *see also* Asia Wheel's SQR2 and RFI Response at RFI-10 ("{t}wo key properties of a finished truck wheel – the offset and load rating – are not established until the rim and disc are assembled.").
[113]  *See* Preliminary Scope Ruling at Issue 2 (The key qualities or characteristics of a disc, as identified in Asia Wheel's own argument, are not changed or otherwise transformed through processing:  "(1) the number, placement, and type of bolt holes; (2) the mounting arrangement; and (3) the materials used to produce the disc," referencing Asia Wheel's SQR2 and RFI Response at RFI-9).
[114]  *See* Asia Wheel's Case Brief at 16.
[115]  *Id.* at 17-18 (citing *Bestfoods*, 165 F.3d at 1372; and *Smith Corona*, 811 F. Supp. at 696).
[116]  *Id.* at 17 (citing *Bestfoods*, 165 F.3d at 1372).
[117]  *See Bestfoods*, 165 F.3d at 1372-73.

However, the Federal Circuit's description that "a product undergoes such a 'substantial transformation' if, as a result of manufacturing or processing steps in this country, the imported product loses its identity and is transformed into a new product having 'a new name, character and use,'"[118] was in the context of a CBP determination, not a substantial transformation analysis conducted by Commerce using the five factor test. We also find Asia Wheel's reliance on *Smith Corona* to be inapposite. There, the question was not whether substantial transformation occurred, but, rather, whether Commerce properly excluded certain third country parts from its circumvention analysis that *Smith Corona* claimed should be considered as products of Japan because they were designed and engineered there.[119] Further, the CIT cites section 781(a)(1)(B) of the Act in its statement that "production, not the design and engineering aspects of production," is "the critical factor";[120] however, this is not relevant to the instant substantial transformation analysis. For the purposes of determining whether substantial transformation has occurred, as stated above, Commerce must consider the nature and sophistication of all production steps required to produce the merchandise, regardless of where those steps occurred. Importantly, as the petitioners correctly note, the CIT in *Smith Corona* referred to design and engineering as "a first step in production."[121] Thus, we consider this initial design and engineering step in China to be important in assessing the processing which takes place in Thailand and the relative sophistication of those steps performed in Thailand.[122]

Asia Wheel contends that Commerce's consideration of steel plate processing in China is inapt because the third country processing provision of the scope language applies to "rims, discs, and wheels," but not steel plates or inputs.[123] We disagree, as this language clearly and plainly discusses the end result of the processing in question, the processing whose nature and sophistication is at issue for the third factor. In our examination of whether this factor (the nature and sophistication of processing) supports substantial transformation, we compare the processing which Asia Wheel performs in Thailand to produce the finished wheel exported to the United States to the processing performed elsewhere to produce the said wheel. The petitioners provided information on this record from the companion trailer wheels AD investigation from Zhejiang Jingu, the most recent cost and production information from a Chinese producer of trailer wheels subject to the *Orders*.[124] Specifically, that record information indicates that the first stage of the Chinese producer's production process involves the slitting and cutting of steel coils into steel plates of specific sizes for rim or disc processing.[125]

Contrary to Asia Wheel's characterization, we did not overlook that, in addition to its finishing operations, Asia Wheel produces wheel components in Thailand.[126] In the Preliminary Scope Ruling, our analysis focused on differences raised by parties, rather than the portions of

---

[118] *Id.*, 165 F.3d at 1373 (citing *United States v. Gibson-Thomsen Co.*, 27 CCPA 267 (CCPA 1939)).
[119] *See Smith Corona*, 811 F. Supp. at 693-96.
[120] *Id.*, 811 F. Supp. at 696.
[121] *See* Petitioners' Rebuttal Brief at 15-16 (citing *Smith Corona*, 811 F. Supp. at 696).
[122] *See Smith Corona*, 811 F. Supp. at 695-96, where the CIT rejected an argument that the location of a product's design is dispositive and emphasized the importance of the subsequent processing at issue.
[123] *See* Asia Wheel's Case Brief at 17-18.
[124] *See* Petitioners' RFI Response at 11-13 and Exhibits 2-4.
[125] *Id.* at 12 and Exhibit 2.
[126] *See* Asia Wheel's Case Brief at 2 and 16.

production the record indicates are otherwise identical, had they not been performed by Asia Wheel in Thailand, *i.e.*, the production of rims in Thailand from a steel plate and subsequent finishing steps. Specifically, we considered differences such as the design and engineering, and the cutting of a steel plate of appropriate size.[127]

Our consideration of the nature and sophistication of processing is not to compare whether individual steps are sophisticated in their own right or in comparison to another case, but whether the nature and sophistication of processing is such that the processing contributes to substantial transformation conferring a new country of origin.[128] Asia Wheel contends that Commerce's comparison of Asia Wheel's processing steps to those in the Flanges from China and India Scope Ruling, where Commerce determined that the processing steps in the third country do not constitute substantial transformation, is mistaken because, in that proceeding, the scope language specified that the countries of origin were where the flange was forged and, thus, did not remove the flange from the scope.[129] Contrary to Asia Wheel's contention that these *Orders* do not contain such provision, the plain language of scope clearly defines that the third country processing does not remove he merchandise from the scope of the *Orders*. Hence, only a positive determination of substantial transformation could remove a product from the scope of these *Orders*.

In case and rebuttal briefs, parties reference scope rulings that have not been supplied to the record of this proceeding, particularly to compare the relative sophistication of processing across inquiries.[130] However, for this scope ruling, we do not address further specific details from those proceedings and, instead, address the parties' arguments, sources supplied to the record, and public precedent of our practice or that of the CIT and Federal Circuit. Regarding how its processing is transformative, Asia Wheel notes that the rims it manufactures establishes the wheel's diameter.[131] As we outlined in the Preliminary Scope Ruling, Asia Wheel's processing in Thailand finishes the production process begun in China.[132] The introduction of certain physical characteristics in Thailand (the rim's diameter), and the assembly and finishing steps performed in Thailand are not sophisticated to the extent that it supports transformation. Rather, the design and engineering steps; the cutting of steel sheet plates; and the production of a disc, which takes place in China, functionally results in an already designed wheel, a complete disc and an in-process other wheel component awaiting additional processing and eventual assembly into a finished wheel. Therefore, we determine that the nature and sophistication of

---

[127] *See* Preliminary Scope Ruling at 18-20.
[128] Continuing our practice of considering substantial transformation on case-by-case basis, we do not view certain types of processing as sophisticated to the extent that they are always indicative of transformation or not, or that certain levels of sophistication of prior processing are sophisticated to the extent that they cannot subsequently be substantially transformed. The CIT has explained that "this type of strict comparative analysis could preclude a finding of substantial transformation for any downstream processing. Such an approach strays from the focus of the inquiry, *i.e.*, whether substantial transformation occurs as a result of the downstream processing." *See Bell Supply CIT 2018*, 348 F. Supp. 3d at 1290.
[129] *See* Asia Wheel's Case Brief at 18 (citing Flanges from China and India Scope Ruling).
[130] *Id.* at 18-19; *see also* Petitioners' Rebuttal Brief at 9.
[131] *Id.* at 16 (citing Asia Wheel's SQR2 and RFI Response at 9).
[132] *See* Preliminary Scope Ruling at 18-20.

the processing performed in Thailand is insufficient to find that substantial transformation has occurred.[133]

*Cost of Production/Value Added*

With respect to COP and value added, Asia Wheel argues that Commerce should attribute the costs, including steel inputs of the rims it produces entirely to processing in Thailand, as it argues the resulting rims are substantially transformed into Thai-origin components.[134]  This approach detracts from an accurate evaluation of this factor.  Our analysis seeks to determine if the COP and value added by Asia Wheel's processing in Thailand supports substantial transformation.  To the extent that prior processing or costs associated with steel plates used by Asia Wheel are attributable to production steps in China or a third country, that information helps to clarify the level attributable to processing in Thailand.  Moreover, Asia Wheel's arguments that any consideration of this factor should attribute Chinese steel sheet input costs to Thai further processing fails to consider the fact that these inputs were sourced from Asia Wheel's affiliate and corporate parent in China, which performed processing on these inputs prior to importation.

In our preliminary ruling, we noted that record information did not support the application of a detailed cost or value-added quantitative analysis.[135]  Specifically, Asia Wheel based its costs on transfer prices with its parent company, Zhejiang Jingu, and the petitioners submitted information from Turkey as surrogate values for finished steel discs, steel plate for the production of rims, and raw material inputs in the production of wheel components, but we did not have any FOPs for the production activity in China of the discs and steel plates.[136]  For this final ruling, Asia Wheel fails to provide a sufficient basis to compel Commerce to rely on its affiliated transfer prices as a basis for cost, because there is no evidence that these are market-based prices.  Asia Wheel also does not provide any support for its stance that, where transfer prices do not reflect arm's-length prices, the transfer prices can only understate costs, or cite to any authority to support using its reported costs.[137]  Furthermore, the record continues to lack sufficient information regarding FOPs or complete surrogate values to calculate the value added otherwise.

Our Preliminary Scope Ruling effectively made no determination on this factor, stating that "even presuming that Thai production adds a not insignificant amount of value, this does not outweigh the findings under the other four factors under a totality of the circumstances analysis."[138]  We find no reason to amend that finding, and – although Asia Wheel is correct that certain of the petitioners' calculations used an improper basis of comparison or were otherwise inconsistent with Commerce's practice – the petitioners' arguments otherwise provide a strong

---

[133] *See, e.g.*, *E.I. Du Pont de Nemours & Co. v. United States*, 22 CIT 370, 374 (1998) (*E.I. Du Pont*) (citing *Smith Corona*, 811 F. Supp. at 696); Memorandum, "Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China:  Aluminum Jalousie Shutters," dated October 15, 2019, at 17; Solaria Solar Cells Scope Ruling at 5; and Flanges from China and India Scope Ruling.
[134] *See* Asia Wheel's Case Brief at 18-19.
[135] *See* Preliminary Scope Ruling at 19.
[136] *Id.* at 19.
[137] *See* Asia Wheel's Case Brief at 20-21.
[138] *See* Preliminary Scope Ruling at 20.

basis of support to find that, at the very least, this factor does not support a finding of substantial transformation.[139]

*Level of Investment*

Concerning level of investment, Asia Wheel argues that "Commerce found" a certain ratio of investment in our preliminary ruling.[140]  Rather, we noted that "{o}utside of the finishing capabilities described, Asia Wheel's response indicates it has not invested substantially in the production of finished truck wheels, and the *record information* provided by the petitioners *suggests* that Zhejiang Jingu's investment in its Thai operations is roughly one-fifth that of its Chinese production plant {emphasis added}."[141]  Our finding with respect to this factor draws from record information, as quoted above, to support a reasonable conclusion that the level of investment in Thailand is not significant based on the submitted record information.

Asia Wheel argues that Chengdu Jingu Wheel Co., Ltd.'s (Chengdu Jingu) factory, the Zhejiang Jingu affiliate operating the aforementioned facility, is much larger than that of Asia Wheel.[142]  However, the relative size of the production facility, potentially, by area or output, can indicate the level of investment.  This analysis seeks to examine the level of investment in Asia Wheel, as a downstream processer, compared to a producer of finished steel wheels, where the relative level of investment serves as a reference as to whether the processing in question supports substantial transformation.[143]  The size of a facility or its output may be indicative of more robust investment in a greater number of production steps occurring in one facility, as an example.  Next, Asia Wheel emphasizes that Chengdu Jingu's facility is the "***largest automotive*** steel wheel manufacturing base in midwest China" (emphasis in original).[144]  However, this descriptor of Chengdu Jingu does not elucidate to what extent investment in the facility, if any, we should attribute to production of subject versus non-subject wheels.[145]  Finally, Asia Wheel suggests that while Chengdu Jingu is a larger enterprise than Asia Wheel, that would not negate the fact that Asia Wheel's level of investment was sufficient to produce the steel wheels with just one in-scope component sourced from China.[146]  However, Asia Wheel fails to take into account that its level of investment is limited and only suffices for manufacturing a truck rim from already processed Chinese or third country-origin steel sheet plates, and the mere assembly of those wheel components into truck wheels.

