No. 2025-1694

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ASIA WHEEL CO., LTD,

Plaintiff-Appellant,

ZC RUBBER AMERICA INC.,

Plaintiff,

v.

UNITED STATES,

Defendant-Appellee,

ACCURIDE CORPORATION,

Defendant-Appellee.

_____

On Appeal from the United States Court of Court of International Trade in Case No. 1:23-Cv-00143, Judge Gary S. Katzmann

_____

## RESPONSE BRIEF FOR DEFENDANT-APPELLEE

_____

BRETT A. SHUMATE
*Assistant Attorney General*

*Of Counsel:*

PATRICA M. MCCARTHY
*Director*

RUSLAN KLAFEHN
*Attorney*
*Office of the Chief Counsel for*
*Trade Enforcement & Compliance*
*U.S. Department of Commerce*
*1401 Constitution Avenue, NW*

TARA K. HOGAN
ISABELLE AUBRUN
*Attorneys, Commercial Litigation Branch*
*Civil Division, U.S. Department of Justice*
*P.O. Box 480, Ben Franklin Station*
*Washington, DC 20044*
*(202) 616-0465*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF JURISDICTION ............................................................................. 1

STATEMENT OF THE ISSUE ..................................................................................... 1

STATEMENT OF THE CASE ....................................................................................... 2

I.  Background for Determining the Scope of an Antidumping or
    Countervailing Duty Order .................................................................................... 2

    A. Scope Determinations in Antidumping and Countervailing Duty
       Investigations ...................................................................................................... 2

    B. Scope Rulings ....................................................................................................... 4

II. Factual Background .................................................................................................... 7

    A.  Commerce Issues Orders Covering Certain Truck Wheels 22.5 to
        24.5 Inches from China ................................................................................... 7

        i.  Commerce Initiates the AD and CVD Investigations .................... 7

        ii. The Resulting AD and CVD Orders ................................................. 11

    B.  Commerce Issues a Scope Determination Finding Asia Wheel's
        22.5 to 24.5 Inch Truck Wheels Within the Scope of the Orders ......... 12

        i.  CBP Issues a Covered Merchandise Referral To Commerce
            Following An Allegation that Asia Wheel is Evading the
            Orders ................................................................................................... 12

        ii. Commerce's Scope Ruling on Asisa Wheel's Truck Wheels ....... 14

III. The Court of International Trade Sustains Commerce's Scope Ruling ............. 17

SUMMARY OF ARGUMENT ...................................................................................... 22

ARGUMENT ................................................................................................... 23

I.      Standard of Review ............................................................................. 23

II.     Commerce's Scope Determination is Lawful and Supported by
        Substantial Evidence .......................................................................... 24

        A.      Commerce Reasonably Determined that the Plain Language of
                the Orders Did Not Unambiguously Exclude Asia Wheel's
                Wheels ..................................................................................... 26

        B.      Commerce Reasonably Concluded that its Final Scope Memo—a
                (k)(1) Source—Did Not Unambiguously Exclude Asia Wheel's
                Merchandise ............................................................................. 28

III.    Commerce Provided Lawful Notice that Wheels Produced in a Third
        Country from Mixed-Origin Components Could be Subject Merchandise ...... 33

        CONCLUSION ................................................................................. 42

# TABLE OF AUTHORITIES

<u>CASES</u>

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
   802 F.3d 1339 (Fed. Cir. 2015) ....................................................................... 23

*Allegheny Ludlum Corp. v. United States,*
   287 F.3d 1365 (Fed. Cir. 2002) ......................................................................... 2

*Arcelormittal Stainless Belgium N.V. v. United States,*
   694 F.3d 82 (Fed. Cir. 2012)............................................................................. 5

*Aspects Furniture Int'l Inc. v. United States,*
   607 F. Supp. 3d 1246 (Ct. In'l Trade 2022)................................................... 41

*Atl. Sugar, Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984) ....................................................................... 24

*Bell Supply Co. v. United States,*
   83 F. Supp. 3d 1311  (2015) ........................................................................... 20

*Bell Supply Co., LLC v. United States,*
   393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019)................................................. 37

*Bell Supply Co., LLC v. United States,*
   888 F.3d 1222 (Fed. Cir. 2018) .................................................................... 3, 4

*Canadian Solar, Inc. v. United States,*
   918 F.3d 909 (Fed. Cir. 2019)..................................................................... 9, 38

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938) ......................................................................................... 24

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ......................................................................................... 24

*Duferco Steel, Inc. v. United States,*
   296 F.3d 1087 (Fed. Cir. 2002) ....................................................................... 26

*Guangdong Wireking Housewares & Hardware Co. v. United States,*
745 F.3d 1194 (Fed. Cir. 2014) ................................................................. 2

*INA Walzlager Schaeffler KG v. United States,*
108 F.3d 301 (Fed. Cir. 1997) .................................................................. 6

*McIntosh v. DOD,*
53 F.4th 630 (Fed. Cir. 2022) ................................................................. 21

*Mid Continent Nail Corp. v. United States,*
725 F.3d 1295 (Fed. Cir. 2013) .............................................................. 37

*Nippon Steel Corp. v. United States,*
458 F.3d 1345 (Fed. Cir. 2006) .............................................................. 24

*Nippon Steel v. United States,*
337 F.3d 1373 (Fed. Cir. 2003) .............................................................. 23

*Reuter v. DOC,*
63 F.4th 1357 (Fed. Cir. 2023) ............................................................... 21

*Sharp v. United States,*
580 F.3d 1234 (Fed. Cir. 2009) .............................................................. 27

*SMA Surfaces, Inc. v. United States,*
617 F. Supp. 3d 1263 (Ct. Int'l Trade 2023) ........................................ 27

*SmithKline Beecham Corp. v. Apotex Corp.,*
439 F.3d 1312 (Fed. Cir. 2006) .............................................................. 21

*Sunpreme Inc. v. United States,*
892 F.3d 1186 (Fed. Cir. 2018) ................................................................ 3

*Sunpreme Inc. v. United States,*
946 F.3d 1300 (Fed. Cir. 2020) .............................................................. 36

*Tai-Ao Aluminum Co. v. United States,*
983 F.3d 487 (Fed. Cir. 2020) ........................................... 21, 33, 39, 40

*Tak Fat Trading Co. v. United States,*
396 F.3d 1378 (Fed. Cir. 2005) ........................................................ 4, 5, 6

*Trans Tex Tire, LLC v. United States,*
  519 F. Supp.3d 1275 (Ct. Int'l Trade 2021) .................................................... 21

*Union Steel v. United States,*
  713 F.3d 1101 (Fed. Cir. 2013) ........................................................................ 23

<u>STATUTES</u>

19 U.S.C. § 1504(a) ............................................................................................ 13

19 U.S.C. § 1517 .......................................................................................... 12, 36

19 U.S.C. § 1517(b)(1) ...................................................................................... 35

19 U.S.C. § 1517(e) ................................................................................... 2, 17, 36

19 U.S.C. § 1517(e)(1) ....................................................................................... 37

19 U.S.C. § 1517(e)(1)-(3) ........................................................................... 13, 35

19 U.S.C. § 1517(e)(2) ....................................................................................... 36

19 U.S.C. § 1677(25) ............................................................................................ 4

19 U.S.C. § 1677(j) ............................................................................................. 40

19 U.S.C. §§ 1673 ................................................................................................ 3

19 U.S.C. §§ 1673d(a) .......................................................................................... 4

28 U.S.C. § 1581(c) .............................................................................................. 1

28 U.S.C. §§1295(a) ............................................................................................. 1

<u>REGULATIONS</u>

19 C.F.R. §351.226(k)(1) ....................................................................... 25, 28, 33

19 C.F.R. § 351.202(b)(5) ..................................................................................... 3

19 C.F.R. § 351.225 .............................................................................................. 5

19 C.F.R. § 351.225(3) ................................................................................ 34

19 C.F.R. § 351.225(a) ............................................................................. 4, 37

19 C.F.R. § 351.225(d) ............................................................................... 5, 6

19 C.F.R. § 351.225(e) .............................................................................. 5, 14

19 C.F.R. § 351.225(k) ................................................................................ 26

19 C.F.R. § 351.225(k)(1) .................................................................... 5, 18, 42

19 C.F.R. § 351.225(k)(2) .............................................................................. 6

19 C.F.R. § 351.225(l)(1) ............................................................................. 34

19 C.F.R. § 351.225(l)(3) ............................................................................. 17

49 CFR 571.120 .......................................................................................... 11

**STATEMENT OF RELATED CASES**

Pursuant to Rule 47.5, counsel for defendant-appellee, the United States, states that she is unaware of any other appeal in or from this action that previously was before this Court of any other appellate court under the same or similar title. Counsel for defendant-appellee further states that she believes the following two cases may directly affect or be affected by this Court's decision in this appeal: *Asia Wheel Co., Ltd. v. United States*, Fed. Cir. Case No. 25-1689 et al (lead case), and *Vanguard Natl. Trailer Corp. v. United States,* Court of International Trade Case No. 24-00034 (stayed pending the outcome of this appeal).

# INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 28(b), defendant-appellee, the United States, respectfully submits this brief in response to the brief filed by plaintiff-appellant, Asia Wheel. This Court should affirm the Court of International Trade's (CIT or trial court) decision upholding the United States Department of Commerce's scope ruling finding Asia Wheel's steel wheels are covered by the scope of the antidumping and countervailing duty orders on certain 22.5 to 24.5 inch steel wheels from China.

# STATEMENT OF JURISDICTION

The CIT possessed jurisdiction pursuant to 28 U.S.C. § 1581(c). The CIT entered final judgment on February 21, 2025, and plaintiff-appellant Asia Wheel[1] (Asia Wheel) filed its notice of appeal on April 21, 2025. Therefore, this appeal is timely, as it was filed within 60 days of the CIT's final judgment. *See* 28 U.S.C. §§1295(a); 2107(b).

# STATEMENT OF THE ISSUE

The issues in this case are:

1. Whether the Department of Commerce's determination that Asia Wheel's truck wheels processed in Thailand with mixed-origin parts from rims and

---

[1] Although ZC Rubber America Inc., a United States-based importer of the subject merchandise, intervened in the trial court case, it does not join Asia Wheel in challenging the trial court's decision on appeal. *See* Appx58, Appx1-17.

discs originating from China and a third country are subject to the orders covering 22.5 to 24.5 inch wheels from China is supported by substantial evidence and in accordance with law.

2. Whether Commerce's continuation of Customs and Border Protection's (CBP) suspension of liquidation on entries of Asia Wheel's covered merchandise pursuant to CBP's authority under Enforce and Protect Act (EAPA), 19 U.S.C. § 1517(e), was supported by substantial evidence and accordance with law.

## STATEMENT OF THE CASE

**I.  Background for Determining the Scope of an Antidumping or Countervailing Duty Order**

### A. Scope Determinations in Antidumping and Countervailing Duty Investigations

At a high level, the Tariff Act of 1930, as amended, "permits Commerce to impose two types of duties on imports that injure domestic industries." *Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1196 (Fed. Cir. 2014). Under the Tariff Act, "American industries may petition for relief from imports that are sold in the United States at less than fair value {*i.e.*, are dumped} . . . or which benefit from subsidies provided by foreign governments," by filing an antidumping and/or countervailing duty petition before Commerce and the U.S. International Trade Commission (ITC). *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1368 (Fed. Cir. 2002). This process requires that Commerce determine if

imports are being dumped or subsidized, 19 U.S.C. §§ 1673, 1671(a)(1), and that the

ITC determine whether any domestic industry is being injured by that conduct.

*Id.* §§ 1673d(b)(1), 1671d(b)(1). To make such a determination, Commerce

undertakes an investigation of the alleged conduct. *See, e.g., Bell Supply Co., LLC v.*

*United States*, 888 F.3d 1222, 125 (Fed. Cir. 2018). If both Commerce and the ITC's

determinations are affirmative, Commerce will publish an antidumping (AD) or

countervailing duty (CVD) order. *Id.* §§ 1673e(a); 1671e(a).

Because Commerce is "charged with writing antidumping and countervailing

duty orders that 'include{} a description of the subject merchandise, in such detail as

the administering authority deems necessary,'" Commerce first requires that a petition

for an AD/CVD investigation include a detailed description of the subject

merchandise defining the requested scope of the investigation. *Sunpreme Inc. v. United*

*States*, 892 F.3d 1186, 1188 (Fed. Cir. 2018); 19 C.F.R. § 351.202(b)(5). However, in

recognition that the petitioner's description of the merchandise risks being over-

inclusive through broad language or use of numerous classification subheadings,

Commerce invites interested parties to raise their concerns regarding product

coverage in case briefing. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg.

27,296, 27,323 (Dep't of Commerce May 19, 1997). Commerce addresses interested

party scope comments in preliminary and final scope memoranda, which are typically

issued concurrently with preliminary and final determinations.

## B. Scope Rulings

After the issuance of an order, "questions may arise about the scope of {an}

order." *Bell Supply Co.*, 888 F.3d at 1225. Commerce is often called upon to

determine whether a certain product is included within the scope of an antidumping

or countervailing duty order because it necessarily writes scope language in general

terms. *See* 19 C.F.R. § 351.225(a). Commerce's determinations concerning a particular

product are made in accordance with its regulations.

Thus, Commerce's regulations permit interested parties to request a scope

ruling to clarify whether their specific product falls under a given order.[2] 19 C.F.R.

§ 351.225(a); *see e.g.*, *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir.

2005); *see also Bell Supply Co.*, 888 F.3d at 1225. Relevant to this appeal, Commerce

amended its scope regulations effective in November 2021. *See Regulations to Improve*

*Administrative and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg.

52300 (Dep't of Commerce Sept. 20, 2021) ("Amendments to § 351.225 . . . apply to

scope inquiries for which a scope ruling application is filed . . . on or after November

4, 2021."). Because Asia Wheel filed its scope request in February 2021, the earlier

---

[2] By statute, Commerce makes a determination on whether *subject merchandise* is being dumped/subsidized and may only impose duties on subject merchandise. 19 U.S.C. §§ 1673d(a), 1673e(a). The statute defines "subject merchandise" as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, [or] an order." 19 U.S.C. § 1677(25). Descriptions of subject merchandise, however, must be written in general terms. 19 C.F.R. § 351.225(a). Commerce must therefore determine which products are subject merchandise in the first place in order to be able to administer its AD/CVD orders.

version of Commerce's scope regulations governed Asia Wheel's request for a scope ruling and serves as a basis for the Government's analysis throughout this brief.[3] *See* 5, n1.

Pursuant to 19 C.F.R. § 351.225(d), Commerce may make a scope ruling based on the information in the scope request and the sources set forth in 19 C.F.R. § 351.225(k)(1). If Commerce cannot reach a decision based on the scope ruling request and (k)(1) sources, Commerce initiates a formal scope inquiry. 19 C.F.R. § 351.225(e).

In considering whether a product is covered by the order, Commerce first considers the language of the order itself. *Arcelormittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 87 (Fed. Cir. 2012). Commerce may decide that the language of the order unambiguously applies to the product at issue. If it does, that ends the scope inquiry. If Commerce concludes that the language of the order does not unambiguously include or exclude the merchandise, Commerce considers the descriptions of the merchandise contained in the (k)(1) sources. *Tak Fat Trading*, 396

---

[3] Of note to this appeal, the 2021 amendments to 19 C.F.R. § 351.225 added a new § 351.225(j), which codified Commerce's use of the substantial transformation test in scope proceedings to determine an imported product's country of origin. While, the 2021 amendments do not apply to Asia Wheel's scope inquiry, Commerce had used the substantial transformation test prior to the 2021 amendments to determine country of origin. Therefore, Commerce reasonably applied the substantial transformation test in the contested scope ruling, and no party challenges Commerce's use of the substantial transformation test in this instance.

F.3d at 1382-83. The (k)(1) sources are the descriptions of the product contained in the petition, Commerce's AD/CVD investigation resulting in the order, Commerce's earlier determinations (including prior scope determinations) and the ITC reports. If Commerce determines that the (k)(1) sources conclusively answer whether the inquiry merchandise is within or excluded from the AD/CVD order, Commerce will issue a final scope ruling. 19 C.F.R. § 351.225(d); *see also Tak Fat Trading*, 396 F.3d at 1382. Only when the (k)(1) sources do not decisively answer this question will Commerce next consider the five sources of information outlined in (k)(2): (1) the physical characteristics of the product, (2) the expectations of the ultimate purchasers; (3) the ultimate use of the product; (4) the channels of trade in which the product is sold; and (5) the manner in which the product is advertised and displayed. 19 C.F.R. § 351.225(k)(2). Importantly, throughout, "Commerce has 'broad authority to interpret its own antidumping duty orders.'" *Tak Fat Trading*, 396 F.3d at 1382 (quoting *INA Walzlager Schaeffler KG v. United States*, 108 F.3d 301, 307 (Fed. Cir. 1997)).