More generally, Asia Wheel primarily contends that its investments should be viewed as substantial and indicative of transformation in isolation, taking issue with Commerce's use of record evidence as a source of comparison but does not offer an alternative for this final ruling. We continue to find that a comparison of the level of investment in the third country to the

---

[139] *See* Memorandum, "Antidumping and Countervailing Duty Orders on Certain Steel Wheels 22.5 – 24.5 Inches in Diameter from the People's Republic of China:  Final Asia Wheel BPI Analysis Memo" dated concurrently with this memorandum (Final BPI Memorandum).
[140] *See* Asia Wheel's Case Brief at 22 (citing Preliminary Scope Ruling at 19).
[141] *See* Preliminary Scope Ruling at 19.
[142] *See* Asia Wheel's Case Brief at 22; and Final BPI Memorandum.
[143] *See Bell Supply CIT 2018*, 348 F. Supp. 3d at 1296.
[144] *See* Asia Wheel's Case Brief at 22 (citing Petitioners' RFI Response at Exhibit 7).
[145] Asia Wheel also does not propose how this compares to its own investment into subject and non-subject wheels.
[146] *See* Asia Wheel's Case Brief at 25.

investment needed to perform the entire production process in the order country is the correct framework and that the record does not support that the processing performed in Thailand is substantial enough to transform the products Jingu first processes in China into a product of Thailand, and Asia Wheel's arguments that we modify this analysis are misplaced.

For this final ruling, our analysis for each factor has not functionally changed from our Preliminary Scope Ruling, and thus, we continue to find that a totality of the evidence does not support that wheels produced using Chinese-origin discs and Thai rims manufactured from steel sheet plates from either China or a third country are substantially transformed in Thailand such that the Thai processing confers country of origin. Specifically: (1) the components are of the same class or kind; (2) the components maintain their essential characteristics (discs and steel sheets each have a sole purpose/end use as exported from China, *i.e.*, to be incorporated into a specific finished wheel); (3) the processing steps of finishing the components (either as imported from China or from a steel plate) into a finished wheel in Thailand are not substantially sophisticated considering the production operations in China, which produce the components themselves; (4) Asia Wheel's investment into truck wheel production is not comparable to the investment into production facilities involved in producing the components in China, and the record reflects that the Thai investment is highly dependent on expertise of the Chinese affiliate; and (5) though the record does not contain information to calculate the precise amount of value added in Thailand, statements regarding the amount of value added by the input steel and initial production steps suggests that production in China constitutes a significant portion of value added and, even given the presumption that Thai production adds a not insignificant amount of value, this does not outweigh the totality finding under the other four factors. Furthermore, with our Preliminary Scope Ruling, we placed on the record Commerce's scope ruling regarding HPS Conductor for Transformer Coil Scope Ruling.[147] We explained that this ruling was supportive of our totality of the circumstances ruling in this inquiry, noting that in that case, we found that the facts did not support substantial transformation without definitive conclusions concerning COP, value added, or level of investment.[148] No party commented on our comparison to this case and ,thus, we continue to view it as supportive of our conclusions here.

We find that the totality of the factors considered in our substantial transformation analysis weigh against finding that the rims manufactured in Thailand are substantially transformed when used to produce steel wheels in Thailand. As a result, we find that the country of origin of such inputs is China and, thus, they remain subject to the *Orders* after processing in Thailand. Because the scope language in the *Orders* is dispositive, we find it unnecessary to further analyze the criteria set forth in 19 CFR 351.225(k)(1) or to consider the additional factors provided in 19 CFR 351.225(k)(2).

---

[147] *See* Preliminary Scope Ruling at 8.
[148] *Id*. at 21 (citing Memorandum, "Antidumping and Countervailing Duty Orders on Aluminum Sheet from the People's Republic of China; Final Scope Ruling Determination: HPS Aluminum Conductor for Transformer Coil," dated January 20, 2022 (HPS Conductor for Transformer Coil Scope Ruling), at 10-11).

**Comment 3: Whether Suspension of Liquidation Should Commence No Earlier than the Date of the Preliminary Scope Ruling**

*Asia Wheel and ZC Rubber's Comments*

- Given the third country processing language in the scope and Commerce's earlier indication that both rims and discs must be of Chinese-origin to be subject to the *Orders*, Commerce should instruct CBP that the suspension of liquidation with respect to the truck wheels at issue begins with the issuance of the Preliminary Scope Ruling, to provide adequate notice to importers on the products covered by the scope of the *Orders*.[149]

- In *Trans Tex. Tire*, the CIT held that Commerce could only assess ADs/CVDs from the date of the final scope determination, because Commerce did not provide adequate notice to the importers that the merchandise was covered by the scope until the date of the final scope determination.[150]

- Asia Wheel did not request the scope ruling because it thought the truck wheels at issue were potentially covered by the scope, but rather, because it wanted to confirm that they are not, in light of the CBP's investigation under its EAPA Investigation No. 7509. Accordingly, neither Asia Wheel nor the importers had adequate notice that Asia Wheel's truck wheels might be covered by the scope of the *Orders*.[151]

- Commerce must stop the suspension of liquidation pursuant to 19 CFR 351.225(l)(1) and (l)(2) for those truck wheels, and as issued by CBP as part of the EAPA investigation, because the interim measures, at section 517(e) of the Act, apply only when CBP makes a determination pursuant to section 500(c) of the Act that the truck wheels are subject to the *Orders*. However, CBP referred the matter to Commerce under section 517(b)(4) of the Act instead.[152]

- Upon suspension of liquidation, Commerce must instruct CBP to suspend the entries of the truck wheels from other importers.[153]

*Petitioners' Rebuttal*

- Zhejiang Jingu and ZC Rubber are incorrect that Commerce cannot apply the scope determination to entries made prior to the Preliminary Scope Ruling, including those already suspended under the EAPA authority, as importers could not have known that Zhejiang Jingu's Thai wheels could be found within the scope of the *Orders*.[154]

- Section 351.225(l) of Commerce's regulations directs Commerce in case of an affirmative scope determination to suspend liquidation for all covered entries made on or after the date of initiation of the scope inquiry. The courts clarified that 19 CFR 351.225(l) was promulgated in the *Federal Register*, and, thus, there is no case of an

---

[149] *See* Asia Wheel's Case Brief at 24-26; and ZC Rubber's Case Brief at 9 (citing *Trans Tex. Tire, LLC v. United States*, 519 F. Supp. 3d 1275, 1281 (CIT 2021) (*Trans Tex. Tire*)); and *Tai-Ao Aluminum (Taishan) Co. v. United States*, 983 F.3d 487 (Fed. Cir. 2021) (*Tai-Ao Aluminum*)).

[150] *Id.* at 25 (citing *Trans Tex. Tire*, 519 F. Supp. 3d at 1275).

[151] *Id.* at 27-28.

[152] *Id.* at 28 (citing *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1317-18 (Fed. Cir. 2020) (*Sunpreme*)).

[153] *Id.* at 29.

[154] *See* Petitioners' Rebuttal Brief at 26.

impermissible retroactive application of the law. The cases cited by Zhejiang Jingu and ZC Rubber to support their claim addressed different situations.[155]

- Commerce issued a formal notice of the scope inquiry informing importers that the steel wheels could be found to be subject merchandise. In *Tai-Ao Aluminum*, as cited by Zhejiang Jingu, Commerce limited the initiation notice to certain companies only, and later applied the resulting determination to other exporters.[156]

- CBP already ordered suspension of liquidation made under its ongoing EAPA investigation and the Federal Circuit previously found that "not applying commerce's scope determination to entries with liquidations previously suspended by Customs would create a perverse incentive for importers to seek unnecessary scope ruling from Commerce," to escape ADs/CVDs.[157]

**Commerce's Position:** As provided in Commerce's regulations at 19 CFR 351.225(l)(3), for the purposes of this final scope ruling, we intend to instruct CBP to continue the suspension of liquidation for products found to be covered by the scope of the *Orders* if already suspended. Additionally, if liquidation of entries of such products is not already suspended, we intend to instruct CBP to suspend liquidation of entries of products found to be covered by the scope of the *Orders* effective to the date we initiated an inquiry upon Asia Wheel's Scope Ruling Request. Section 351.225(l) of Commerce's regulations addresses the suspension of liquidation in the context of a scope inquiry. Specifically, this section provides for Commerce to: (1) continue any existing suspension of liquidation pending subsequent rulings; (2) continue such liquidation in the event of a preliminary ruling or suspend liquidation from the date of the scope inquiry's initiation; and (3) further continue suspension of liquidation if a final ruling finds the relevant products included within the scope, in 19 CFR 225(l)(1), (l)(2), and (l)(3), respectively.

Asia Wheel asserts that, the regulations notwithstanding, suspension is impermissible prior to the date on which parties were given reasonable notice that the merchandise in question could be subject to AD/CVD liabilities.[158] Asia Wheel also asserts that the facts of the case establish that fair warning that AD/CVD liabilities may be applicable to the merchandise in question was not given until the date of the Preliminary Scope Ruling, and parties cannot be said to have had reasonable notice prior to this date given the language of the investigation rejecting the petitioners' request to explicitly include relevant merchandise in the plain language of the scope.[159] We disagree.

As an initial matter, fair warning that merchandise produced pursuant to production methods other than those outlined in the underlying investigation, generally, may be the subject of a future scope inquiry was explicitly provided by the statements in the underlying investigation which considered this type of inquiry:

---

[155] *Id.* at 27 (citing *Target Corp. v. United States*, 33 CIT 760, 779-80 (2009), *aff'd* 609 F.3d 1352 (Fed. Cir. 2010); *Sunpreme*, 946 F.3d at 1316 and 1318); *see also* Asia Wheel's Case Brief at 25-26; ZC Rubber's Case Brief at 9 (citing *Trans Texas Tire*, 519 F. Supp. 3d at 1275; and *Tai-Ao Aluminum*)).
[156] *Id.* at 28-30.
[157] *See* Petitioners' Rebuttal Brief at 30-31 (citing *Sunpreme*, 946 F.3d at 1318).
[158] *See generally* Asia Wheel's Case Brief at 24-29.
[159] *Id.* at 24-29.

While in some instances Commerce has relied on a substantial transformation analysis to address country-of-origin issues, ***the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case. However, here, we find that we can properly frame the scope of the investigation and properly address issues concerning circumvention by incorporating the petitioners' proposed clarification of the scope***, subject to the minor change discussed further below."[160] (emphasis added).

Commerce conveyed to any reasonably informed importer sufficient notice that such merchandise may be the subject of a future scope inquiry.[161]  As discussed in Comment 1, above, Asia Wheel's contentions regarding the ambiguity of this statement and conclusions that this statement reflected the opposite meaning are not informed by reason.  Notably, notwithstanding Asia Wheel's strained attempts to interpret the meaning of the language of the *Final Determinations* otherwise, no party contests that the steel wheels subject to this request are precisely the merchandise contemplated by Zhejiang Jingu in its comments for the *Final Determinations*, namely, that "{t}he proposed scope language is overly broad and vague, potentially expanding the scope to include other merchandise that also originates in third countries (*e.g.*, the language does not explicitly require that both the rim and disc be produced in China for China to be considered the country of origin)."[162]  Zhejiang Jingu clearly was aware that the product for which its affiliate Asia Wheel is requesting a scope ruling was potentially within the scope of the *Orders*.  Thus, establishing the effective date of suspension of liquidation of entries for which liquidation was not already suspended to be May 12, 2021, the date of initiation pursuant to 19 CFR 351.225(l), is wholly consistent with the principles espoused in *Tai-Ao Aluminum* and *Trans Texas Tire*.  Adequate notice that a product be completed in a third country from a mix of rim and disc parts from China and a third country may be subject to further analysis of substantial transformation, *in general*, was established at the time of the underlying investigation.  Any ambiguity that the *specific* steel wheels assembled in Thailand from Chinese-origin discs and Thai-origin rims manufactured from rectangular steel plates sourced from China or a third country may be subject to liabilities was established by the May 12, 2021, Asia Wheel scope inquiry initiation memorandum, and the explicit mention of the merchandise in question therein constituted fair warning to any reasonably informed importer.[163]

---

[160] *See Steel Wheels from China AD Final Determination* IDM at 11 (citing *Canadian Solar*; and, *e.g.*, *Certain Cold-Rolled Steel Flat Products from Brazil, India, the Republic of Korea, and the United Kingdom:  Amended Final Affirmative Antidumping Determinations for Brazil and the United Kingdom and Antidumping Duty Orders*, 81 FR 64432 (September 20, 2016)).

[161] *Id.*

[162] *Id.* IDM at Comment 1 (page 8).

[163] *See* Commerce's Letter, "Initiation of Asia Wheel Scope Inquiry," dated May 12, 2021, at 1 (Commerce finds that it cannot determine whether the requested products are inside the scope of the *Orders* based solely upon Asia Wheel's application for a scope ruling and other comments provided to the record, and the descriptions of the merchandise contained in 19 CFR 351.225(k)(1)).  Although Commerce published revisions to its scope regulations in September 2021, the new scope regulations only became effective on November 4, 2021.  *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021).  Thus, because Asia Wheel filed its scope ruling request on February 11, 2021, before the effective date of the new regulations, the instant determination has been made under the scope regulations, 19 CFR 351.225, in effect prior to November 4, 2021.  *Id.* ("Amendments to {19 CFR} 351.225 … apply to scope inquiries for which a scope ruling application is filed … on or after November 4, 2021.").