## II.  Factual Background

### A. Commerce Issues Orders Covering Certain Truck Wheels 22.5 to 24.5 Inches from China

#### i.  Commerce Initiates the AD and CVD Investigations

In April 2018, following the filing of petitions by domestic producers Accuride Corporation (Accuride) and Maxion Wheels Akron LLC (Maxion)[4],Commerce initiated the AD and CVD investigations of certain steel wheels 22.5 to 24.5 inches in diameter from the People's Republic of China.  *Certain Steel Wheels from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 83 Fed. Reg. 26,257 (Dep't of Commerce June 6, 2018); *Certain Steel Wheels from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 83 Fed. Reg. 17,798 (Dep't of Commerce Apr. 24, 2018).

During the investigation, the domestic producers expressed concern that Chinese steel truck wheel producers with facilities in Vietnam and Thailand might circumvent the orders.  Appx77.  To address this concern, they proposed adding the following language to Commerce's initial description of subject merchandise:

> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not

---

[4]  On September 1, 2023, Accuride moved to intervene as a defendant-intervenor before the trial court; on September 12, 2023, the trial court granted Accuride's motion.  *See* ECF Nos. 14, 18, CIT No. 23-00096; Appx58.  Accuride remains a defendant-appellee in this appeal.

otherwise remove the merchandise from the scope of the investigations if performed in China.

Appx77.

Additionally, the domestic producers asked that Commerce make use of a substantial transformation analysis in order to determine the country of origin for steel wheels processed in a third country with rims and discs made in China. Appx77.

In response, the mandatory respondents (Zhejiang Jingu Company Limited, Asia Wheel's parent company, and Xiamen Sunrise Wheel Group) argued that "Chinese rims and discs that are welded and painted in a third country *are* 'substantially transformed' in that third country, such that the third country is the country of origin for AD and CVD purposes." Appx78 (emphasis added). Respondents explained that the third country processing was capital intensive and highly technical in a way that transformed the wheels from Chinese-origin to originating from the country in which the wheels were welded and painted. Appx78. Therefore, importers argued, the proposed scope language was too broad and risked "expanding the scope to include other merchandise that also originates in a third country (e.g., the language does not explicitly require that both the rim and the disc be produced in China for China to be considered the country of origin.")  Appx78.  This, the respondents argued, was an improper expansion of the scope as originally proposed by the domestic producers. Appx78-79.

Considering those two viewpoints, Commerce determined that the scope language as amended sufficiently addressed the parties' concerns. That is, Commerce explained in its final determination that it changed the scope of the investigations subject to only minor changes. Appx81-82. Therefore, Commerce declined to undertake a substantial transformation analysis at the time of the investigations. Appx81-82. Importantly, Commerce left open the option of conducting a substantial transformation analysis in the future to determine whether a given product is within the scope of the orders. Commerce explained that "{w}hile in some instances Commerce has relied on a substantial transformation analysis to address country-or-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case." Appx81. Still, Commerce determined that for the purposes of defining the general scope of the orders on certain steel truck wheels 22.5 to 24.5 inches in diameter, it could address concerns about circumvention by simply clarifying the scope language rather than undertaking a substantial transformation analysis.[5] *Id.*

---

[5] For example, a substantial transformation test could be important to determining which input confers country of origin. *See Canadian Solar, Inc. v. United States*, 918 F.3d 909, 914 (Fed. Cir. 2019) ("Because some solar cells manufactured in China can be assembled into panels elsewhere and because some solar cells manufactured elsewhere can be assembled into panels in China, Commerce applied the substantial transformation test to determine the country of origin. Commerce determined that the solar cell is the origin-conferring component because the process of assembling the solar cells into panels does not constitute a substantial transformation. Commerce therefore concluded that the duty orders covered solar

*Continued on next page.*

On March 28, 2019, Commerce made a final affirmative determination that certain steel wheels from China 22.5 to 24.5 inches in diameter were being sold in the United States at less than fair market value and that countervailable subsidies were being provided to producers and exporters of that same type of steel wheel. *Certain Steel Wheels From the People's Republic of China: Final Determination of Sales at Less-Than-Fair-Value*, 84 Fed. Reg. 11746 (Dep't of Commerce Mar. 28, 2019); *Certain Steel Wheels From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 84 Fed. Reg. 11,744 (Dep't of Commerce Mar. 28, 2019). Concurrent with the final affirmative determinations, Commerce clarified the scope of the AD and CVD orders for that merchandise based on comments from the petitioners and respondents as described above.[6]  Appx79, Appx91.

---

cells and solar panels from China—including solar panels assembled outside of China using Chinese solar cells, but excluding solar panels assembled in China using non-Chinese solar cells.").  Here, however, if either constituent part of the wheel is Chinese-origin, then it is within scope.  Therefore, Commerce concluded that clarifying the scope language would resolve circumvention concerns.  Appx81.

[6] We agree with Asia Wheel that because Commerce made use of the same scope analysis in its final determination in both the AD and CVD cases, it makes sense to only refer to Commerce's analysis in one of those investigations rather than both.  *See* Applnt. Br. at 5, n1 (comparing Appx76-83 with Appx85-95).  We likewise cite to the analysis in the AD investigation found at Appx76-83.

### ii.  The Resulting AD and CVD Orders

Following its AD and CVD investigations and an affirmative determination of injury by the ITC, in May 2019 Commerce issued the orders on truck wheels from China.

The product subject to these orders are:

The scope of the orders covers certain on-the-road steel wheels, discs, and rims for tubeless tires, with a nominal rim diameter of 22.5 inches and 24.5 inches, regardless of width. Certain on-the-road steel wheels with a nominal wheel diameter of 22.5 inches and 24.5 inches are generally for Class 6, 7, and 8 commercial vehicles (as classified by the Federal Highway Administration Gross Vehicle Weight Rating system), including tractors, semi-trailers, dump trucks, garbage trucks, concrete mixers, and buses, and are the current standard wheel diameters for such applications. The standard widths of certain on-the-road steel wheels are 7.5 inches, 8.25 inches, and 9.0 inches, but all certain on-the-road steel wheels, regardless of width, are covered by the scope. While 22.5 inches and 24.5 inches are standard wheel sizes used by Class 6, 7, and 8 commercial vehicles, the scope covers sizes that may be adopted in the future for Class 6, 7, and 8 commercial vehicles.

The scope includes certain on-the-road steel wheels with either a "hub-piloted" or "stud- piloted" mounting configuration, and includes rims and discs for such wheels, whether imported as an assembly or separately. The scope includes certain onthe-road steel wheels, discs, and rims, of carbon and/or alloy steel composition, whether cladded or not cladded, whether finished or not finished, and whether coated or uncoated. All on-the-road wheels sold in the United States are subject to the requirements of the National Highway Traffic Safety Administration and bear markings, such as the "DOT" symbol, indicating compliance with applicable motor vehicle standards. *See* 49 CFR 571.120. The scope includes certain on-the-road steel wheels imported with or without the required markings. Certain on-the-road steel wheels imported as an assembly with a tire mounted on the wheel and/or with a valve stem attached are included. However, if the certain on-the-road steel wheel is imported as an assembly with a tire mounted on the wheel and/or with a valve stem attached, the certain on-

the-road steel wheel is covered by the scope, but the tire and/or valve stem is not covered by the scope.

The scope includes rims and discs that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the proceeding if performed in China.

Excluded from the scope are: (1) Steel wheels for tube-type tires that require a removable side ring; (2) Aluminum wheels; (3) Wheels where steel represents less than fifty percent of the product by weight; and (4) Steel wheels that do not meet National Highway Traffic Safety Administration requirements, other than the rim marking requirements found in 49 CFR 571.120S5.2.

Imports of the subject merchandise are currently classified under the following Harmonized Tariff Schedule of the United States (HTSUS) subheadings: 8708.70.4530, 8708.70.4560, 8708.70.6030, 8708.70.6060, 8716.90.5045, and 8716.90.5059. Merchandise meeting the scope description may also enter under the following HTSUS subheadings: 4011.20.1015, 4011.20.5020, and 8708.99.4850. While HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the orders is dispositive.