Further, we disagree with Asia Wheel regarding the applicability of the *Tai-Ao Aluminum* and *Trans Texas Tire* decisions to scope inquiries, generally, including the instant inquiry. *Tai-Ao Aluminum* concerned a circumvention proceeding and addressed issues regarding fair warning and adequate notice regarding collection of duties which arose due to the specific nature of circumvention proceedings. Specifically, the "adequate notice" issue in *Tai-Ao Aluminum* concerned the retroactive collection of duties with respect to a series of products considered by the request, which evaluated the production/export activities of certain firms as initiated, but where the resulting determination made an affirmative finding of circumvention applicable on a country-wide basis (*i.e.*, applicable to all imports of that series of product, including products not explicitly manufactured, exported, or imported by entities identified in the request, as initiated).[164] Critical to the *Tai-Ao Aluminum* decision was the fact that *Tai-Ao Aluminum* was not identified as a company covered by the Commerce's circumvention inquiry when it published its initiation notice, which covered only Zhongwang Holdings Ltd.[165] The lack of reasonable notice with respect to *Tai-Ao Aluminum* at issue in that proceeding is, thus, inapposite to the instant proceeding where Asia Wheel was plainly identified as the applicable party at all points in this inquiry.

Further, *Trans Texas Tire* concerned a scope determination made in the final determination stage of the investigation and involved reconciling the date on which adequate notice was established with Commerce's standard practice in an investigation of commencing the collection of duties on the date of the preliminary determination (which necessarily results in the retroactive collection of duties for any products determined to be in-scope at the final stage of the investigation which were not considered at the time of the preliminary determination).[166] The critical issue regarding fair warning in *Trans Texas Tire* concerned the ambiguity of the scope coverage with respect to PVD coated wheels and applicability of the scope exclusion for chrome-coated wheels.[167] As this type of coating and the ambiguity of scope coverage with respect to this merchandise was introduced shortly before the preliminary determination, Commerce indicated the necessity of further building the record on this issue and deferred our decision of whether the scope of that order covered merchandise with a PVD coating until the final determination, where we found the products covered by the scope.[168] As a result, such products were at that point covered by the cash deposit instructions, which identified the date of the preliminary determination as the first date of suspension of liquidation, which the CIT found to be an impermissible retroactive application of liabilities lacking adequate reasonable notice.[169] Thus, *Trans Texas Tire* involved "fair warning" and "adequate notice" in the context of collection of duties at a point prior to the time at which the central issue regarding scope coverage was adequately identified and addressed in the underlying proceeding. In other words, the relevance of the scope coverage of PVD wheels was not fully laid bare at the initial stages of the investigation, but only became apparent through the progression of the investigation, and issues regarding "adequate notice" were compounded by specific aspects of the nature of the proceeding itself (*i.e.*, standard practice in an investigation sets the date of beginning of suspension as of the preliminary determination).

---

[164] *See Tai-Ao Aluminum*, 983 F.3d 487.
[165] *Id.*
[166] *See Trans Texas Tire*, 519 F. Supp. 3d 1275.
[167] *Id.*
[168] *Id.*
[169] *Id.*

This is not analogous to the instant inquiry where the products under consideration were explicitly identified in the initial scope request, not later identified, and 19 CFR 351.225(l) dictates that suspension commence as of the date of initiation. Thus, neither circumstance is analogous to the circumstances of a scope inquiry, generally, nor is it analogous to the instant scope inquiry, where the product subject to the inquiry (steel wheels assembled in Thailand from Chinese-origin discs and Thai-origin rims manufactured from rectangular steel plates sourced from China or a third country) and the entity to which collection of duties would be applicable (importers of merchandise produced and exported by Asia Wheel) was clearly identified at the time of the initial request and subsequent initiation of the inquiry. Asia Wheel does not cite a case where the notice of initiation of a scope proceeding was found to constitute inadequate notice of the potential that AD/CVD liabilities may apply to the products identified in the underlying request.

Regarding Asia Wheel's assertion that Commerce must not continue the suspension of liquidation with respect steel wheels assembled in Thailand from Chinese-origin discs and Thai-origin rims manufactured from rectangular steel plates sourced from China or a third country, implemented by CBP as part of the EAPA investigation, we note that CBP suspends liquidation under interim measures pursuant to 19 USC 1517(e) based on its own authority, not that of Commerce. We have no authority to direct suspension of liquidation implemented by CBP, and Asia Wheel cites no statutory or regulatory authority under which such an instruction would be permissible, nor precedent in support of this request. While Commerce will direct CBP to continue suspension of liquidation for steel wheels assembled in Thailand from Chinese-origin discs and Thai-origin rims manufactured from rectangular steel plates sourced from China or a third country as of the May 12, 2021, date of initiation of this inquiry, we have no authority to dictate any existing suspension implemented pursuant to CBP's separate EAPA authority and, thus, reject Asia Wheel's request, consistent with the CIT's findings in *Diamond Tools Tech*.[170] Asia Wheel asserts that CBP's continuation of suspension of liquidation is inconsistent with the Federal Circuit's findings in *Sunpreme* that suspension applies only when CBP has made a determination under 19 USC 1500(c), and that no such decision was made in the instant case, but, rather, referred to Commerce.[171] We decline to read any such meaning into the *Sunpreme* decision, and disagree with Asia Wheel's interpretation that this ruling provides Commerce any authority with respect to suspension of liquidation implemented by CBP.[172]

Finally, Asia Wheel states that,

> Commerce should be aware that CBP has not suspended liquidation of all entries
> of truck wheels at issue; CBP has suspended liquidation only of such entries made
> by the importers targeted in its EAPA investigations. Consequently, at a
> minimum, Commerce is obligated to instruct CBP when suspension of liquidation

---

[170] *See Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1344 (CIT 2021) (*Diamond Tools Tech*).
[171] *See* Asia Wheel's Case Brief at 28 (citing *Sunpreme*, 946 F.3d at 1317-18).
[172] We note that the *Sunpreme* decision otherwise supports Commerce's decision to set the effective date of suspension of liquidation as the initiation date of the scope inquiry, as the issue in that case concerned a circumstance where suspension began prior to formal initiation of the relevant scope inquiry, and the Federal Circuit sustained the CIT's determination that Commerce's instructions to Customs would be limited to products entered on or after the date of initiation of the scope inquiry. *See Sunpreme*, 946 F.3d at 1300.

applies to entries of the truck wheels at issue made by other importers … no earlier than the date of Commerce's Preliminary Scope Ruling.[173]

As identified in the initial scope request and noted in the section, "Description of the Merchandise Subject to the Scope Request," above, Commerce's scope inquiry concerns: "truck wheels that Asia Wheel processes in Thailand using discs from China and rims produced in Thailand from rectangular steel plates sourced from China or a third country," exported to the United States from Thailand by Asia Wheel. This language does not limit the scope of Commerce's inquiry to merchandise imported by any party, nor has any party to this proceeding suggested that the inquiry be limited only to merchandise imported by certain importers. Thus, this scope inquiry covers all relevant wheel products otherwise described by the production method identified, produced, and exported by Asia Wheel, regardless of importer of record.

In its covered merchandise referral, CBP merely referenced back to the products identified in Asia Wheel's Scope Ruling Request as the merchandise for which it requested a ruling, *i.e.*, the merchandise of the CMR was identical to that of the scope inquiry, "whether the steel wheels exported from Thailand by Asia Wheel Co. Ltd. (Asia Wheel), which are produced from imported rectangular steel plates from China and a third country that Asia Wheel converts into rims in Thailand and welds with Chinese-origin discs in Thailand, are covered merchandise subject to the *Orders*."[174] The CMR likewise made no reference to specific importers.

Commerce is not aware of information, on the record or otherwise, to substantiate the veracity of Asia Wheel's claims regarding the importer-specific nature of CBP's suspension of liquidation. However, presuming these statements to be accurate, it would be inappropriate for Commerce to speculate as to the reason that CBP suspended liquidation only for entries made by the importers targeted in its EAPA investigations. We are only able to note that, to the extent that our scope inquiry informs the EAPA investigation, it should not be read in a manner that limits its applicability to certain importers.

For the reasons stated above, Commerce has no authority to direct CBP as to when CBP's own suspension of liquidation applies to entries of truck wheels processed in Thailand using discs from China and rims produced in Thailand from rectangular steel plates sourced from China or a third country, made by other importers. For Commerce's purposes, suspension of liquidation, applicable to all importers, for entries for which liquidation was not already suspended, is effective as of the May 12, 2021, date of initiation of this inquiry. This effective date was transmitted to CBP in its preliminary instructions, which otherwise contain no information restricting applicability to certain importers and will be elsewhere indicated in the final determination instructions and notice to CBP regarding the final results of the scope inquiry in the context of the covered merchandise referral.[175] CBP may use this information to inform its own investigation but, as noted above, we have no authority to otherwise direct suspension of liquidation implemented separately by CBP.

---

[173] *See* Asia Wheel's Case Brief at 28-29.
[174] *See* CBP's EAPA Letter.
[175] *See* CBP Message Nos. 3072412 and 3072419, dated March 13, 2023.

31

**Comment 4:  Whether Only the Chinese-Origin Components Should Be Subject to AD/CVD Liabilities**

*Asia Wheel and ZC Rubber's Comments*
- If Commerce continues to find that substantial transformation did not occur, Commerce should find that only the Chinese-origin disc is subject to the scope of the *Orders*, as supported by its analysis and the plain language of the third country processing provision, because then, only the Chinese-origin disc did not lose its identity through the processing, as outlined under the scope of the *Orders*.[176]
- Accordingly, Commerce should instruct CBP to suspend liquidation of the Chinese-origin discs only and required cash deposits based on their value.[177]

*Petitioners' Rebuttal*
- Zhejiang Jingu and ZC Rubber's argument that ADs/CVDs should be applied only to Chinese-origin discs is incorrect.  Neither respondent party cited any authority to support their claim that Commerce should split its determination to only part of a product. Commerce's substantial transformation analysis serves to determine the country of origin for purposes of the AD/CVD orders of the resulting merchandise and not just part of it.[178]
- The CIT has explained that "{t}he 'substantial transformation' rule provides a yardstick for determining whether the processes performed on merchandise in a country are of such significance as to require that the resulting merchandise be considered the product of the country in which the transformation occurred."[179]
- The resulting merchandise is the merchandise that is the result of the third country processing, *i.e.*, the complete finished product, not only some subsection of it brought into the third country.  The Federal Circuit stated that "Commerce is entitled to use the substantial transformation analysis to determine whether an imported article is covered by AD or CVD orders," and that Commerce's determination applies to the finished, imported article, not only to some earlier input to it.[180]

**Commerce's Position:**  We continue to apply our analysis and findings to the finished truck wheels processed in Thailand as the imported articles subject to this scope proceeding.  As the petitioners correctly note, the purpose of applying the substantial transformation framework is to determine whether the merchandise *as imported* into the United States has been substantially transformed by third country processing and covered by the orders.[181]  The precedent of applying AD/CVD liabilities to the merchandise that is the result of the third country processing, regardless of whether components thereof are otherwise covered by the scope, has been established by virtually the entirety of cases which have involved a substantial transformation analysis, and has been upheld by the courts.[182]  Our determination with respect to the production

---

[176] *See* Asia Wheel's Case Brief at 29.
[177] *Id.* at 30; and ZC Rubber's Case Brief at 10.
[178] *See* Petitioners' Rebuttal Brief at 33-34 (citing *E.I. Du Pont*, 22 CIT at 374; and *Bell Supply CAFC 2018*, 888 F.3d at 1230).
[179] *See* Petitioners' Rebuttal Brief at 33-34.
[180] *Id.* at 33-34.
[181] *See, e.g.*, *Bell Supply CAFC 2018*, 888 F.3d at 1230.
[182] *See, e.g.*, *Al Ghurair*, 536 F. Supp. 3d at 1357; *E.I. Du Pont*, 22 CIT at 370; and *Bell Supply CAFC 2018*, 888 F.3d at 1230.

of truck wheels resulting from the assembly in Thailand from the Chinese-origin discs and Thai-origin rims manufactured from steel sheet plates from China or a third country, and as exported from Thailand to the United States, is that they are not substantially transformed by Thai processing and remain Chinese-origin wheels. This decision plainly applies to the finished article, the steel wheel, as exported from Thailand. We fundamentally disagree with Asia Wheel's assertion that this finding begs the concurrent conclusion that Asia Wheel's steel wheels exported to the United States were not truck wheels but, rather, respective combinations of discs from China and rims from Thailand. The products exported from Thailand are Chinese steel wheels, not substantially transformed by component parts sourced or further processing performed in Thailand. Asia Wheel and ZC Rubber cite neither any precedent to underly its presumption, nor any instance where Commerce has split a substantial transformation determination and held that only some inputs are subject to an order.