*Certain Steel Wheels From the People's Republic of China: Antidumping and Countervailing Duty*

*Orders*, 84 Fed. Reg. 24,098 (Dep't of Commerce May 24, 2019) (*Orders*).

### B. Commerce Issues a Scope Determination Finding Asia Wheel's 22.5 to 24.5 Inch Truck Wheels Within the Scope of the Orders

#### i. CBP Issues a Covered Merchandise Referral To Commerce Following An Allegation that Asia Wheel is Evading the Orders

In June 2020, Accuride and Maxion filed an allegation under EAPA, 19 U.S.C.

§ 1517, alleging that certain U.S. importers were evading the orders by transshipping

Chinese-origin steel wheels through Thailand. *See generally* Appx143-150. As an

interim measure and based on its "reasonable suspicion," that "Vanguard imported steel wheels into the United States that were transshipped from China through Asia Wheel in Thailand, and should have been subject to the AD/CVD orders," CBP initiated its interim measures consistent with 19 U.S.C. § 1517(e)(1)-(3).  Appx149-150.  Specifically, CBP "suspend{ed} the liquidation of each unliquidated entry of such covered merchandise that entered on or after August 18, 2020, the date of the initiation of the investigation," and "extend{ed} the period for liquidating each unliquidated entry of such covered merchandise that entered before the date of the initiation of the investigation on August 18, 2020."[7]  Appx150.

In June 2021, unable to determine whether certain steel wheels from China evaded the AD/CVD orders, CBP submitted a "covered merchandise referral" to Commerce.  CBP requested "that Commerce issue a determination as to whether steel wheels produced in Thailand by Asia Wheel from Thai-origin steel wheel rims and Chinese-origin steel wheel discs, are covered merchandise."  Appx589; *see generally* 587-599.  In its Federal Register Notice accepting CBP's referral, Commerce explained that the product subject to the covered merchandise referral was already under

---

[7]  Under 19 U.S.C. § 1504(a), an entry of merchandise for consumption not liquidated within {one} year . . . shall be deemed liquidated at the rate of duty, value, quantity, and amount of duties asserted by the importer of record."  As interim measures under EAPA, CBP may extend that one year period for deemed liquidation of *unliquidated* entries of covered merchandise subject to the EAPA investigation.

consideration in Asia Wheel's scope inquiry and would be addressed as part of that proceeding.  Appx601-608.

### ii. Commerce's Scope Ruling on Asisa Wheel's Truck Wheels

Before CBP made its covered merchandise referral to Commerce, in February 2021, Asia Wheel filed a scope ruling application, asking Commerce to determine whether certain types of steel truck wheels that it manufactures in its facilities in Thailand and exports to the United States are covered by the orders.  Appx62-69, Appx23.  Asia Wheel's request identified its truck wheels made from steel plates from China or a third country.  Appx62.  Thereafter, Commerce initiated a formal scope inquiry pursuant to 19 C.F.R. § 351.225(e).  Appx195-196.

Commerce preliminarily determined that a plain reading of the scope language reflects that rims, discs, and wheels further processed in a third country are covered by the *scope if the processing would not otherwise exclude these items from the scope had the processing occurred in China*.  Appx1789-1791.  Specifically, Commerce noted that third country processing provision stated that:

> The scope includes "rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China."

> Appx1790; *Orders*, 84 Fed. Reg. at 24,100.

Commerce determined that the "including, but not limited to" language provided a non-exhaustive list of processing activities. Appx1789. Therefore, Commerce concluded that the scope language was ambiguous because it "does not address what varieties of processing may otherwise exclude a product from the scope." *Id.*

As a result of concerns raised by interested parties about the AD/CVD investigations, Commerce then examined the (k)(1) sources, specifically, the final determination in the less-than-fair value investigation, Appx76-85, and the final determination in the countervailing duty investigation, Appx86-101.[8] Therein, Commerce stated that "while in some instances {it} has relied on a substantial transformation analysis to address country-of-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case." App81. Thus, Commerce concluded that under (k)(1), "Commerce did not automatically exclude an array of products, such as steel wheels assembled in a third country of Chinese-origin and third country components." Appx26.

Because Asia Wheel's scope inquiry concerned certain steel wheels assembled in a third country that contain components manufactured in China (as well as another

---

[8] As we explained in footnote 6, however, because the analyses are identical where on the issues relevant to this appeal, we cite only to the final determination in the less-than-fair value investigation. *See* Appx76-85.

country), Commerce employed a substantial transformation analysis to determine whether the country of origin for the purposes of the AD/CVD law was China.

Commerce evaluated several factors to conclude that a totality of the circumstances supported a finding that Asia Wheel's finished wheels are not substantially transformed into Thai-origin wheels by their processing in Thailand and remain Chinese-origin wheels—that is, they remain in scope. Appx1791-1798. Specifically, Commerce concluded that: (1) the components, individually, are of the same class or kind as Chinese-origin wheels; (2) they maintain their essential characteristics; (3) the processing steps of finishing the components into a finished wheel in Thailand are relatively minor; and (4) Asia Wheel's investment in truck wheel production in Thailand is not comparable to the investment into Chinese production facilities involved in producing the components even assuming that the value added by Thai production is not insignificant. *Id.* In other words, much of the work required to make a steel wheel is completed in China with only comparatively minor finishing done in Thailand.

In its final scope ruling, Commerce continued to find that Asia Wheel's wheels were in scope merchandise and further elaborated on its substantial transformation analysis. Appx32-53.

Having found Asia Wheel's merchandise within the scope of the orders, Commerce instructed CBP to continue to suspend liquidation of entries of truck wheels as of the date of the initiation of the scope inquiry (May 12, 2021) consistent

with 19 C.F.R. § 351.225(l)(3).  Appx2025-2026.  Commerce declined Asia Wheel's

request that Commerce direct CBP not to continue suspension of liquidation of

earlier entries.  Appx43; Appx1869-1874.  Commerce explained that CBP suspends

liquidation under its own authority pursuant to 19 U.S.C. § 1517(e), and Commerce

could not impinge CBP's authority.  Appx47.  Commerce also explained that it did

not order any retroactive suspension of liquidation, that is, before initiation of the

scope inquiry.

## III.  The Court of International Trade Sustains Commerce's Scope Ruling

Asia Wheel appealed Commerce's scope ruling to the Court of International

Trade.[9]  On February 21, 2025, the trial court affirmed Commerce's final results in full

---

[9]  The scope ruling contested in the related (lead) case *Asia Wheel I* is relevant to the contested scope ruling in this appeal. There are, however, some practical difference between the two cases.

First, *Asia Wheel I* and this case deal with scope rulings under two different sets of companion orders.  The scope ruling in *Asia Wheel I* was issued under the AD and CVD orders on *trailer* wheels from China.  The scope ruling in this case was issued under the AD and CVD orders on *truck* wheels from China.  The products are, however, nearly identical.

Second, the underlying orders in the two cases use separate, albeit nearly identical, scope language.  Relevant to this case is the difference in the two scopes' third-country processing language.  In *Asia Wheel I* the third-country processing language states that "<u>rims, discs, and wheels</u> that have been further processed in a third country, including, but not limited to, . . . the welding and painting of rims and discs from China," are subject to the scope of orders.  In this case, the third-country processing language states that "<u>rims and discs</u> that have been further processed in a third country, including, but not limited to, the welding and painting of rims and discs from China," are subject to the scope of the orders.

*Continued on next page.*

and sustained Commerce's final scope ruling. Appx1-17. Specifically, the trial court made four findings.

First, the trial court held that Commerce's interpretation of the scope of the orders with respect to Asia Wheel's wheels was supported by substantial evidence. Appx6-9. Asia Wheel and ZC Rubber argued that the fact that the scope language identifies wheels that have been further processed in a third country by "welding and painting of rims and discs from China to form a steel wheel" meant that Asia Wheel's wheels, which are only comprised of discs from China, are necessarily excluded from the orders. Appx7. The trial court rejected this selective reading of the AD/CVD orders and instead gave meaning to the entirety of the scope language: "'The scope includes rims and discs that have been further processed in a third country, *including, but not limited to*, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, *or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in China*.'" Appx7 (quoting *Orders*, 84 Fed. Reg. at 24,100) (emphasis in original). The trial court explained that "{t}he phrase 'including, but not limited to' indicates that there are

_____

Under Commerce's scope regulations, Commerce may take into account "determinations of {Commerce} (including prior scope determinations)." 19 C.F.R. § 351.225(k)(1). The scope ruling in *Asia Wheel I* was issued prior to the scope ruling in this case. Consistent with its regulatory framework, Commerce relied, among other things, on the *Asia Wheel I* scope ruling in making its determination on the contested scope ruling in this case. *See* Appx24.

methods of third-country processing that will fall within the scope of the Orders, even if not specifically outlined in the orders." Appx7.