Existing precedent applies only to cases where separate subject and non-subject items are packaged and imported together in an aggregation of separate items and do not interact in any way or otherwise represent a unique product, or where subject chemical products are comingled with product from non-subject countries.[183] This precedent is inapplicable to steel wheels exported from Thailand, which are solitary articles plainly covered by the scope of the *Orders*.

## Comment 5: Whether to Draft Importer/Exporter Certifications

*Asia Wheel and ZC Rubber's Comments*
- Commerce should implement a certification procedure for truck wheels manufactured in Thailand from Thai-origin rims and discs, consistent with the preliminary scope rulings in the trailer wheels proceedings, for truck wheels assembled from Thai-origin discs and rims manufactured from Chinese or third country-origin steel plates.[184]

*Petitioners' Rebuttal*
- Commerce should not implement a certification process for exports of non-subject merchandise. Commerce already found the certification process for non-subject merchandise unnecessary and declined to implement a certification process at that time, as Commerce was not addressing any out-of-scope merchandise, which it is also not addressing in this scope ruling request.[185]
- In contrast to the Trailer Wheels Scope Ruling, there was no additional scope ruling request for a finding that steel wheels manufactured in Thailand from both Thai-origin rims and discs, and exported from Thailand are non-subject merchandise that would lead Commerce to consider processes for certification of non-subject merchandise.[186]
- Were Commerce to implement a certification process, it would have to be very robust to stop an importer from claiming the steel wheels are made only from non-Chinese parts by a Chinese's third country subsidiary. Without a detailed forensic review of production

---

[183] *See Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1298 (Fed. Cir. 2013); *Walgreen*, 620 F. 3d at 1356-57; and *Global Commodity Group LLC v. United States*, 709 F.3d 1134 (Fed. Cir. 2013).
[184] *See* Asia Wheel's Case Brief at 30-32.
[185] *See* Petitioners' Rebuttal Brief at 35.
[186] *Id.* at 36-37.

records necessitating the full cooperation, it would be very difficult for CBP to test the veracity of such claims.[187]

- In that event, Commerce should require certifications from both the importer and the producer of the wheel because the producer would have records of where the parts for the wheels were produced. Both importer and producer should agree in their certifications that CBP may take any further verification steps and fully cooperate with CBP.[188]

**Commerce Position:** In the underlying investigation, Commerce declined to implement a certification process, stating that the scope language does not seek to include non-subject imports, as not all steel wheels exported from a third country are covered by the scope of the investigation. Accordingly, Commerce determined that a certification process for non-subject-merchandise from a third country was unnecessary.[189] Asia Wheel now argues that Commerce implemented a certification process in the Trailer Wheels Scope Ruling, and Commerce should do likewise in the instant proceeding. However, this ignores that the companion Trailer Wheels Scope Ruling request included a scope ruling for an additional production method where both the discs and rims were manufactured in Thailand from Chinese-origin plate. In the instant inquiry, Asia Wheel requested a scope ruling regarding truck wheels that Asia Wheel processes in Thailand using discs from China and rims produced in Thailand from rectangular steel plates sourced from China or a third country that Commerce determines to be in-scope, thus making the certification process unnecessary for this product.[190] There was no request for another production method scope ruling and no out-of-scope finding, necessitating the certification process. Additionally, in its second supplemental response to this scope ruling proceeding, Asia Wheel stated that is does not produce discs for truck wheels in Thailand.[191] Therefore, we continue to find the implementation of a certification process unnecessary.

## VIII. RECOMMENDATION

Based on the above analysis concerning country of origin, and in accordance with 19 CFR 351.225(f)(3), we recommend that Commerce preliminarily find that the truck wheels manufactured by Asia Wheel in Thailand using Chinese-origin discs and rims manufactured in Thailand from Chinese-origin (or another foreign country) steel sheet plates are subject to the scope of the *Orders*.

---

[187] *Id.* at 37-38.
[188] *Id.* at 38.
[189] *See Steel Wheels from China AD Final Determination* IDM at12-13; and *Steel Wheels from China CVD Final Determination* IDM at 20-21.
[190] *See* Asia Wheel's Scope Ruling Request at Exhibit 4 (Steel Truck Wheel Production Process Description and Flowchart).
[191] *See* Asia Wheel's SQR2 and RFI Response at 9.

If the recommendations in this memorandum are accepted, we will notify all interested parties on the scope service list, as directed by 19 CFR 351.225(f)(3).

☒                              ☐
_____        _____
Agree                          Disagree

6/7/2023

X   *James Maeder*
_____

Signed by: JAMES MAEDER

James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

19 U.S.C. § 1671e

Subsec. (c)(5). Pub. L. 103–465, §264(b)(2), added par. (5).

1988—Subsec. (b)(4)(A). Pub. L. 100–418, §1324(a)(3), amended subpar. (A) generally. Prior to amendment, subpar. (A) read as follows: "If the finding of the administering authority under subsection (a)(2) of this section is affirmative, then the final determination of the Commission shall include findings as to whether—

　　"(i) there is material injury which will be difficult to repair, and

　　"(ii) the material injury was by reason of such massive imports of the subsidized merchandise over a relatively short period."

Subsec. (e). Pub. L. 100–418, §1333(a), added subsec. (e).

1984—Subsec. (a)(1). Pub. L. 98–573, §606, inserted provision that when an investigation under this part is initiated simultaneously with an investigation under part II of this subtitle, which involves imports of the same class or kind of merchandise from the same or other countries, the administering authority, if requested by the petitioner, shall extend the date of the final determination under this paragraph to the date of the final determination of the administering authority in such investigation initiated under part II of this subtitle.

Subsec. (a)(2). Pub. L. 98–573, §605(a)(1), inserted provision after subpar. (B) that such findings may be affirmative even though the preliminary determination under section 1671b(e)(1) of this title was negative.

Subsec. (b)(1). Pub. L. 98–573, §602(a)(2), inserted ", or sales (or the likelihood of sales for importation)," in provision after subpar. (B).

Subsec. (c)(3)(A). Pub. L. 98–573, §605(a)(3), inserted reference to par. (4).

Subsec. (c)(4). Pub. L. 98–573, §605(a)(2), added par. (4).

**Statutory Notes and Related Subsidiaries**

Effective Date of 1994 Amendment

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

Effective Date of 1988 Amendment

Amendment by section 1333(a) of Pub. L. 100–418 effective Aug. 23, 1988, and amendment by section 1324(a)(3) of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, see section 1337(a), (c) of Pub. L. 100–418, set out as a note under section 1671 of this title.

Effective Date of 1984 Amendment

Amendment by section 602(a)(2) of Pub. L. 98–573 applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, and amendment by sections 605(a) and 606 of Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a), (b)(1) of Pub. L. 98–573, as amended, set out as a note under section 1671 of this title.

## § 1671e. Assessment of duty

### (a) Publication of countervailing duty order

Within 7 days after being notified by the Commission of an affirmative determination under section 1671d(b) of this title, the administering authority shall publish a countervailing duty order which—

　　(1) directs customs officers to assess a countervailing duty equal to the amount of the net countervailable subsidy determined or estimated to exist, within 6 months after the date on which the administering authority receives satisfactory information upon which the assessment may be based, but in no event later than 12 months after the end of the annual accounting period of the manufacturer or exporter within which the merchandise is entered, or withdrawn from warehouse, for consumption,

　　(2) includes a description of the subject merchandise, in such detail as the administering authority deems necessary, and

　　(3) requires the deposit of estimated countervailing duties pending liquidation of entries of merchandise at the same time as estimated normal customs duties on that merchandise are deposited.

### (b) Imposition of duties

#### (1) General rule

If the Commission, in its final determination under section 1671d(b) of this title, finds material injury or threat of material injury which, but for the suspension of liquidation under section 1671b(d)(2) of this title, would have led to a finding of material injury, then entries of the merchandise subject to the countervailing duty order, the liquidation of which has been suspended under section 1671b(d)(2) of this title, shall be subject to the imposition of countervailing duties under section 1671(a) of this title.

#### (2) Special rule

If the Commission, in its final determination under section 1671d(b) of this title, finds threat of material injury, other than threat of material injury described in paragraph (1), or material retardation of the establishment of an industry in the United States, then merchandise subject to a countervailing duty order which is entered, or withdrawn from warehouse, for consumption on or after the date of publication of notice of an affirmative determination of the Commission under section 1671d(b) of this title shall be subject to the imposition of countervailing duties under section 1671(a) of this title, and the administering authority shall release any bond or other security, and refund any cash deposit made, to secure the payment of countervailing duties with respect to entries of the merchandise entered, or withdrawn from warehouse, for consumption before that date.

### (c) Special rule for regional industries

#### (1) In general

In an investigation under this part in which the Commission makes a regional industry determination under section 1677(4)(C) of this title, the administering authority shall, to the maximum extent possible, direct that duties be assessed only on the subject merchandise of the specific exporters or producers that exported the subject merchandise for sale in the region concerned during the period of investigation.

#### (2) Exception for new exporters and producers

After publication of the countervailing duty order, if the administering authority finds that a new exporter or producer is exporting the subject merchandise for sale in the region

concerned, the administering authority shall direct that duties be assessed on the subject merchandise of the new exporter or producer consistent with the provisions of section 1675(a)(2)(B) of this title.

(June 17, 1930, ch. 497, title VII, §706, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 160; amended Pub. L. 98–573, title VI, §607, Oct. 30, 1984, 98 Stat. 3029; Pub. L. 99–514, title XVIII, §1886(a)(5), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 103–465, title II, §§218(b)(1), 233(a)(5)(O), 264(c)(9), 265, 270(a)(1)(H), Dec. 8, 1994, 108 Stat. 4855, 4899, 4914, 4917.)

### Editorial Notes

#### AMENDMENTS

1994—Subsec. (a)(1). Pub. L. 103–465, §270(a)(1)(H), substituted "countervailable subsidy" for "subsidy".

Subsec. (a)(2) to (4). Pub. L. 103–465, §233(a)(5)(O), 265, redesignated par. (3) as (2) and substituted "subject merchandise" for "class or kind of merchandise to which it applies", redesignated par. (4) as (3), and struck out former par. (2) which read as follows:

"(2) shall presumptively apply to all merchandise of such class or kind exported from the country investigated, except that if—

"(A) the administering authority determines there is a significant differential between companies receiving subsidy benefits, or

"(B) a State-owned enterprise is involved,

the order may provide for differing countervailing duties,".

Subsec. (b)(1). Pub. L. 103–465, §264(c)(9), substituted "1671b(d)(2)" for "1671b(d)(1)" in two places.

Subsec. (c). Pub. L. 103–465, §218(b)(1), added subsec. (c).

1986—Subsec. (a)(2). Pub. L. 99–514 realigned the margins in provisions following subpar. (B), which realignment had been editorially supplied, thereby requiring no change in text.

1984—Subsec. (a)(2) to (4). Pub. L. 98–573 added par. (2) and redesignated pars. (2) and (3) as (3) and (4), respectively.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

#### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

#### PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§1101–1147 and 1171–1177] or title XVIII [§§1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

## § 1671f. Treatment of difference between deposit of estimated countervailing duty and final assessed duty under countervailing duty order

### (a) Deposit of estimated countervailing duty under section 1671b(d)(1)(B) of this title

If the amount of a cash deposit, or the amount of any bond or other security, required as security for an estimated countervailing duty under section 1671b(d)(1)(B) of this title is different from the amount of the countervailing duty determined under a countervailing duty order issued under section 1671e of this title, then the difference for entries of merchandise entered, or withdrawn from warehouse, for consumption before notice of the affirmative determination of the Commission under section 1671d(b) of this title is published shall be—

(1) disregarded, to the extent that the cash deposit, bond, or other security is lower than the duty under the order, or

(2) refunded or released, to the extent that the cash deposit, bond, or other security is higher than the duty under the order.

### (b) Deposit of estimated countervailing duty under section 1671e(a)(3) of this title

If the amount of an estimated countervailing duty deposited under section 1671e(a)(3) of this title is different from the amount of the countervailing duty determined under a countervailing duty order issued under section 1671e of this title, then the difference for entries of merchandise entered, or withdrawn from warehouse, for consumption after notice of the affirmative determination of the Commission under section 1671d(b) of this title is published shall be—

(1) collected, to the extent that the deposit under section 1671e(a)(3) of this title is lower than the duty determined under the order, or

(2) refunded, to the extent that the deposit under section 1671e(a)(3) of this title is higher than the duty determined under the order,

together with interest as provided by section 1677g of this title.

(June 17, 1930, ch. 497, title VII, §707, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 161; amended Pub. L. 103–465, title II, §264(c)(10), Dec. 8, 1994, 108 Stat. 4914.)