The trial court rejected Asia Wheel's argument that Commerce altered, during its investigations, the scope of the orders. Appx7-8. The trial court explained that from the outset, Commerce made clear that its investigations left silent what *other* sorts of third country processing besides the two non-exclusive examples articulated in the orders, such as wheels produced from mixed-origin components, would be covered by the orders. Appx7. That is, the trial court understood that Commerce reasonably determined that "the scope was ambiguous as to which types of third-country processing would not remove a product from the scope" and "noted that further analysis would be necessary on a case-by-case basis." Appx8. Commerce's determination that the orders did not expressly exclude wheels from mixed-origin components comported with the plain language of the orders and Commerce's statements during the AD/CVD investigations. Appx8-9. Therefore, the trial court explained, "Commerce's scope determination that the Orders did not exclude wheels produced from mixed-origin components was consistent with both the plain text of the Orders and with Commerce's statements during the investigations," after which point Commerce was lawfully permitted to undertake a substantial transformation analysis. Appx9.

Second, the trial court concluded that Commerce's determination that the mixed-origin components of Asia Wheel's wheels were not substantially transformed

from China- to Thai-origin wheels is supported by substantial evidence and consistent with the five-factor test outlined in *Bell Supply Co. v. United States*, 83 F. Supp. 3d 1311, 1328 (2015). Appx9-10. Dismissing Asia Wheel's argument that Commerce incorrectly only considered one component of the wheel, rather than the finished, entire wheel, in its analysis, the trial court reasoned that correct question to ask and answer—both of which Commerce did—was "whether *both* wheel components undergo substantial transformation to become a *finished wheel*." Appx10 (emphasis in original). Citing the scope ruling, the trial court explained that "(1) the wheel components *and finished wheel* are of the same class or kind of merchandise included within the scope, (2) both major components continue to function as the only such component after incorporation into *the finished wheel*, and (3) the production in China culminates in a *complete component and an in-process component, functionally creating an already-designed wheel*." Appx10 (emphasis in original); *see also* Appx33-53.

Third, the trial court sustained Commerce's decision to impose AD/CVD duties on the value of the entire wheel, based on its substantial transformation analysis, rather than just the wheel component that was exported from China. Appx11. The trial court explained that Commerce's substantial transformation analysis reasonably concluded that rims and discs were Chinese-origin, and that the finishing process in Thailand did not substantially transform the finished wheel into Thai-origin wheels. Appx9111. Commerce's substantial transformation analysis, the trial court explained, correctly determined the country of origin of the "resulting

merchandise," not its constituent parts. The court found that Asia Wheel does not provide "any legal support for a different method of duty assessment that would first exclude specific components before determining what duties to assess." Appx9.[10]

Fourth and finally, the trial court held that, by the express language of the orders themselves, Commerce provided adequate notice to Asia Wheel that truck wheels produced in third countries from mixed origin components may be included within the scope of the orders. Appx12-15. Commerce, the trial court noted, covered its bases by noting in the investigations that "{w}hile in some instances Commerce has relied on a substantial transformation analysis to address country-or-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case." Appx8 (quoting Appx81). And, the trial court rejected Asia Wheel's reliance on two decisions which, the court explained, contemplated entirely different scenarios than the ones in which Asia Wheel found itself. Appx14-15 (distinguishing Asia Wheel from the importers in *Tai-Ao Aluminum Co. v. United States*, 983 F.3d 487 (Fed. Cir. 2020) and *Trans Tex Tire, LLC v. United*

---

[10] On appeal, Asia Wheel does not reiterate this argument or otherwise challenge Commerce's reasonable decision to consider the entire wheel in its substantial transformation analysis, rather than simply a single part. Therefore, any challenge to this determination that Asia Wheel might raise in its reply is waived. *See e.g.*, *Reuter v. DOC*, 63 F.4th 1357, n4 (Fed. Cir. 2023); *McIntosh v. DOD*, 53 F.4th 630, 642 (Fed. Cir. 2022); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

*States*, 519 F. Supp.3d 1275 (Ct. Int'l Trade 2021)). The Court entered judgment in favor of the United States.

## SUMMARY OF ARGUMENT

Commerce reasonably concluded that Asia Wheel's steel truck wheels 22.5 to 24.5 inches in diameter—wheels manufactured in a third country with a mix of components from China and another country—are covered by the orders. The trial court affirmed Commerce's Final Scope ruling in full and this Court should as well.

On appeal, Asia Wheel limits its challenge to the trial court's decision to two arguments: (1) that Commerce's Final Scope Ruling improperly mischaracterizes or misunderstands Commerce's statements in the investigation concerning mixed-origin component wheels, and (2) that Commerce did not provide Asia Wheel with adequate notice that its mixed-origin wheels could be subject to the orders prior to the date of initiation of the scope and therefore, Commerce may only impose duties starting with the date of Commerce's initiation of the scope inquiry rather than continuing CBP's prior suspension of entries as part of its EAPA investigation.

As the trial court explained in detail, neither argument is supported by the record or this Court's precedent. Commerce reasonably determined that the language of the orders was ambiguous as to Asia Wheel's mixed-origin wheels, and it reasonably determined that Asia Wheel's mixed-origin wheels were not unambiguously excluded. The conclusion of Commerce's resultant substantial transformation analysis – which Asia Wheel does not challenge on appeal – was a

finding that Asia Wheel's merchandise is covered by the orders. Commerce acted in accordance with law when it directed CBP to continue to suspend liquidation of those entries that had been subject to the covered merchandise referral prior to the initiation of the scope inquiry. Asia Wheel's arguments that it did not receive adequate notice that its merchandise might be subject to the orders finds no support in the record.

Asia Wheel's arguments on appeal do not undermine Commerce's reasoned and well-supported interpretation of the orders covering certain steel wheels 22.5 to 24.5 inch wheels and ultimately, do nothing to yield a different conclusion than that of the trial court: Commerce's Final Scope Ruling should be affirmed.

## ARGUMENT

### I.    Standard of Review

When reviewing the trial court's judgment, this Court "reappl{ies} the statutory standard of review that the Court of International Trade applied in reviewing the administrative record." *Nippon Steel v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (citation omitted.). This Court will uphold Commerce's determination unless that determination is unsupported by substantial record evidence or otherwise unlawful. *See Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). Importantly, this Court has declared that it "will not ignore the informed opinion of the {trial court}." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (cleaned up).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). A party disputing Commerce's determination as unsupported by substantial evidence thus "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006), and the Court will sustain Commerce's determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from it. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II. Commerce's Scope Determination is Lawful and Supported by Substantial Evidence

Commerce reasonably concluded that Asia Wheel's wheels—"steel wheels manufactured in Thailand from Chinese-origin discs and Thai-origin rims manufactured from steel plate from China or a Third Country"—are subject to the orders covering certain steel wheels from China. *See generally* Appx18-52; Appx25; Appx67-68.[11] It did so by determining first that the orders were ambiguous as to

---

[11] In its request for a scope ruling, Asia Wheel describes its merchandise as this way: "Asia Wheel manufactures rims in Thailand from rectangular steel plates sourced from China or a {third country} and welds the Thailand-produced rims to discs from China to assemble steel truck wheels." Appx67.

whether it covered wheels processed in a third country from a mix of one wheel component from China and one component originating from a third country. Appx25-27. Commerce then conducted a substantial transformation analysis, concluding that the processing of Asia Wheel's wheels in Thailand did not transform them into Thai-origin (rather than Chinese-origin). Appx28-42; Appx1791-1798. The trial court agreed, holding that Commerce's determination that Asia Wheel's wheels were in-scope merchandise was supported by substantial evidence and in accordance with law. Appx1-17.