### Editorial Notes

#### AMENDMENTS

1994—Subsec. (a). Pub. L. 103–465 substituted "1671b(d)(1)(B)" for "1671b(d)(2)" in heading and text.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

## § 1671g. Effect of derogation of Export-Import Bank financing

Nothing in this subtitle shall be interpreted as superseding the provisions of section 635a–3 of

19 U.S.C. § 1673e

section, it shall notify the petitioner, other parties to the investigation, and the other agency of its determination and of the facts and conclusions of law upon which the determination is based, and it shall publish notice of its determination in the Federal Register.

**(e) Correction of ministerial errors**

The administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors. As used in this subsection, the term "ministerial error" includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial.

(June 17, 1930, ch. 497, title VII, §735, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 169; amended Pub. L. 98–573, title VI, §§602(c), 605(b), Oct. 30, 1984, 98 Stat. 3024, 3028; Pub. L. 100–418, title I, §§1324(b)(3), 1333(a), Aug. 23, 1988, 102 Stat. 1201, 1209; Pub. L. 103–465, title II, §§212(b)(2)(B), 213(b), 214(b)(2), 219(b), (c)(6)–(8), 233(a)(5)(V), Dec. 8, 1994, 108 Stat. 4849–4851, 4856, 4857, 4900; Pub. L. 104–295, §20(b)(6), Oct. 11, 1996, 110 Stat. 3527.)

### Editorial Notes

#### Amendments

1996—Subsec. (a)(3)(A)(i). Pub. L. 104–295 amended Pub. L. 103–465, §214(b)(2)(A)(i). See 1994 Amendment note below.

1994—Subsec. (a)(1). Pub. L. 103–465, §233(a)(5)(V), substituted "subject merchandise" for "merchandise which was the subject of the investigation".

Subsec. (a)(3)(A)(i). Pub. L. 103–465, §214(b)(2)(A)(i), as amended by Pub. L. 104–295, inserted "and material injury by reason of dumped imports" after "history of dumping" and substituted "subject merchandise" for "class or kind of merchandise which is the subject of the investigation".

Subsec. (a)(3)(A)(ii). Pub. L. 103–465, §214(b)(2)(A)(ii), substituted "subject merchandise at less than its fair value and that there would be material injury by reason of such sales" for "merchandise which is the subject of the investigation at less than its fair value".

Subsec. (a)(3)(B). Pub. L. 103–465, §214(b)(2)(A)(iii), substituted "subject merchandise" for "merchandise which is the subject of the investigation".

Subsec. (a)(4). Pub. L. 103–465, §213(b), added par. (4).

Subsec. (b)(1). Pub. L. 103–465, §212(b)(2)(B), inserted at end of concluding provisions "If the Commission determines that imports of the subject merchandise are negligible, the investigation shall be terminated."

Subsec. (b)(4)(A). Pub. L. 103–465, §214(b)(2)(B), amended subpar. (A) generally, substituting present provisions for provisions requiring, in the case of an affirmative critical circumstances determination, a further finding as to whether retroactive imposition of antidumping duties on the subject merchandise would be necessary to prevent recurrence of material injury caused by massive imports of the merchandise over a relatively short period of time.

Subsec. (c)(1). Pub. L. 103–465, §219(b)(1), struck out "and" at end of subpar. (A), added subpar. (B), and redesignated former subpar. (B) as (C) and substituted "the suspension of liquidation under section 1673b(d)(2) of this title" for "under paragraphs (1) and (2) of section 1673b(d) of this title the suspension of liquidation and the posting of a cash deposit, bond, or other security".

Subsec. (c)(2)(A). Pub. L. 103–465, §219(c)(6), substituted "1673b(d)(2)" for "1671b(d)(1)".

Subsec. (c)(2)(B). Pub. L. 103–465, §219(c)(7), substituted "1673b(d)(1)(B)" for "1673b(d)(2)".

Subsec. (c)(3)(B). Pub. L. 103–465, §219(c)(8), substituted "1673b(d)(1)(B)" for "1673b(d)(2)".

Subsec. (c)(5). Pub. L. 103–465, §219(b)(2), added par. (5).

1988—Subsec. (b)(4)(A). Pub. L. 100–418, §1324(b)(3), amended subpar. (A) generally. Prior to amendment, subpar. (A) read as follows: "If the finding of the administering authority under subsection (a)(2) of this section is affirmative, then the final determination of the Commission shall include a finding as to whether the material injury is by reason of massive imports described in subsection (a)(3) of this section to an extent that, in order to prevent such material injury from recurring, it is necessary to impose the duty imposed by section 1673 of this title retroactively on those imports."

Subsec. (e). Pub. L. 100–418, §1333(a), added subsec. (e).

1984—Subsec. (a)(3). Pub. L. 98–573, §605(b)(1), inserted provision that such findings may be affirmative even though the preliminary determination under section 1673b(e)(1) of this title was negative.

Subsec. (b)(1). Pub. L. 98–573, §602(c), inserted ", or sales (or the likelihood of sales) for importation," in provisions after subpar. (B).

Subsec. (c)(3)(A). Pub. L. 98–573, §605(b)(3), inserted reference to par. (4).

Subsec. (c)(4). Pub. L. 98–573, §605(b)(2), added par. (4).

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1994 Amendment

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

#### Effective Date of 1988 Amendment

Amendment by section 1333(a) of Pub. L. 100–418 effective Aug. 23, 1988, and amendment by section 1324(b)(3) of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, see section 1337(a), (c) of Pub. L. 100–418, set out as a note under section 1671 of this title.

#### Effective Date of 1984 Amendment

Amendment by section 602(c) of Pub. L. 98–573 applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, and amendment by section 605(b) of Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a), (b)(1) of Pub. L. 98–573, as amended, set out as a note under section 1671 of this title.

## § 1673e. Assessment of duty

### (a) Publication of antidumping duty order

Within 7 days after being notified by the Commission of an affirmative determination under section 1673d(b) of this title, the administering authority shall publish an antidumping duty order which—

(1) directs customs officers to assess an antidumping duty equal to the amount by which the normal value of the merchandise exceeds the export price (or the constructed export

price) of the merchandise, within 6 months after the date on which the administering authority receives satisfactory information upon which the assessment may be based, but in no event later than—

    (A) 12 months after the end of the annual accounting period of the manufacturer or exporter within which the merchandise is entered, or withdrawn from warehouse, for consumption, or

    (B) in the case of merchandise not sold prior to its importation into the United States, 12 months after the end of the annual accounting period of the manufacturer or exporter within which it is sold in the United States to a person who is not the exporter of that merchandise,

(2) includes a description of the subject merchandise, in such detail as the administering authority deems necessary, and

(3) requires the deposit of estimated antidumping duties pending liquidation of entries of merchandise at the same time as estimated normal customs duties on that merchandise are deposited.

**(b) Imposition of duty**

**(1) General rule**

If the Commission, in its final determination under section 1673d(b) of this title, finds material injury or threat of material injury which, but for the suspension of liquidation under section 1673b(d)(2) of this title would have led to a finding of material injury, then entries of the subject merchandise, the liquidation of which has been suspended under section 1673b(d)(2) of this title, shall be subject to the imposition of antidumping duties under section 1673 of this title.

**(2) Special rule**

If the Commission, in its final determination under section 1673d(b) of this title, finds threat of material injury, other than threat of material injury described in paragraph (1), or material retardation of the establishment of an industry in the United States, then subject merchandise which is entered, or withdrawn from warehouse, for consumption on or after the date of publication of notice of an affirmative determination of the Commission under section 1673d(b) of this title shall be subject to the assessment of antidumping duties under section 1673 of this title, and the administering authority shall release any bond or other security, and refund any cash deposit made, to secure the payment of antidumping duties with respect to entries of the merchandise entered, or withdrawn from warehouse, for consumption before that date.

**(c) Security in lieu of estimated duty pending early determination of duty**

**(1) Conditions for waiver of deposit of estimated duties**

The administering authority may permit, for not more than 90 days after the date of publication of an order under subsection (a), the posting of a bond or other security in lieu of the deposit of estimated antidumping duties required under subsection (a)(3) if—

    (A) the investigation has not been designated as extraordinarily complicated by reason of—

        (i) the number and complexity of the transactions to be investigated or adjustments to be considered,

        (ii) the novelty of the issues presented, or

        (iii) the number of firms whose activities must be investigated,

    (B) the final determination in the investigation has not been postponed under section 1673d(a)(2)(A) of this title;

    (C) on the basis of information presented to the administering authority by any manufacturer, producer, or exporter in such form and within such time as the administering authority may require, the administering authority is satisfied that a determination will be made, within 90 days after the date of publication of an order under subsection (a), of the normal value and the export price (or the constructed export price) for all merchandise of such manufacturer, producer, or exporter described in that order which was entered, or withdrawn from warehouse, for consumption on or after the date of publication of—

        (i) an affirmative preliminary determination by the administering authority under section 1673b(b) of this title, or

        (ii) if its determination under section 1673b(b) of this title was negative, an affirmative final determination by the administering authority under section 1673d(a) of this title,

and before the date of publication of the affirmative final determination by the Commission under section 1673d(b) of this title;

    (D) the party described in subparagraph (C) provides credible evidence that the amount by which the normal value of the merchandise exceeds the export price (or the constructed export price) of the merchandise is significantly less than the amount of such excess specified in the antidumping duty order published under subsection (a); and

    (E) the data concerning the normal value and the export price (or the constructed export price) apply to sales in the usual commercial quantities and in the ordinary course of trade and the number of such sales are sufficient to form an adequate basis for comparison.

**(2) Notice; hearing**

If the administering authority permits the posting of a bond or other security in lieu of the deposit of estimated antidumping duties under paragraph (1), it shall—

    (A) publish notice of its action in the Federal Register, and

    (B) upon the request of any interested party, hold a hearing in accordance with section 1677c of this title before determining the normal value and the export price (or the constructed export price) of the merchandise.

**(3) Determinations to be basis of antidumping duty**

The administering authority shall publish notice in the Federal Register of the results of

its determination of normal value and export price (or the constructed export price), and that determination shall be the basis for the assessment of antidumping duties on entries of merchandise to which the notice under this subsection applies and also shall be the basis for the deposit of estimated antidumping duties on future entries of merchandise of manufacturers, producers, or exporters described in paragraph (1) to which the order issued under subsection (a) applies.

**(4) Provision of business proprietary information; written comments**

Before determining whether to permit the posting of bond or other security under paragraph (1) in lieu of the deposit of estimated antidumping duties, the administering authority shall—

(A) make all business proprietary information supplied to the administering authority under paragraph (1) available under a protective order in accordance with section 1677f(c) of this title to all interested parties described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title, and

(B) afford all interested parties an opportunity to file written comments on whether the posting of bond or other security under paragraph (1) in lieu of the deposit of estimated antidumping duties should be permitted.

**(d) Special rule for regional industries**

**(1) In general**

In an investigation in which the Commission makes a regional industry determination under section 1677(4)(C) of this title, the administering authority shall, to the maximum extent possible, direct that duties be assessed only on the subject merchandise of the specific exporters or producers that exported the subject merchandise for sale in the region concerned during the period of investigation.

**(2) Exception for new exporters and producers**

After publication of the antidumping duty order, if the administering authority finds that a new exporter or producer is exporting the subject merchandise for sale in the region concerned, the administering authority shall direct that duties be assessed on the subject merchandise of the new exporter or producer consistent with the provisions of section 1675(a)(2)(B) of this title.

(June 17, 1930, ch. 497, title VII, §736, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 172; amended Pub. L. 99–514, title XVIII, §1886(a)(7), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 100–418, title I, §1325, Aug. 23, 1988, 102 Stat. 1201; Pub. L. 103–465, title II, §§218(b)(2), 219(c)(9), 233(a)(1)(C), (2)(A)(iii), (5)(W)–(Y), Dec. 8, 1994, 108 Stat. 4855, 4857, 4898, 4900.)

**Editorial Notes**

AMENDMENTS

1994—Subsec. (a)(1). Pub. L. 103–465, §233(a)(1)(C), (2)(A)(iii), substituted "normal value" for "foreign market value" and "export price (or the constructed export price)" for "United States price".

Subsec. (a)(2). Pub. L. 103–465, §233(a)(5)(W), substituted "subject merchandise" for "class or kind of merchandise to which it applies".

Subsec. (b)(1). Pub. L. 103–465, §§219(c)(9), 233(a)(5)(X), substituted "1673b(d)(2)" for "1673b(d)(1)" in two places and "subject merchandise" for "merchandise subject to the antidumping duty order".

Subsec. (b)(2). Pub. L. 103–465, §233(a)(5)(Y), substituted "subject merchandise" for "merchandise subject to an antidumping duty order".

Subsec. (c). Pub. L. 103–465, §233(a)(1)(C), (2)(A)(iii), substituted "normal value" for "foreign market value" and "export price (or the constructed export price)" for "United States price" in pars. (1)(C) to (E), (2)(B), and (3).