On appeal, Asia Wheel only challenges a small sliver of the trial court's findings. Asia Wheel does not challenge the trial court's sustaining of Commerce's determination that the orders were ambiguous with respect to Asia Wheel's wheels, nor does it challenge Commerce's substantial transformation analysis. Instead, the entire dispute flows from Asia Wheel's disagreement with Commerce's consideration of the (k)(1) sources, specifically Commerce's statements made during the AD/CVD investigations. *See generally* Applnt. Br. at 18-29; Appx18 ("Commerce's scope determination in the original investigations—consideration of which is required under 19 C.F.R. §351.226(k)(1) – demonstrates that…").

The gravamen of Asia Wheel's argument is that during its investigations, Commerce in fact conceded that wheels completed in a third country from mixed-origin (China and another country) rims and discs are outside the scope of the orders. *See* Applnt. Br. at 18-29. And as a result, Asia Wheel concludes, there was no need for

Commerce to undertake a substantial transformation analysis of Asia Wheel's wheels because Commerce had already confirmed that only "wheels made in third countries with rims *or* discs from China (but not both) are outside the scope." Applnt. Br. at 19, 24. Not so. As we demonstrate below, Asia Wheel's arguments on appeal were correctly debunked as unsupported by the record by the trial court. This Court should do the same.

### A. Commerce Reasonably Determined that the Plain Language of the Orders Did Not Unambiguously Exclude Asia Wheel's Wheels

Consistent with the law and its own regulations, Commerce first determined that the plain language of the orders did not unambiguously exclude "finished wheels processed in a third country from a mix of one wheel component sourced from China and one component originating from a third country." Appx26 (Final Scope Ruling); Appx1787-1791 (Preliminary Scope Ruling); *see* 19 C.F.R. § 351.225(k); *see also Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1087 (Fed. Cir. 2002) ("Scope orders may be interpreted as including merchandise only if they contain language that specifically includes merchandise or may be reasonably interpreted to exclude it.").

The excerpt from the orders that addresses third party processing reads as follows:

> The scope includes rims, discs, and wheels that have been further processed in a third country, including, but not limited to, the painting of wheels from China and the welding and painting of rims and discs from China to form a steel wheel, or any other processing that would not

otherwise remove the merchandise from the scope of the Orders if performed in China.

*Orders*, 84 Fed. Reg. at 24,100.

As Commerce explained and the trial court affirmed, "{w}hile this scope language does not specifically include wheels produced from mixed-origin components, it can be reasonably interpreted to include any wheels produced from mixed-origin components that still qualify as 'steel wheels…from China,' and whose processing 'would not otherwise remove the merchandise from the scope of the investigations if performed in {China.}'" Appx7 (quoting the scope language itself). That is, Commerce identified two non-exclusive examples of third-country processing that would *not* remove certain steel wheels from the scope of the orders but left open the possibility that other forms of third-country processing could keep the wheels in scope by prefacing those examples with the phrase "including, but not limited to."[12] Appx6-7; Appx27; Appx1789.  As written, Commerce's determination that the plain

_____

[12] As the trial court explained, an interpretation of the language "the welding and painting of *rims and discs from China* to form a steel wheel" as excluding wheels produced from mixed-origin components would render meaningless the phrase "including but not limited to."  Appx7 (citing *SMA Surfaces, Inc. v. United States*, 617 F. Supp. 3d 1263, 1275 (Ct. Int'l Trade 2023)).  Treating (1) "the painting of wheels from China" and (2) "the welding and painting of rims and discs from China" as the only two possible forms of third country processing that would nevertheless leave a product within scope would entirely erase the purpose of the phrase "including but not limited to."  *C.f.*, *Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009) (rejecting interpretation of statutory language that "would violate the canon that {this Court} must 'give effect, if possible, to every clause and word of a statute' and should avoid rendering any of the statutory text meaningless or as mere surplusage.")

language of the orders leaves open other forms of third country processing beyond those two examples is supported by substantial evidence. Asia Wheel, for its part, does not seriously challenge the trial court's conclusion on this point.

### B. Commerce Reasonably Concluded that its Final Scope Memo—a (k)(1) Source—Did Not Unambiguously Exclude Asia Wheel's Merchandise

Instead, Asia Wheel focuses almost entirely on Commerce's interpretation of the scope language under the (k)(1) sources, specifically Commerce's investigation that resulted in the AD/CVD orders. *See generally* Applnt. Br. at 18-29; Appx26 ("Commerce's scope determination in the original investigations—consideration of which is required under 19 C.F.R. §351.226(k)(1) – demonstrates that…"). Asia Wheel argues that, in the AD/CVD investigations, Commerce determined that wheels completed in a third country from a mix of rims and discs from China and a third country are out-of-scope merchandise. *See* Applnt. Br. at 18-29. Asia Wheel argues that Commerce's final scope ruling improperly recharacterized its scope analysis from the investigations. *See* Applnt. Br. at 22-26.

Asia Wheel makes two main arguments: (1) that Commerce's statements on the scope of the orders in its AD and CVD investigations requires that both the rims and discs must come from China in order to be covered by the orders, Applnt. Br. at 19-26, and (2) that the scope ruling impermissibly recharacterized Commerce's final determination. Applnt. Br. at 22-26. Both arguments are meritless. Indeed, it is Asia Wheel that now seeks to rewrite history.

28

Prior to the final determinations, both petitioners and respondents suggested revisions and clarifications to the proposed scope language defining the subject merchandise. Appx77-79. The petitioners sought clarification of the scope, based on new information that came to light in December 2018, owing to concerns that importers would use third-country processing to circumvent a potential order. Appx80. The respondents were concerned that petitioners' proposed clarification would also include components from third countries. Appx78. Accordingly, Commerce revised the scope language to include petitioners' proposed third-country processing language with the addition of "from China" such that the clarification read "rims and discs from China that have been further processed in a third country into finished steel wheels." Appx79. Commerce made this decision, it explained in its final determination, because it understood petitioners "to be requesting that rims and discs from China that have been further processed in a third country into finished steel wheels be included within the scope." Appx82.

Asia Wheel exaggerates the meaning of Commerce's response to petitioners' request to modify the scope language. *See* Applnt. Br. at 22-25. By Asia Wheel's telling, when Commerce added the phrase "from China" to the proposed scope language addressing third country processing, Commerce conveyed that some other, unspecified combination of rims and discs processed in a third country would necessarily be outside the scope. Applnt. Br. at 20; *see also* Appx7 ("A nonexclusive example of third-country processing that would certainly not remove wheels from the

scope still leaves open what other types of third country processing would similarly not remove the merchandise from the scope of the investigation."). As Commerce explained and as the trial court agreed, Commerce's statements addressed scope language referring to "rims and discs from China." Appx7-8; Appx26-27. Commerce did not, at the time of the investigations, articulate how it would later, based on a substantial transformation analysis, determine whether other merchandise was outside the scope of the orders. In fact, it plainly left that determination for a future, merchandise-specific inquiry, despite pressure from interested parties to conduct a substantial transformation analysis as part of the investigation. Appx81.

Despite Asia Wheel's attempts to minimize this fact, Applnt. Br. at 20—evident from the investigation—Commerce made clear that notwithstanding the two examples of third country processing that it *did* identify, "{w}hile in some instances Commerce has relied on a substantial transformation analysis sot address country-of-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case." Appx81.

Asia Wheel demurs on this point, arguing that Commerce did not in fact make a substantive point in its interpretation of the scope language. Applnt. Br. at 21 (citing Commerce's investigations). This statement, however, only pertains to wheels made with Chinese discs and rims, and not to mixed-origin components, as the trial court held and as demonstrated by Commerce's other statements. Indeed, as the trial court held, "Commerce deferred the issue of wheels produced from mixed-origin

components and noted that further analysis would be necessary on a case-by-case basis." Appx8.

The notion that Commerce considers Chinese-origin rims and discs assembled in a third country to be in-scope is not mutually exclusive to Commerce's intention to consider mixed-origin wheels at a later time, on a case-by-case basis. In fact, it has no bearing on Asia Wheel's at all. It does not matter, as Asia Wheel shrugs off, that "Commerce *always* has the authority to conduct a scope ruling and perform a substantial transformation analysis to address a particular fact pattern." Applnt. Br. at 21 (emphasis in original). What matters is that in *this* investigation, Commerce specifically left open the question of whether wheels like those of Asia Wheel, that were processed in a third country and made of mixed origin components, could be in-scope merchandise. Accordingly, Commerce conducted a substantial transformation analysis of Asia Wheel's wheels under the residuary prong of the order: "or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in China." Appx27 ("In fact, the plain language of the scope extends to 'any other processing that would not otherwise exclude a product from the scope.'") As the trial court correctly explained, this amounted to a reasoned decision from Commerce "that during the original investigation it would not address the inclusion of wheels produced from mixed-origin components." Appx9 (citing Appx27). Commerce made plain that it "deferred the issue of wheels produced from mixed-origin components and noted that further analysis would be necessary on a

case-by-case basis." Appx8. And that is precisely what Commerce then did when presented with Asia Wheel's later request for a scope ruling on precisely those wheels.