Subsec. (d). Pub. L. 103–465, §218(b)(2), added subsec. (d).

1988—Subsec. (c)(1). Pub. L. 100–418, §1325(a), amended par. (1) generally, designating existing provisions as cl. (C) and adding cls. (A), (B), (D), and (E).

Subsec. (c)(4). Pub. L. 100–418, §1325(b), added par. (4).

1986—Subsec. (c)(1). Pub. L. 99–514 inserted ", and was sold to any person that is not related to such manufacturer, producer, or exporter," before "on or after the date".

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and to reviews initiated under section 1673e(c) or 1675 of this title after Aug. 23, 1988, see section 1337(b) of Pub. L. 100–418, set out as a note under section 1671 of this title.

PLAN AMENDMENTS NOT REQUIRED UNTIL
JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

**§ 1673f. Treatment of difference between deposit of estimated antidumping duty and final assessed duty under antidumping duty order**

**(a) Deposit of estimated antidumping duty under section 1673b(d)(1)(B) of this title**

If the amount of a cash deposit, or the amount of any bond or other security, required as security for an estimated antidumping duty under section 1673b(d)(1)(B) of this title is different from the amount of the antidumping duty determined under an antidumping duty order published under section 1673e of this title, then the difference for entries of merchandise entered, or withdrawn from warehouse, for consumption before notice of the affirmative determination of the Commission under section 1673d(b) of this title is published shall be—

(1) disregarded, to the extent that the cash deposit, bond, or other security is lower than the duty under the order, or

19 C.F.R. § 351.225
(2021)

error (*see* paragraph (f) of this section), the correction of which, either singly or in combination with other errors:

(1) Would result in a change of at least five absolute percentage points in, but not less than 25 percent of, the weighted-average dumping margin or the countervailable subsidy rate (whichever is applicable) calculated in the original (erroneous) preliminary determination; or

(2) Would result in a difference between a weighted-average dumping margin or countervailable subsidy rate (whichever is applicable) of zero (or *de minimis*) and a weighted-average dumping margin or countervailable subsidy rate of greater than *de minimis*, or vice versa.

### § 351.225   Scope rulings.

(a) *Introduction.* Issues arise as to whether a particular product is included within the scope of an antidumping or countervailing duty order or a suspended investigation. Such issues can arise because the descriptions of subject merchandise contained in the Department's determinations must be written in general terms. At other times, a domestic interested party may allege that changes to an imported product or the place where the imported product is assembled constitutes circumvention under section 781 of the Act. When such issues arise, the Department issues "scope rulings" that clarify the scope of an order or suspended investigation with respect to particular products. This section contains rules regarding scope rulings, requests for scope rulings, procedures for scope inquiries, and standards used in determining whether a product is within the scope of an order or suspended investigation.

(b) *Self-initiation.* If the Secretary determines from available information that an inquiry is warranted to determine whether a product is included within the scope of an antidumping or countervailing duty order or a suspended investigation, the Secretary will initiate an inquiry, and will notify all parties on the Department's scope service list of its initiation of a scope inquiry.

(c) *By application*—(1) *Contents and service of application.* Any interested party may apply for a ruling as to whether a particular product is within the scope of an order or a suspended investigation. The application must be served upon all parties on the scope service list described in paragraph (n) of this section, and must contain the following, to the extent reasonably available to the interested party:

(i) A detailed description of the product, including its technical characteristics and uses, and its current U.S. Tariff Classification number;

(ii) A statement of the interested party's position as to whether the product is within the scope of an order or a suspended investigation, including:

(A) A summary of the reasons for this conclusion,

(B) Citations to any applicable statutory authority, and

(C) Any factual information supporting this position, including excerpts from portions of the Secretary's or the Commission's investigation, and relevant prior scope rulings.

(2) *Deadline for action on application.* Within 45 days of the date of receipt of an application for a scope ruling, the Secretary will issue a final ruling under paragraph (d) of this section or will initiate a scope inquiry under paragraph (e) of this section.

(d) *Ruling based upon the application.* If the Secretary can determine, based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of this section, whether a product is included within the scope of an order or a suspended investigation, the Secretary will issue a final ruling as to whether the product is included within the order or suspended investigation. The Secretary will notify all persons on the Department's scope service list (*see* paragraph (n) of this section) of the final ruling.

(e) *Ruling where further inquiry is warranted.* If the Secretary finds that the issue of whether a product is included within the scope of an order or a suspended investigation cannot be determined based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1)

of this section, the Secretary will notify by mail all parties on the Department's scope service list of the initiation of a scope inquiry.

(f) *Notice and procedure.* (1) Notice of the initiation of a scope inquiry issued under paragraph (b) or (e) of this section will include:

(i) A description of the product that is the subject of the scope inquiry; and

(ii) An explanation of the reasons for the Secretary's decision to initiate a scope inquiry;

(iii) A schedule for submission of comments that normally will allow interested parties 20 days in which to provide comments on, and supporting factual information relating to, the inquiry, and 10 days in which to provide any rebuttal to such comments.

(2) The Secretary may issue questionnaires and verify submissions received, where appropriate.

(3) Whenever the Secretary finds that a scope inquiry presents an issue of significant difficulty, the Secretary will issue a preliminary scope ruling, based upon the available information at the time, as to whether there is a reasonable basis to believe or suspect that the product subject to a scope inquiry is included within the order or suspended investigation. The Secretary will notify all parties on the Department's scope service list (see paragraph (n) of this section) of the preliminary scope ruling, and will invite comment. Unless otherwise specified, interested parties will have within twenty days from the date of receipt of the notification in which to submit comments, and ten days thereafter in which to submit rebuttal comments.

(4) The Secretary will issue a final ruling as to whether the product which is the subject of the scope inquiry is included within the order or suspended investigation, including an explanation of the factual and legal conclusions on which the final ruling is based. The Secretary will notify all parties on the Department's scope service list (*see* paragraph (n) of this section) of the final scope ruling.

(5) The Secretary will issue a final ruling under paragraph (k) of this section (other scope rulings) normally within 120 days of the initiation of the inquiry under this section. The Sec-

retary will issue a final ruling under paragraph (g), (h), (i), or (j) of this section (circumvention rulings under section 781 of the Act) normally within 300 days from the date of the initiation of the scope inquiry.

(6) When an administrative review under §351.213, a new shipper review under §351.214, or an expedited antidumping review under §351.215 is in progress at the time the Secretary provides notice of the initiation of a scope inquiry (*see* paragraph (e)(1) of this section), the Secretary may conduct the scope inquiry in conjunction with that review.

(7)(i) The Secretary will notify the Commission in writing of the proposed inclusion of products in an order prior to issuing a final ruling under paragraph (f)(4) of this section based on a determination under:

(A) Section 781(a) of the Act with respect to merchandise completed or assembled in the United States (other than minor completion or assembly);

(B) Section 781(b) of the Act with respect to merchandise completed or assembled in other foreign countries; or

(C) Section 781(d) of the Act with respect to later-developed products which incorporate a significant technological advance or significant alteration of an earlier product.

(ii) If the Secretary notifies the Commission under paragraph (f)(7)(i) of this section, upon the written request of the Commission, the Secretary will consult with the Commission regarding the proposed inclusion, and any such consultation will be completed within 15 days after the date of such request. If, after consultation, the Commission believes that a significant injury issue is presented by the proposed inclusion of a product within an order, the Commission may provide written advice to the Secretary as to whether the inclusion would be inconsistent with the affirmative injury determination of the Commission on which the order is based.

(g) *Products completed or assembled in the United States.* Under section 781(a) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order imported parts or components referred to in section 781(a)(1)(B) of the Act that are

235

used in the completion or assembly of the merchandise in the United States at any time such order is in effect. In making this determination, the Secretary will not consider any single factor of section 781(a)(2) of the Act to be controlling. In determining the value of parts or components purchased from an affiliated person under section 781(a)(1)(D) of the Act, or of processing performed by an affiliated person under section 781(a)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(f)(3) of the Act.

(h) *Products completed or assembled in other foreign countries.* Under section 781(b) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order, at any time such order is in effect, imported merchandise completed or assembled in a foreign country other than the country to which the order applies. In making this determination, the Secretary will not consider any single factor of section 781(b)(2) of the Act to be controlling. In determining the value of parts or components purchased from an affiliated person under section 781(b)(1)(D) of the Act, or of processing performed by an affiliated person under section 781(b)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(f)(3) of the Act.

(i) *Minor alterations of merchandise.* Under section 781(c) of the Act, the Secretary may include within the scope of an antidumping or countervailing duty order articles altered in form or appearance in minor respects.

(j) *Later-developed merchandise.* In determining whether later-developed merchandise is within the scope of an antidumping or countervailing duty order, the Secretary will apply section 781(d) of the Act.

(k) *Other scope determinations.* With respect to those scope determinations that are not covered under paragraphs (g) through (j) of this section, in considering whether a particular product is included within the scope of an order or a suspended investigation, the Sec-

retary will take into account the following:

(1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.

(2) When the above criteria are not dispositive, the Secretary will further consider:

(i) The physical characteristics of the product;

(ii) The expectations of the ultimate purchasers;

(iii) The ultimate use of the product;

(iv) The channels of trade in which the product is sold; and

(v) The manner in which the product is advertised and displayed.

(l) *Suspension of liquidation.* (1) When the Secretary conducts a scope inquiry under paragraph (b) or (e) of this section, and the product in question is already subject to suspension of liquidation, that suspension of liquidation will be continued, pending a preliminary or a final scope ruling, at the cash deposit rate that would apply if the product were ruled to be included within the scope of the order.

(2) If the Secretary issues a preliminary scope ruling under paragraph (f)(3) of this section to the effect that the product in question is included within the scope of the order, any suspension of liquidation described in paragraph (l)(1) of this section will continue. If liquidation has not been suspended, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry. If the Secretary issues a preliminary scope ruling to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the product ended, and will instruct the Customs Service to refund any cash deposits or release any bonds relating to that product.

(3) If the Secretary issues a final scope ruling, under either paragraph (d) or (f)(4) of this section, to the effect

that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) or (l)(2) of this section will continue. Where there has been no suspension of liquidation, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry. If the Secretary's final scope ruling is to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the subject product ended and will instruct the Customs Service to refund any cash deposits or release any bonds relating to this product.

(4) If, within 90 days of the initiation of a review of an order or a suspended investigation under this subpart, the Secretary issues a final ruling that a product is included within the scope of the order or suspended investigation that is the subject of the review, the Secretary, where practicable, will include sales of that product for purposes of the review and will seek information regarding such sales. If the Secretary issues a final ruling after 90 days of the initiation of the review, the Secretary may consider sales of the product for purposes of the review on the basis of non-adverse facts available. However, notwithstanding the pendency of a scope inquiry, if the Secretary considers it appropriate, the Secretary may request information concerning the product that is the subject of the scope inquiry for purposes of a review under this subpart.

(m) *Orders covering identical products.* Except for a scope inquiry and a scope ruling that involves section 781(a) or section 781(b) of the Act (assembly of parts or components in the United States or in a third country), if more than one order or suspended investigation cover the same subject merchandise, and if the Secretary considers it appropriate, the Secretary may conduct a single inquiry and issue a single scope ruling that applies to all such orders or suspended investigations.

(n) *Service of applications; scope service list.* The requirements of § 351.303(f) apply to this section, except that an application for a scope ruling must be served on all persons on the Department's scope service list. For purposes of this section, the "scope service list" will include all persons that have participated in any segment of the proceeding. If an application for a scope ruling in one proceeding results in a single inquiry that will apply to another proceeding (*see* paragraph (m) of this section), the Secretary will notify persons on the scope service list of the other proceeding of the application for a scope ruling.

(o) *Publication of list of scope rulings.* On a quarterly basis, the Secretary will publish in the FEDERAL REGISTER a list of scope rulings issued within the last three months. This list will include the case name, reference number, and a brief description of the ruling.

## Subpart C—Information and Argument

### § 351.301 Time limits for submission of factual information.

(a) *Introduction.* The Department obtains most of its factual information in antidumping and countervailing duty proceedings from submissions made by interested parties during the course of the proceeding. This section sets forth the time limits for submitting such factual information, including information in questionnaire responses, publicly available information to value factors in nonmarket economy cases, allegations concerning market viability, allegations of sales at prices below the cost of production, countervailable subsidy allegations, and upstream subsidy allegations. Section 351.302 sets forth the procedures for requesting an extension of such time limits. Section 351.303 contains the procedural rules regarding filing, format, translation, service, and certification of documents.

(b) *Time limits in general.* Except as provided in paragraphs (c) and (d) of this section and § 351.302, a submission of factual information is due no later than:

(1) For a final determination in a countervailing duty investigation or an antidumping investigation, seven days

237

19 U.S.C. § 1517

section 171 of Title 28, Judiciary and Judicial Procedure.