Accordingly, Commerce reasonably determined that (k)(1) sources, *i.e.* Commerce's statements in the investigations, did not unambiguously exclude Asia Wheel's wheels from the scope of the orders.

And in any event, on appeal, Asia Wheel does not challenge the substance of Commerce's substantial transformation analysis. As the trial court correctly held, Commerce's substantial transformation analysis and its resulting conclusion that Asia Wheel's wheels remain of Chinese-origin despite their mixed origin components and third country processing is supported by substantial evidence. *See* Appx1791-1799; Appx28-42. The trial court concluded that Commerce made use of the correct, five-factor test in its assessment of the origin of Asia Wheel's wheels. Appx9-10. And, the trial court explained, Commerce's conclusion that "'the finished truck wheels Asia Wheel manufactures in its facilities in Thailand using discs from China and rims it produced in Thailand from steel plates from China or a third country are not substantially transformed such that the third-country processing confers country of origin based on the totality of the circumstances,'" Appx10-11 (quoting Appx33), describing this as "supported by substantial evidence," Appx11. Because Commerce's substantial transformation analysis was both (1) warranted and (2) correctly considered the factors to conclude that Asia Wheel's wheels remained of Chinese

origin despite their Thai-processing, this Court should affirm Commerce's Final Scope Ruling.

### III. Commerce Provided Lawful Notice that Wheels Produced in a Third Country from Mixed-Origin Components Could be Subject Merchandise

Next, Asia Wheel argues that even if this Court were to affirm Commerce's scope ruling, it should nevertheless limit which of Asia Wheel's entries are subject to duties because, Asia Wheel argues, it did not receive adequate notice that its mixed-origin wheels could be subject to the orders until Commerce formally initiated its scope inquiry on May 21, 2021, Appx195-196. Applnt. Br. at 29-43. Therefore, Asia Wheel argues, Commerce does not have the authority to impose duties on any entries entered *prior* to that initiation date. *Id.* The trial court correctly rejected this argument and this Court should affirm the trial court.

First, Asia Wheel claims that Commerce's statements in its investigations that "{w}hile in some instances Commerce has relied on a substantial transformation analysis to address country-or-origin issues, the decision to conduct such an analysis is contingent upon the facts and circumstances of a particular case," Appx81, was nothing more than the 'intent to consider' found insufficient {as fair notice} in *Tai-Ao.*" Applnt. Br. at 30-35 (citing *Tai-Ao Aluminum*, 983 F.3d at 495). Second, Asia Wheel argues that Commerce unlawfully continued CBP's suspension of liquidation when, Asia Wheel argues, CBP issued a covered merchandise referral because it could

not determine if the wheels were covered by the AD/CVD orders. Applnt. Br. at 35-43. Asia Wheel's arguments are unconvincing.

As an initial matter, Commerce's continuance of CBP's prior suspension of liquidation is consistent with its regulations, irrespective of "CBP's admission that it could not determine whether the wheels were within the scope of the *AD/CVD Orders*." Applnt. Br. at 38. When Commerce has initiated a formal scope inquiry and some subset of entries for the product in question "is already subject to suspension of liquidation, that suspension of liquidation will be continued, pending a preliminary or final scope ruling, at the cash deposit rate that would apply if the product were rules to be included within the scope of the order." 19 C.F.R. § 351.225(l)(1). Once Commerce issues a final scope ruling "to the effect that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) …will continue." 19 C.F.R. § 351.225(3).

That is exactly what happened here. CBP began suspending liquidation of Asia Wheel's entries on August 18, 2020, throughout the pendency of the EAPA investigation. Appx150. CBP did so only once it developed, as part of its EAPA investigation, a "reasonable suspicion" that "Vanguard imported steel wheels into the United States that were transshipped from China through Asia Wheel in Thailand, and should have been subject to the {AD/CVD} orders." Appx149-150. And, in responding to CBP's covered merchandise referral, Commerce explained that it had already initiated a formal scope inquiry to determine if Asia Wheel's wheels were

within scope. Appx589. Thus, it would be inconsistent with its own regulations for Commerce "to instruct CBP to terminate its prior (and retroactive) suspension of liquidation," Applnt. Br. at 38. Moreover, Asia Wheel's position ignores that CBP is a separate government agency and implemented interim measures under a different statutory authority. Suspension of liquidation of certain entries had already occurred as a result of CBP's actions pursuant to its EAPA investigation. Specifically, on August 18, 2020, CBP began to suspend those entries from under 19 U.S.C. § 1517(e)(1)-(3) once it developed, as part of its EAPA investigation into the same, a "reasonable suspicion," that "Vanguard imported steel wheels into the United States that were transshipped from China through Asia Wheel in Thailand, and should have been subject to the {AD/CVD} orders." Appx2149-150. CBP initiated its interim measures consistent with 19 U.S.C. §1517(e)(1)-(3).

Asia Wheel's arguments to the contrary are flawed in several ways. First, Asia Wheel presents an overly narrow definition of covered merchandise. Asia Wheel seems to require that CBP conclusively determine that the merchandise described in EAPA allegations are subject to an AD/CVD order before imposing duties starting at the date of the initiation of the scope inquiry. Applnt. Br. 39-41. The EAPA statutory scheme, however, is not so strict. 19 U.S.C. § 1517(b)(1) allows for initiation of an investigation where an allegation or referral "reasonably suggests that covered merchandise has been entered into the . . . United States." This language suggests that information provided in the allegation reasonably suggests that the products within

the allegation *are* covered merchandise under an AD/CVD order.  Indeed, that is

central to the purpose of EAPA: to determine whether products imported as not

subject to an AD/CVD order are actually products subject to an AD/CVD order.  *See*

*generally* 19 U.S.C. § 1517.   It would also frustrate EAPA's purpose if entries of

covered merchandise could liquidate despite a pending investigation as to whether it is

subject to an AD/CVD order and thus should be liquidated with assessment of

AD/CVD duties.  *See* 19 U.S.C. § 1517(e)(2).

Additionally, Asia Wheel's reliance on *Sunpreme Inc. v. United States*, 946 F.3d

1300 (Fed. Cir. 2020) is misplaced.  Relying on a single sentence in that opinion, Asia

Wheel argues that CBP may only suspend liquidation when it has concluded that a

product falls within ambiguous scope language and, because CBP had referred the

matter to Commerce, CBP had not made the requisite finding determination. Applnt.

Br. at 41-42, 49 (citing *Sunpreme Inc.*, 946 F.3d at 1321).  But unlike in that case, where

CBP exercised its inherent authority to collect duties, 946 F.3d at 1320-21, as

concerns Asia Wheel here, CBP suspended liquidation during its *own* EAPA

proceeding because it had found a "reasonable suspicion" of evasion. 19 U.S.C. §

1517(e); *see* Appx597.  Therefore, Asia Wheel is incorrect that in an EAPA

proceeding, CBP need not affirmatively find that a product is within the scope of an

order. *See* Applnt. Br. at 41-42.  All CBP needs is a "reasonable suspicion" of evasion,

19 U.S.C. § 1517(e), before it shall "suspend the liquidation of each unliquidated entry

of such covered merchandise that entered on or after the date of the initiation of the

{EAPA} investigation." 19 U.S.C. § 1517(e)(1). Because that is what CBP had here, Asia Wheel has no basis to collaterally attack CBP's suspension of liquidation. And in any event, this is an appeal of Commerce's Final Scope Ruling—*not* a challenge to CBP's EAPA investigation.

As Asia Wheel reiterates and the trial court agreed, however, Commerce discharges its duty under the scope regulations only if it has provided the importer with fair notice that its product can be subject to AD/CVD duties. *See* Applnt. Br. at 35-37; Appx12. That is, Commerce may only impose such a duty "to merchandise that {AD/CVD Orders} may be reasonably interpreted to include;" only then has Commerce given "adequate notice of what conduct is regulated by the order." *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1301 (Fed. Cir. 2013) (internal quotation omitted); *see* Applnt. Br. at 36-37.