### EFFECTIVE DATE OF 1980 AMENDMENTS

Pub. L. 96–542, §3, Dec. 17, 1980, 94 Stat. 3210, provided that: "The amendments made by this Act [amending this section and provisions set out as a note under section 251 of Title 28, Judiciary and Judicial Procedure] shall be effective as of November 1, 1980."

Amendment by Pub. L. 96–417 effective Nov. 1, 1980, and applicable with respect to civil actions pending on or commenced on or after such date, see section 701(a) of Pub. L. 96–417, set out as a note under section 251 of title 28.

### EFFECTIVE DATE; TRANSITIONAL RULES

Pub. L. 96–39, title X, §1002, July 26, 1979, 93 Stat. 306, provided that:

"(a) EFFECTIVE DATE.—The amendments made by this title [enacting this section and amending sections 1514, 1515, and 1516 of this title and sections 1541, 1582, 2632, 2633, and 2637 of Title 28, Judiciary and Judicial Procedure] shall take effect on that date (hereinafter in this section referred to as the 'effective date') on which title VII of the Tariff Act of 1930 [subtitle IV of this chapter] (as added by title I of this Act) takes effect [Jan. 1, 1980]; and section 515(a) of such Act of 1930 [section 1515(a) of this title] (as amended by section 1001(b)(2)) shall apply with respect to any denial, in whole or in part, of a protest filed under section 514 of such Act of 1930 [section 1514 of this title] on or after the effective date.

"(b) TRANSITIONAL RULES.—

"(1) CERTAIN PROTESTS, PETITIONS, ACTIONS, ETC.— The amendments made by this title [enacting this section and amending sections 1514, 1515, and 1516 of this title and sections 1541, 1582, 2632, 2633, and 2637 of Title 28, Judiciary and Judicial Procedure] shall not apply with respect to—

"(A) any protest, petition, or notice of desire to contest filed before the effective date [Jan. 1, 1980] under section 514, 516(a), or 516(d), respectively, of the Tariff Act of 1930 [section 1514, 1516(a), or 1516(d) of this title];

"(B) any civil action commenced before the effective date [Jan. 1, 1980] under section 2632 of title 28 of the United States Code; or

"(C) any civil action commenced after the effective date [Jan. 1, 1980] under such section 2632 if the protest, petition, or notice of desire to contest (under section 514, 516(a), or 516(d), respectively, of the Tariff Act of 1930) on which such action is based was filed before such effective date.

"(2) LAW TO BE APPLIED FOR PURPOSES OF SUCH ACTIONS.—Notwithstanding the repeal of the Antidumping Act, 1921 [sections 160 to 171 of this title], by section 106(a) of this Act, and the amendment of section 303 of the Tariff Act of 1930 [section 1303 of this title] by section 103 of this Act, the law in effect on the date of any finding or determination contested in a civil action described in subparagraph (A), (B), or (C) of paragraph (1) shall be applied for purposes of that action.

"(3) CERTAIN COUNTERVAILING AND ANTIDUMPING DUTY ASSESSMENTS.—The amendments made by this title [enacting this section and amending sections 1514, 1515, and 1516 of this title and sections 1541, 1582, 2632, 2633, and 2637 of Title 28, Judiciary and Judicial Procedure] shall apply with respect to the review of the assessment of, or failure to assess, any countervailing duty or antidumping duty on entries subject to a countervailing duty order or antidumping finding if the assessment is made after the effective date. If no assessment of such duty had been made before the effective date that could serve the party seeking review as the basis of a review of the underlying determination, made by the Secretary of the Treasury or the International Trade Commission before the effective date, on which such order, finding, or lack

thereof is based, then the underlying determination shall be subject to review in accordance with the law in effect on the day before the effective date.

"(4) CERTAIN COUNTERVAILING AND ANTIDUMPING DUTY DETERMINATIONS.—With respect to any preliminary determination or final determination of the Secretary of the Treasury under section 303 of the Tariff Act of 1930 [section 1303 of this title] or the Antidumping Act, 1921 [sections 160 to 171 of this title], which is treated under section 102 of this Act [set out as a note under section 1671 of this title] as if made under section 703(b), 705(a), 733(b), or 735(a) of the Tariff Act of 1930 [section 1671b(b), 1671d(a), 1673b(b), or 1673d(a) of this title] (as added by title I of this Act) such determinations shall be subject to judicial review in the same manner and to the same extent as if made on the day before the effective date."

### TRANSFER OF FUNCTIONS

For transfer of functions, personnel, assets, and liabilities of the United States Customs Service of the Department of the Treasury, including functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 203(1), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6. For establishment of U.S. Customs and Border Protection in the Department of Homeland Security, treated as if included in Pub. L. 107–296 as of Nov. 25, 2002, see section 211 of Title 6, as amended generally by Pub. L. 114–125, and section 802(b) of Pub. L. 114–125, set out as a note under section 211 of Title 6.

### EFFECT OF TERMINATION OF USMCA COUNTRY STATUS

For provisions relating to effect of termination of USMCA country status on sections 401 to 432 of Pub. L. 116–113, see section 4601 of this title.

### PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

### Executive Documents

#### ACCEPTANCE BY PRESIDENT OF PANEL AND COMMITTEE DECISIONS

For acceptance by President of decisions of binational panels and extraordinary challenge committees in event that subsec. (b)(7)(B) of this section takes effect, see section 2 of Ex. Ord. No. 12889, Dec. 27, 1993, 58 F.R. 69681, set out as a note under former section 3311 of this title.

For provision that in the event that subsec. (g)(7)(B) of this section takes effect, the President accepts, as a whole, all decisions of binational panels and extraordinary challenge committees, see section 3 of Ex. Ord. No. 12662, Dec. 31, 1988, 54 F.R. 785, set out as a note under section 2112 of this title.

## § 1517. Procedures for investigating claims of evasion of antidumping and countervailing duty orders

### (a) Definitions

In this section:

### (1) Administering authority

The term "administering authority" has the meaning given that term in section 1677(1) of this title.

## (2) Commissioner

The term "Commissioner" means the Commissioner of U.S. Customs and Border Protection.

## (3) Covered merchandise

The term "covered merchandise" means merchandise that is subject to—

(A) an antidumping duty order issued under section 1673e of this title; or

(B) a countervailing duty order issued under section 1671e of this title.

## (4) Enter; entry

The terms "enter" and "entry" refer to the entry, or withdrawal from warehouse for consumption, of merchandise into the customs territory of the United States.

## (5) Evasion

### (A) In general

Except as provided in subparagraph (B), the term "evasion" refers to entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.

### (B) Exception for clerical error

#### (i) In general

Except as provided in clause (ii), the term "evasion" does not include entering covered merchandise into the customs territory of the United States by means of—

(I) a document or electronically transmitted data or information, written or oral statement, or act that is false as a result of a clerical error; or

(II) an omission that results from a clerical error.

#### (ii) Patterns of negligent conduct

If the Commissioner determines that a person has entered covered merchandise into the customs territory of the United States by means of a clerical error referred to in subclause (I) or (II) of clause (i) and that the clerical error is part of a pattern of negligent conduct on the part of that person, the Commissioner may determine, notwithstanding clause (i), that the person has entered such covered merchandise into the customs territory of the United States through evasion.

#### (iii) Electronic repetition of errors

For purposes of clause (ii), the mere nonintentional repetition by an electronic system of an initial clerical error does not constitute a pattern of negligent conduct.

#### (iv) Rule of construction

A determination by the Commissioner that a person has entered covered merchandise into the customs territory of the United States by means of a clerical error referred to in subclause (I) or (II) of clause (i) rather than through evasion shall not be construed to excuse that person from the payment of any duties applicable to the merchandise.

## (6) Interested party

### (A) In general

The term "interested party" means—

(i) a foreign manufacturer, producer, or exporter, or the United States importer, of covered merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise;

(ii) a manufacturer, producer, or wholesaler in the United States of a domestic like product;

(iii) a certified union or recognized union or group of workers that is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a domestic like product;

(iv) a trade or business association a majority of the members of which manufacture, produce, or wholesale a domestic like product in the United States;

(v) an association a majority of the members of which is composed of interested parties described in clause (ii), (iii), or (iv) with respect to a domestic like product; and

(vi) if the covered merchandise is a processed agricultural product, as defined in section 1677(4)(E), a coalition or trade association that is representative of either—

(I) processors;

(II) processors and producers; or

(III) processors and growers.

### (B) Domestic like product

For purposes of subparagraph (A), the term "domestic like product" means a product that is like, or in the absence of like, most similar in characteristics and uses with, covered merchandise.

## (b) Investigations

### (1) In general

Not later than 15 business days after receiving an allegation described in paragraph (2) or a referral described in paragraph (3), the Commissioner shall initiate an investigation if the Commissioner determines that the information provided in the allegation or the referral, as the case may be, reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion.

### (2) Allegation described

An allegation described in this paragraph is an allegation that a person has entered covered merchandise into the customs territory of the United States through evasion that is—

(A) filed with the Commissioner by an interested party; and

(B) accompanied by information reasonably available to the party that filed the allegation.

### (3) Referral described

A referral described in this paragraph is information submitted to the Commissioner by

any other Federal agency, including the Department of Commerce or the United States International Trade Commission, that reasonably suggests that a person has entered covered merchandise into the customs territory of the United States through evasion.

**(4) Consideration by administering authority**

**(A) In general**

If the Commissioner receives an allegation under paragraph (2) and is unable to determine whether the merchandise at issue is covered merchandise, the Commissioner shall—

(i) refer the matter to the administering authority to determine whether the merchandise is covered merchandise pursuant to the authority of the administering authority under subtitle IV; and

(ii) notify the party that filed the allegation, and any other interested party participating in the investigation, of the referral.

**(B) Determination; transmission to Commissioner**

After receiving a referral under subparagraph (A)(i) with respect to merchandise, the administering authority shall determine whether the merchandise is covered merchandise and promptly transmit that determination to the Commissioner.

**(C) Stay of deadlines**

The period required for any referral and determination under this paragraph shall not be counted in calculating any deadline under this section.

**(D) Rule of construction**

Nothing in this paragraph shall be construed to affect the authority of an interested party to commence an action in the United States Court of International Trade under section 1516a(a)(2) of this title with respect to a determination of the administering authority under this paragraph.

**(5) Consolidation of allegations and referrals**

**(A) In general**

The Commissioner may consolidate multiple allegations described in paragraph (2) and referrals described in paragraph (3) into a single investigation if the Commissioner determines it is appropriate to do so.

**(B) Effect on timing requirements**

If the Commissioner consolidates multiple allegations or referrals into a single investigation under subparagraph (A), the date on which the Commissioner receives the first such allegation or referral shall be used for purposes of the requirement under paragraph (1) with respect to the timing of the initiation of the investigation.

**(6) Information-sharing to protect health and safety**

If, during the course of conducting an investigation under paragraph (1) with respect to covered merchandise, the Commissioner has reason to suspect that such covered merchandise may pose a health or safety risk to consumers, the Commissioner shall provide, as appropriate, information to the appropriate Federal agencies for purposes of mitigating the risk.

**(7) Technical assistance and advice**

**(A) In general**

Upon request, the Commissioner shall provide technical assistance and advice to eligible small businesses to enable such businesses to prepare and submit allegations described in paragraph (2), except that the Commissioner may deny technical assistance if the Commissioner concludes that the allegation, if submitted, would not lead to the initiation of an investigation under this subsection or any other action to address the allegation.

**(B) Eligible small business defined**

**(i) In general**

In this paragraph, the term ''eligible small business'' means any business concern that the Commissioner determines, due to its small size, has neither adequate internal resources nor the financial ability to obtain qualified outside assistance in preparing and filing allegations described in paragraph (2).

**(ii) Non-reviewability**

The determination of the Commissioner regarding whether a business concern is an eligible small business for purposes of this paragraph is not reviewable by any other agency or by any court.

**(c) Determinations**

**(1) Determination of evasion**

**(A) In general**

Except as provided in subparagraph (B), not later than 300 calendar days after the date on which the Commissioner initiates an investigation under subsection (b) with respect to covered merchandise, the Commissioner shall make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion.

**(B) Additional time**

The Commissioner may extend the time to make a determination under subparagraph (A) by not more than 60 calendar days if the Commissioner determines that—

(i) the investigation is extraordinarily complicated because of—

(I) the number and complexity of the transactions to be investigated;

(II) the novelty of the issues presented; or

(III) the number of entities to be investigated; and

(ii) additional time is necessary to make the determination under subparagraph (A).