But adequate notice is *not* the same as giving an importer certainty that a product will be subject to duties. *Id.* at 1301-1302; Appx12. Precisely because Commerce is required to describe merchandise subject to its orders using "general terms, 19 C.F.R. § 351.225(a), "issues arise regarding whether a product falls within the scope of an {AD or CVD order}." *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229, 1236-37 (Ct. Int'l Trade 2019).

This reality was central to the trial court's analysis of this question. In its opinion, the trial court correctly explained that "{t}he existence of some ambiguity in scope language does not mean that notice inadequate as to products requiring

37

substantial transformation to determine country of origin, as it is impractical to require Commerce to anticipate every type of third-country processing." Appx13 (discussing *Canadian Solar Inc. v. United States*, 918 F.3d 909, 921-922 (Fed. Cir. 2019)). During the investigation, Commerce expressly articulated its intention to later evaluate whether wheels that did not fit the two, non-exclusive examples of third-country processing outlined in the order might nevertheless be covered by the order. Appx13; *see also* Appx81. The scope language explicitly covers "rims and discs that have been further processed in a third country." Beyond the two examples of further processing listed, this part of the order included "any other processing that would not otherwise remove the merchandise from the scope of the orders if performed in {China}." Appx13.

Asia Wheel argues that this language alone was insufficient to provide notice that its third-country processed wheels from mixed-origin components would be subject to the order, relying on the same theory underpinning its argument challenging the Final Scope Ruling. *See* Applnt. Br. at 35-43. And, according to Asia Wheel, Commerce's statements in the investigation's Final Scope Memorandum likewise did not adequately signal that its merchandise might be subject to the orders. *Id.* By Asia Wheel's telling, Commerce's statements in the investigation concerning the types of third country-processed wheels in fact "convey{ed} that wheels produced in a third country from rims or discs from China (but not both) are outside the scope." Applnt.

Br. at 34. This illogic, the same that Asia Wheel uses to support its challenge to the scope ruling itself, is contrary to Commerce's reasoned analysis.

In response to questions (and as we explained above) about whether the scope included third country processed wheels made from rims and discs (but not both) from China, Commerce explained that it believed the language as currently written adequately addressed the parties' concerns about the risk of third country processing being used to circumvent the orders. Appx82. However, plainly Commerce left open the option for a future evaluation of wheels such as Asia Wheel's, writing that "the decision to conduct {a substantial transformation} analysis is contingent upon the facts and circumstances of a particular case." Appx81. This confirmation, the trial court correctly explained, was precisely the sort of notice that Commerce was required to provide an importer: enough to permit a "reasonable importer {to} interpret Commerce's original scope language to include the wheels at issue and where Commerce provided additional commentary noting that substantial transformation analysis would be used on a case-by-case basis." Appx14.

Asia Wheel is correct in its recitation of the general principles of notice articulated in *Tai-Ao Aluminum Co. v. United States*, 983 F.3d 487, 495 (Fed. Cir. 2020), but overstates *Tai-Ao*'s holding by asserting that Commerce's statement of intent to investigate something in the future, if prompted, is never adequate notice. Applnt. Br. at 32-34; Appx14. In *Tai-Ao*, this Court held that certain importers did not receive adequate notice that their merchandise might be subject to an anti-circumvention

inquiry on the date of initiation because Commerce's initiation of that inquiry was with respect to specific producers, and not on country-wide basis. *Tai-Ao*, 983 F.3d at 495-96. The trial court distinguished *Tai-Ao*, where "Commerce expanded the scope of its inquiry" from "the present case, where a reasonable importer could interpret Commerce's original scope language to include the wheels at issue and where Commerce provided additional commentary noting that substantial transformation analysis would be used on a case-by-case basis.[13] Appx14. Commerce provided notice to parties that their merchandise may be covered pursuant to the original investigation. Appx81; Appx14. Asia Wheel and its products were plainly identified at all points in this inquiry, from Commerce's initial investigation, CBP's EAPA proceeding begun in August 2020, CBP's referral of 2021, and the 2022 initiation notice.

---

[13] Importantly, the purpose of scope rulings and anti-circumvention proceedings are also different. In scope rulings, Commerce is tasked with determining whether a product is covered by an AD/CVD order. Anti-circumvention proceedings, however, typically involves merchandise that has been purposely modified to circumvent an existing order. *See e.g.*, 19 U.S.C. § 1677(j) (later-developed merchandise); *see Tai-Ao*, 983 F.3d at 490-491 ("AEFTC contended that 5050-grade aluminum alloy, which has between 1.1 and 1.8 percent magnesium by weight and therefore "technically meets the scope exclusion for 5xxx series," "behaves like in-scope 6xxx series subject merchandise" and thereby circumvented the Orders."). That is, with circumvention Commerce already knows that the merchandise is technically out of scope but because the differences are so minimal, Commerce correctly considers them in-scope via a circumvention inquiry.

The trial court correctly confirmed that in the present case, Commerce's statements in the Final Scope Ruling did not contradict statements made by Commerce in the investigations. *Id.* Asia Wheel's reliance on *Tai-Ao* is ultimately misplaced. Applnt. Br. at 30-35.

Although Asia Wheel discusses Commerce's authority under EAPA, Asia Wheel does not appear to seriously dispute that *had* Asia Wheel been provided with adequate notice, Commerce would have been permitted to direct CBP to continue to suspend pre-initiation but post-EAPA referral entries. The only challenge Asia Wheel actually has is to Commerce's decision is that Asia Wheel's wheels were subject to the orders. *See e.g.*, Applnt. Br. at 40. Asia Wheel writes that "the CIT has recognized that Commerce's determination of the scope overrides a contrary scope position taken by CBP. *Id.* (quoting from *Aspects Furniture Int'l Inc. v. United States*, 607 F. Supp. 3d 1246, 1267-1268 (Ct. In'l Trade 2022) in support of this proposition). But regardless of the holding of this non-binding trial court opinion, it has no relevance because Commerce *did* find Asia Wheel's wheels to be in-scope merchandise. Therefore, this scope determination does not "override{} a contrary scope position taken by CBP." *C.f.*, Applnt. Br. at 40. The only reason Asia Wheel claims Commerce should not have continued CBP's suspension of liquidation is because Asia Wheel believes its wheels were not in scope. As we have demonstrated, that position is not borne out by the record.

Finally and importantly, the trial court noted that "Commerce's commentary in Asia Wheel I, a relevant prior scope determination, provided further notice to the parties in this case." Appx13. As Commerce explained, the prior scope ruling "considered wheels much like those here: those manufactured in Thailand using discs from China and rims it produces in Thailand from steel plates sourced from China or a third country," and concerned almost identical orders. Appx13. On appeal, Asia Wheel does not address this additional form of notice. Asia Wheel's silence does not undo this additional form of notice that it received, proper under a (k)(1) analysis that among other things considers "prior scope rulings," 19 C.F.R. § 351.225(k)(1), of how Commerce would interpret third country processing in the orders. Appx14 (noting that Asia Wheel itself identified the prior scope ruling as relevant in its request for a scoping ruling on its truck wheels, and attached the Final Scope memo to its request for a scope ruling).

Because Commerce explained all this and relied on these principles in its Final Scope Ruling to show that it provided adequate notice to Asia Wheel, this Court should affirm Commerce's determination to instruct CBP to continue suspension of pre-initiation entries. Appx43-49.

## CONCLUSION

For these reasons, the judgment of the Court of International Trade should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

PATRICIA M. McCARTHY
  *Director*

*Of Counsel:*

RUSLAN KLAFEHN
  *Attorney Office of the Chief Counsel*
  *For Trade Enforcement & Compliance*
  *U.S. Department of Commerce*
  *14-01 Constitution Avenue, NW*

TARA K HOGAN
  *Assistant Director*

/s/ Isabelle Aubrun
ISABELLE AUBRUN
  *Trial Attorney/Senior Trial Counsel*
  *Commercial Litigation Branch*
  *Civil Division*
  *U.S. Department of Justice*
  *P.O. Box 480, Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 616-0465*
  *Isabelle.aubrun2@usdoj.gov*

December 15, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,681 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Isabelle Aubrun*

Isabelle Aubrun