**(2) Authority to collect and verify additional information**

In making a determination under paragraph (1) with respect to covered merchandise, the

Commissioner may collect such additional information as is necessary to make the determination through such methods as the Commissioner considers appropriate, including by—

    (A) issuing a questionnaire with respect to such covered merchandise to—

        (i) an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise;

        (ii) a person alleged to have entered such covered merchandise into the customs territory of the United States through evasion;

        (iii) a person that is a foreign producer or exporter of such covered merchandise; or

        (iv) the government of a country from which such covered merchandise was exported; and

    (B) conducting verifications, including on-site verifications, of any relevant information.

**(3) Adverse inference**

**(A) In general**

If the Commissioner finds that a party or person described in clause (i), (ii), or (iii) of paragraph (2)(A) has failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information, the Commissioner may, in making a determination under paragraph (1), use an inference that is adverse to the interests of that party or person in selecting from among the facts otherwise available to make the determination.

**(B) Application**

An inference described in subparagraph (A) may be used under that subparagraph with respect to a person described in clause (ii) or (iii) of paragraph (2)(A) without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought by the Commissioner, such as import or export documentation.

**(C) Adverse inference described**

An adverse inference used under subparagraph (A) may include reliance on information derived from—

    (i) the allegation of evasion of the trade remedy laws, if any, submitted to U.S. Customs and Border Protection;

    (ii) a determination by the Commissioner in another investigation, proceeding, or other action regarding evasion of the unfair trade laws; or

    (iii) any other available information.

**(4) Notification**

Not later than 5 business days after making a determination under paragraph (1) with respect to covered merchandise, the Commissioner—

    (A) shall provide to each interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise a notification of the determination and may, in addition, include an explanation of the basis for the determination; and

    (B) may provide to importers, in such manner as the Commissioner determines appropriate, information discovered in the investigation that the Commissioner determines will help educate importers with respect to importing merchandise into the customs territory of the United States in accordance with all applicable laws and regulations.

**(d) Effect of determinations**

**(1) In general**

If the Commissioner makes a determination under subsection (c) that covered merchandise was entered into the customs territory of the United States through evasion, the Commissioner shall—

    (A)(i) suspend the liquidation of unliquidated entries of such covered merchandise that are subject to the determination and that enter on or after the date of the initiation of the investigation under subsection (b) with respect to such covered merchandise and on or before the date of the determination; or

    (ii) if the Commissioner has already suspended the liquidation of such entries pursuant to subsection (e)(1), continue to suspend the liquidation of such entries;

    (B) pursuant to the Commissioner's authority under section 1504(b) of this title—

        (i) extend the period for liquidating unliquidated entries of such covered merchandise that are subject to the determination and that entered before the date of the initiation of the investigation; or

        (ii) if the Commissioner has already extended the period for liquidating such entries pursuant to subsection (e)(1), continue to extend the period for liquidating such entries;

    (C) notify the administering authority of the determination and request that the administering authority—

        (i) identify the applicable antidumping or countervailing duty assessment rates for entries described in subparagraphs (A) and (B); or

        (ii) if no such assessment rate for such an entry is available at the time, identify the applicable cash deposit rate to be applied to the entry, with the applicable antidumping or countervailing duty assessment rate to be provided as soon as that rate becomes available;

    (D) require the posting of cash deposits and assess duties on entries described in subparagraphs (A) and (B) in accordance with the instructions received from the administering authority under paragraph (2); and

    (E) take such additional enforcement measures as the Commissioner determines appropriate, such as—

(i) initiating proceedings under section 1592 or 1595a of this title;

(ii) implementing, in consultation with the relevant Federal agencies, rule sets or modifications to rule sets for identifying, particularly through the Automated Targeting System and the Automated Commercial Environment authorized under section 58c(f)(4) of this title, importers, other parties, and merchandise that may be associated with evasion;

(iii) requiring, with respect to merchandise for which the importer has repeatedly provided incomplete or erroneous entry summary information in connection with determinations of evasion, the importer to deposit estimated duties at the time of entry; and

(iv) referring the record in whole or in part to U.S. Immigration and Customs Enforcement for civil or criminal investigation.

**(2) Cooperation of administering authority**

**(A) In general**

Upon receiving a notification from the Commissioner under paragraph (1)(C), the administering authority shall promptly provide to the Commissioner the applicable cash deposit rates and antidumping or countervailing duty assessment rates and any necessary liquidation instructions.

**(B) Special rule for cases in which the producer or exporter is unknown**

If the Commissioner and the administering authority are unable to determine the producer or exporter of the merchandise with respect to which a notification is made under paragraph (1)(C), the administering authority shall identify, as the applicable cash deposit rate or antidumping or countervailing duty assessment rate, the cash deposit or duty (as the case may be) in the highest amount applicable to any producer or exporter, including the "all-others" rate of the merchandise subject to an antidumping order or countervailing duty order under section 1673e of this title or 1671e of this title, respectively, or a finding issued under the Antidumping Act, 1921, or any administrative review conducted under section 1675 of this title.

**(e) Interim measures**

Not later than 90 calendar days after initiating an investigation under subsection (b) with respect to covered merchandise, the Commissioner shall decide based on the investigation if there is a reasonable suspicion that such covered merchandise was entered into the customs territory of the United States through evasion and, if the Commissioner decides there is such a reasonable suspicion, the Commissioner shall—

(1) suspend the liquidation of each unliquidated entry of such covered merchandise that entered on or after the date of the initiation of the investigation;

(2) pursuant to the Commissioner's authority under section 1504(b) of this title, extend the period for liquidating each unliquidated entry of such covered merchandise that en-

tered before the date of the initiation of the investigation; and

(3) pursuant to the Commissioner's authority under section 1623 of this title, take such additional measures as the Commissioner determines necessary to protect the revenue of the United States, including requiring a single transaction bond or additional security or the posting of a cash deposit with respect to such covered merchandise.

**(f) Administrative review**

**(1) In general**

Not later than 30 business days after the Commissioner makes a determination under subsection (c) with respect to whether covered merchandise was entered into the customs territory of the United States through evasion, a person determined to have entered such covered merchandise through evasion or an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise may file an appeal with the Commissioner for de novo review of the determination.

**(2) Timeline for review**

Not later than 60 business days after an appeal of a determination is filed under paragraph (1), the Commissioner shall complete the review of the determination.

**(g) Judicial review**

**(1) In general**

Not later than 30 business days after the Commissioner completes a review under subsection (f) of a determination under subsection (c) with respect to whether covered merchandise was entered into the customs territory of the United States through evasion, a person determined to have entered such covered merchandise through evasion or an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise may seek judicial review of the determination under subsection (c) and the review under subsection (f) in the United States Court of International Trade to determine whether the determination and review is conducted in accordance with subsections (c) and (f).

**(2) Standard of review**

In determining whether a determination under subsection (c) or review under subsection (f) is conducted in accordance with those subsections, the United States Court of International Trade shall examine—

(A) whether the Commissioner fully complied with all procedures under subsections (c) and (f); and

(B) whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**(3) Rule of construction**

Nothing in this subsection shall affect the availability of judicial review to an interested party under any other provision of law.

**(h) Rule of construction with respect to other civil and criminal proceedings and investigations**

No determination under subsection (c), review under subsection (f), or action taken by the Commissioner pursuant to this section shall preclude any individual or entity from proceeding, or otherwise affect or limit the authority of any individual or entity to proceed, with any civil, criminal, or administrative investigation or proceeding pursuant to any other provision of Federal or State law, including sections 1592 of this title and 1595a of this title.

(June 17, 1930, ch. 497, title IV, § 517, as added Pub. L. 114–125, title IV, § 421(a), Feb. 24, 2016, 130 Stat. 161.)

### Editorial Notes

#### References in Text

The Antidumping Act, 1921, referred to in subsec. (d)(2)(B), is act May 27, 1921, ch. 14, title II, 42 Stat. 11, which was classified generally to sections 160 to 171 of this title, and was repealed by Pub. L. 96–39, title I, § 106(a), July 26, 1979, 93 Stat. 193.

#### Prior Provisions

A prior section 1517, act June 17, 1930, ch. 497, title IV, § 517, 46 Stat. 737, related to frivolous protest or appeal, prior to repeal by act June 25, 1948, ch. 646, § 39, 62 Stat. 992, eff. Sept. 1, 1948. See section 2641 of Title 28, Judiciary and Judicial Procedure.

### Statutory Notes and Related Subsidiaries

#### Effective Date

Pub. L. 114–125, title IV, § 421(c), Feb. 24, 2016, 130 Stat. 168, provided that: "The amendments made by this section [enacting this section and amending section 1581 of Title 28, Judiciary and Judicial Procedure] shall take effect on the date that is 180 days after the date of the enactment of this Act [Feb. 24, 2016]."

#### Regulations

Pub. L. 114–125, title IV, § 421(d), Feb. 24, 2016, 130 Stat. 169, provided that: "Not later than the date that is 180 days after the date of the enactment of this Act [Feb. 24, 2016], the Secretary [of the Treasury] shall prescribe such regulations as may be necessary to implement the amendments made by this section [enacting this section and amending section 1581 of Title 28, Judiciary and Judicial Procedure]."

## §§ 1518, 1519. Repealed. June 25, 1948, ch. 646, § 39, 62 Stat. 992, eff. Sept. 1, 1948

Section 1518, acts June 10, 1890, ch. 407, § 12, 26 Stat. 136; May 27, 1908, ch. 205, § 3, 35 Stat. 406; Aug. 5, 1909, ch. 6, § 28, 36 Stat. 98; May 28, 1926, ch. 411, § 1, 44 Stat. 669; June 17, 1930, ch. 497, title IV, § 518, 46 Stat. 737, related to the judges of the United States Customs Court: their appointment, salary, retirement, vacancies, and powers; the control of the fiscal affairs and of the clerical force of the court; and the division of the court. See sections 251 to 254, 456, 1581, 2071, 2639, and 2640 of Title 28, Judiciary and Judicial Procedure. Last sentence of section, relating to the transfer of unexpended appropriations for salaries to be available for expenditures for the same purposes, was omitted as executed.

Section 1519, act June 17, 1930, ch. 497, title IV, § 519, 46 Stat. 739, related to publication of Customs Court's decisions. See section 255 of Title 28, Judiciary and Judicial Procedure.

## § 1520. Refunds and errors

**(a) Cases in which refunds authorized**

The Secretary of the Treasury is authorized to refund duties or other receipts in the following cases:

(1) *Excess deposits.*—Whenever it is ascertained on liquidation or reliquidation of an entry or reconciliation that more money has been deposited or paid as duties than was required by law to be so deposited or paid.

(2) *Fees, charges, and exactions.*—Whenever it is determined in the manner required by law that any fees, charges, or exactions, other than duties and taxes, have been erroneously or excessively collected.

(3) *Fines, penalties, and forfeitures.*—Whenever money has been deposited in the Treasury on account of a fine, penalty, or forfeiture which did not accrue, or which is finally determined to have accrued in an amount less than that so deposited, or which is mitigated to an amount less than that so deposited or is remitted.

(4) *Prior to liquidation.*—Prior to the liquidation of an entry or reconciliation, whenever an importer of record declares or it is ascertained that excess duties, fees, charges, or exactions have been deposited or paid.

**(b) Authorization of appropriations**

The necessary moneys to make such refunds are authorized to be appropriated annually from the general fund of the Treasury.

**(c) Repealed. Pub. L. 108–429, title II, § 2105, Dec. 3, 2004, 118 Stat. 2598**

**(d) Goods qualifying under free trade agreement rules of origin**

Notwithstanding the fact that a valid protest was not filed, the Customs Service may, in accordance with regulations prescribed by the Secretary, reliquidate an entry to refund any excess duties (including any merchandise processing fees) paid on a good qualifying under the rules of origin set out in section 202 of the United States-Chile Free Trade Agreement Implementation Act, section 4033 of this title, section 202 of the United States-Oman Free Trade Agreement Implementation Act, section 203 of the United States-Peru Trade Promotion Agreement Implementation Act, section 202 of the United States-Korea Free Trade Agreement Implementation Act, section 203 of the United States-Colombia Trade Promotion Agreement Implementation Act, or section 203 of the United States-Panama Trade Promotion Agreement Implementation Act, or section 4531 of this title, for which no claim for preferential tariff treatment was made at the time of importation if the importer, within 1 year after the date of importation, files, in accordance with those regulations, a claim that includes—

(1) a written declaration that the good qualified under the applicable rules at the time of importation;

(2) copies of all applicable certificates or certifications of origin; and

(3) such other documentation and information relating to the importation of the goods as the Customs Service may require.

(June 17, 1930, ch. 497, title IV, § 520, 46 Stat. 739; June 26, 1934, ch. 756, § 2, 48 Stat. 1225; June 25,

(Form 19)

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## CAFC Court No. 2025-1694

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 9,403 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: June 23, 2025

Signature: _____/s/ Jay C. Campbell___

Name: _____Jay C. Campbell___